IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| CELIA SANCHEZ and OSCAR SALAS, Statutory Death Beneficiaries of ERIK EMMANUEL SALAS-SANCHEZ | § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 3:17-cv-133 |
| MANDO KENNETH GOMEZ, ALBERTO RIVERA, PAMELA SMITH, and the CITY OF El PASO, TEXAS, | § § § § | |
| *Defendants*, | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

### INTRODUCTION

This case concerns the unjustified, brutal shooting of an unarmed young man with mental health issues who was killed in front of his mother, sister, and newborn niece in violation of his Fourth and Fourteenth Amendment rights.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over all causes of action herein pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs' claims for relief are created by 42 U.S.C §1983.

2. Venue is proper in this court under 28 U.S.C. §1391.

### PARTIES

3. Plaintiffs, CELIA SANCHEZ and OSCAR SALAS are residents of El Paso County, Texas. They are the natural parents of ERIK EMMANUEL SALAS-SANCHEZ ("Erik"), Deceased.

4. Defendant MANDO KENNETH GOMEZ was at all times herein relevant employed as a Police Officer by the City of El Paso Police Department ("EPPD"). He is being sued in his individual capacity.

5. Defendant ALBERTO RIVERA was at all times herein relevant employed as a Police Officer by the City of El Paso Police Department. He is being sued in his individual capacity.

6. Defendant PAMELA SMITH was at all times herein relevant employed as a Police Officer of the City of El Paso. She is being sued in her individual capacity.

7. Defendant CITY OF EL PASO, is a Texas municipal corporation.

8. At all times herein relevant, the individual Defendants were acting within the course and scope of their authority as employees of the City of El Paso and under color of state law and the custom and usage, patterns, and practice of the State of Texas and the City of El Paso.

**FACTUAL BACKGROUND**

I.   THE SHOOTING OF ERIK EMMANUEL SALAS-SANCHEZ

9. On April 29, 2015 Erik Salas-Sanchez was 22 years old and lived with his family at 376 Jesuit Drive in El Paso, Texas. Erik was five foot seven inches and weighed only 117 pounds.

10. Prior to and including April 29, 2015, Erik was taking an anti-depressant and had been exhibiting signs of mental health issues.

11. On April 29, 2015, Defendants Gomez and Rivera responded to a call by Luisa Yvette Romero – Erik's neighbor across the street from his house. Upon information and belief, she informed them that Erik had been present in her home unexpectedly but left. She did not tell

the officers that a burglary had occurred.  Erik was no longer present in Ms. Romero's home when the officers arrived.

12.     She also told the officers that she knew Erik and that he lived across the street. She did not want to pursue any legal action against Erik.  At no point did she inform the officers that Erik was a threat to her or her family when he was inside her home.

13.     After speaking with Ms. Romero, the officers went across the street to Erik's residence and began speaking with Erik's mother, Celia Sanchez, outside the home.

14.     While standing outside the home, the officers asked Mrs. Sanchez if Erik was her son, to which she said, "yes."  She immediately informed them that Erik had been acting strange lately and that she had attempted to find mental health services for him.  She also informed them that her son was not under the influence of any illicit drugs.

15.     Mrs. Sanchez was cooperative in answering the officers' questions and believed that the officers could provide advice as to how she could get mental health assistance for her son.

16.     At no point in this conversation did Defendant Officers inform Mrs. Sanchez that they were interested in arresting or questioning Erik.  Nor did Mrs. Sanchez indicate that Erik's mental health issues posed a threat.

17.     At some point during Defendants Gomez and Rivera's conversation with Mrs. Sanchez, Defendant Smith arrived at the home.[1]

18.     While Ms. Sanchez spoke with the officers outside her home, Erik began talking to his mother from inside the screen door.  His mother asked him to let her talk with the officers – telling him that the police were there to talk with her, not with him.

---

[1] Hereafter, Defendants Gomez, Sanchez, and Smith will be referred to as "Defendant Officers."

19. Understanding his rights, Erik began telling the officers to leave as he believed they had no right to be at his home. He did not have any weapons and did not threaten the police or anyone else, but insisted that they leave the home.

20. Defendant Officers continued to talk with Mrs. Sanchez for several minutes outside the home while Erik continued to tell them to leave.

21. After an extended period of time speaking with Mrs. Sanchez, and frustrated by Erik's insistence that they leave the home, Defendant Officers pushed Mrs. Sanchez out of the way and entered the home without consent and without a warrant.

22. Defendant Officers did not have a warrant to enter her home, nor did they have the consent of any of the residents of 376 Jesuit Drive to enter the home, nor was there any indication that Erik was a threat to themselves, himself, or others.

23. When Defendant Officers entered the home, they did not inform Mrs. Sanchez or Erik about why they were entering the home. The Officers also did not announce their intention to detain Erik or their reasons, if any, to detain Erik.

24. At the time Defendant Officers entered the home, Mrs. Sanchez's daughter, Nora Salas, was standing in the living room with her newborn infant in her arms.

25. Immediately upon entering the home, Defendants Rivera and Gomez drew their weapons on Erik. At no point did they announce their intention to arrest Erik.

26. Erik was unarmed and did not make any aggressive movements toward the Officers. There was sufficient lighting conditions in the home for Defendant Officers to observe Erik's movements.

27. Erik moved away from the officers and to the kitchen to the left of the front door. The kitchen is connected by an open entryway to the living room and back hallway. Defendant

Rivera moved to the dining area adjacent to the kitchen while Defendant Gomez stood in the living room.

28.     Though Erik had no weapon and was not threatening anyone, Defendant Rivera nevertheless attempted to tase Erik while Erik was in the kitchen and Defendant Rivera was in the dining room.

29.     The taser connected with Erik's clothing but did not make full contact with his skin.

30.     Panicked by the unexpected and unjustified use of the taser, Erik moved away from Defendant Rivera, toward the back hallway, and away from all Defendants.  Even in the face of unfounded aggression by Defendant Rivera, Erik still did not make any aggressive movements toward Defendant Officers.

31.     As Erik moved toward the back hallway with his back to Defendant Gomez, Defendant Gomez immediately shot five rounds of ammunition at Erik.  Two of the bullets entered Erik's back while one bullet entered his left buttock.  He immediately fell to the ground.

32.     Defendant Officers kicked Erik's limp body and handcuffed him.  They did not attempt any emergency resuscitation as they waited for first responders.

33.     No firearm, knife, or any other weapon was found at the scene.

34.     El Paso Fire Department officers eventually arrived at the scene and took Erik to Del Sol Medical Center where he was pronounced deceased.  His death was caused by the three bullets that were fired by Officer Gomez's gun.

35.     All Defendant Officers lacked probable cause prior to entering Plaintiffs' home. Defendant Officers had no consent from any of the residents of 376 Jesuit Drive to enter the

home when they did, and no exigent circumstances existed for them to enter the home. Their entry of 376 Jesuit Drive on the night of April 29 was not authorized.

36. Defendant Rivera tased Erik when the use of a taser was not necessary nor justified. He tased Erik when intermediate force was not authorized under EPPD policy. Defendant Rivera had no reason to believe that the use of a taser was authorized. The use of the taser was objectively unreasonable and grossly excessive.

37. Defendant Gomez shot and killed Erik when Erik posed no imminent threat of serious bodily injury or death to Defendant Gomez or others. Defendant Gomez had no reason to believe that the use of deadly force was immediately necessary, nor that there was a substantial risk that the failure to use deadly force would cause death or serious bodily injury to him or another. The use of deadly force was objectively unreasonable and grossly excessive.

38. Following the incident, members of the EPPD presented misinformation to the public. The day after the shooting death of Erik, on April 30, the EPPD issued a press release that mischaracterized the events leading to Erik's death. The press release gave the impression that Erik was in the process of burglarizing a home when he was shot. It also states that Erik was shot after he "charged at the officers" and the press release failed to mention that he was shot in his own home. The EPPD knew at the time that it issued this press release that these facts were incorrect.

39. On February 28, 2017, after an independent El Paso County Grand Jury heard testimony about the Gomez shooting of Erik, the State of Texas indicted Gomez on manslaughter charges for "recklessly caus[ing] the death of an individual, namely Eric Salas, by shooting Eric Salas in the back with a firearm. . ."

## II. THE EL PASO POLICE DEPARTMENT'S CUSTOM, POLICY, AND/OR PRACTICE OF USING EXCESSIVE FORCE.

40. The policies, practices, or customs of the EPPD constituted moving forces of the unconstitutional conduct that proximately caused Erik's death. The EPPD has a persistent and widespread practice of officers using excessive deadly or intermediate force; using excessive deadly or intermediate force against El Pasoans when they are on notice of a victim's mental health issues; and using excessive force against El Pasoans generally. These practices are so widespread that they constitute a custom that fairly represents municipal policy and are so obvious that they demonstrate the EPPD policymaker's deliberate indifference toward El Pasoans' constitutional rights.

41. The policymaker responsible for this policy, practice, or custom is Police Chief Gregory Allen. EPPD policy and City law designate him as the final authority on all matters of policy, operations, and discipline of the EPPD.

### A. USE OF DEADLY OR INTERMEDIATE FORCE

42. First, the EPPD has a persistent and widespread practice of officers using excessive deadly or intermediate force. EPPD Chief Gregory Allen has had direct knowledge of this practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

43. In the fifteen years prior to 2012, there had been at least thirty-two incidents reported in which El Paso police officers used excessive deadly force.

44. Since that time, the number has jumped. From 2012 to 2016, based on a limited data set that does not include all instances, EPPD officers utilized excessive deadly or intermediate force at least twenty-one times – fourteen of which resulted in deaths.

45. These rates are consistently higher than national rates.

46. In 2015 alone, the per-capita rate of residents who died after being shot by EPPD officers was 90% higher than the national rate.[2]

47. From 2012 to 2016, 50% percent of total deaths in EPPD custody involved unarmed victims.

48. The percentage of residents shot and killed by EPPD officers involving unarmed victims in 2015 was 50% higher than the national percentage for the same year.  In 2016, the percentage of residents shot by EPPD officers involving unarmed victims was over 250% higher than the national rate.

49. Moreover, of the shooting deaths reported by the EPPD to the Texas Attorney General between 2012 and 2016, the Department classified all but one as a "Justified Homicide" with one classified as "Other Homicide."  None of the shootings, including those involving unarmed victims, were classified as "Unjustified Homicide."  When the EPPD refuses to classify any officer-involved shootings as an "Unjustified Homicide," the Department fails to hold officers accountable for discharging their firearms – thereby creating a culture where officers use excessive deadly force with impunity.

    B.    <u>USE OF DEADLY OR INTERMEDIATE FORCE WHEN OFFICERS ARE ON NOTICE OF VICTIM'S MENTAL ILLNESS.</u>

50. Second, the EPPD also has a persistent, widespread practice of using excessive deadly or intermediate force when officers are on notice that the victim is exhibiting signs of mental illness.  This practice is so common and widespread as to constitute a custom that fairly represents municipal policy.  EPPD Chief Gregory Allen has had direct knowledge of this practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

---

[2] No reliable comparative national rate exists prior to 2015.  The federal government has failed to maintain an accurate collective database of people killed by law enforcement at the national level.

51. From 2012 to 2016, close to 57% of persons who died while in EPPD custody exhibited signs of mental illness and the police were on notice of those signs.

52. In 2015, over 66% of the residents shot and killed by EPPD officers exhibited signs of mental illness visible to officers prior to their deaths.  Nationwide, only about 26% of victims shot and killed by the police in 2015 exhibited signs of mental illness visible to the police prior to their deaths.

53. In 2016, 100% of the residents shot and killed by EPPD officers exhibited signs of mental illness visible to officers prior to their death.  This rate was close to 300% greater than the national average of 25% for the same year.

54. Examples of these deaths show a pattern by which officers consistently escalate situations where they are on notice of mental health issues rather than de-escalating the situation, thereby triggering the use of excessive deadly or intermediate force.

55. On March 8, 2013, officers arrested Daniel Rodrigo Saenz after receiving reports that he was acting strangely and threatening people.  Officers were aware when called out that he had been at a mental health facility.  After his arrest, in police custody, outside the local jail, unarmed, and while handcuffed behind his back, officers started dragging Saenz on the ground to take him to a medical facility for treatment of injuries.  As they dragged him, he started to resist.  An officer pulled out his gun and shot Mr. Saenz who died shortly thereafter as a result of the gunshot wounds.  An independent arbitrator later found that the officer violated use-of-force policies.

56. In October of 2013, police responded to a call that person was screaming outside a motel.  When they arrived, they found Fernando Gomez, also known as Mercedes Demarco,

unarmed outside the motel and screaming for help. The officers immediately tasered Ms. Demarco who allegedly died in the squad car shortly thereafter.

57. On May 21, 2015, officers received a 911 call reporting that a man was very distraught, crying, and threatening to kill himself. Officers arrived and saw that David Alejandro Gandara did not have a weapon. They immediately yelled at him to stop. When he continued walking, the officers fired six shots at him, killing him on the scene.

58. On June 23, 2015, officers received a 911 call from Daniel Ramirez's parents concerned that he was exhibiting suicidal tendencies. The EPPD had prior knowledge of Ramirez's mental health issues. Numerous officers arrived at the house and entered the backyard. Upon entry into the backyard, they found Ramirez, unarmed, attempting to hang himself from a basketball net. Rather than pulling him down from the noose, the officers immediately tased him. Mr. Ramirez died shortly thereafter.

59. On April 16, 2016, El Paso Police Officers received a telephone call from a distressed Eric Wilson. Wilson had a rapport with the EPPD from previous calls related to his mental health. They were aware he was suffering from a mental illness. Nonetheless, five police officers arrived at his home to find him walking back and forth in front of his residence. The officers ordered Wilson to show his hands. According to reports, Wilson held up a cell phone in his hand in flashlight mode. The officers shot several rounds at him which caused his death after another eight excruciating hours.

60. On May 9, 2016, Arthur Williams' mother called the police and the police had notice of his mental health issues. Officers arrived and spoke with his mother, who was outside the house. Williams' mother asked him to leave the house and speak with the officers. Williams

exited the house holding a toy BB gun and was immediately shot multiple times by several officers.

61. Several other events involving the use of intermediate force in 2015 and 2016 that did not result in death also show a custom and practice of officers escalating the use of force when confronted with situations involving victims with disabilities. For example, Jose Angel Acevedo alleged excessive use of force involving his arrest on August 11, 2015. According to his report, Acevedo's wife called 911 so that emergency responders could take him to the hospital because he was in emotional distress. The responding officers entered Acevedo's residence without permission, probable cause, or exigent circumstances. The officers allegedly beat Acevedo, threw him to the ground, and held him in a choke hold while he repeatedly told them that he was unable to breath. The officers also allegedly tased him several times.

62. On December 6, 2015, Javier Ortega suffered a seizure while driving and crashed his vehicle into a rock wall. Mr. Ortega was unarmed. Allegedly, responding officers -- rather than treating him -- allegedly tased him multiple times and beat him with a police baton. Upon information and belief, none of the officers involved in this incident were terminated or suspended.

63. On November 5, 2016, officers received a call reporting a possible suicide in progress. When the officers arrived, Francisco Ramirez was allegedly holding a knife. Rather than de-escalating the situation, officers immediately drew their weapons and shot Mr. Ramirez -- who was injured but not killed from the attack.

64. Each of these incidences shows a pattern of the police, when called to help with or on notice of a victim's mental health issues, to use excessive force to subdue the victim rather than utilizing alternative means to de-escalate the situation.

C. USE OF EXCESSIVE FORCE IN GENERAL

65. A limited review of citizen complaints between 2014 and 2016 show a high rate of excessive force complaints reported by citizens against officers.  EPPD Chief Gregory Allen has had direct knowledge of this practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

66. Public data regarding Citizen Complaints is extremely limited because the City has obfuscated efforts to obtain this information publicly.

67. In response to a citizen request for public documents related to allegations of excessive use of force in August 2016, the City -- after five months -- only produced a fraction of the documents requested.  The initial requests sought Citizen Complaint Forms and related information as well as "Blue Team" and "IA Pro" reports.  The "Blue Team" and "IA Pro" software has previously been touted as new software that warehouses excessive force allegations and allows the department to "identify patterns of concern early on so that proactive action can be taken."  However, when asked for these documents, Defendant City claimed that this software does no such thing.

68. After limiting the search, the City was only asked to provide citizen complaint information for a twenty-four month period.  The City only provided sixteen months worth of data and, of that data, the City did not fully produce incident information for almost 60% of the approximately 167 citizen complaint incidents allegedly reported in that period.  This lack of documentation makes it difficult to assess the factual basis of each complaint.

69. There is also reason to believe that the 167 incidents is a drastic underreporting of actual incidents in the sixteen month period.  In its 2014 Annual Report, the Department stated that it had investigated 1,296 citizen complaints in that year.  It seems unlikely that the following

16 months would only see 167 complaints -- under 13% of the number of complaints investigated in 2014.

70.     The lack of willingness to produce this information makes it difficult to conduct a comparative analysis of the City's excessive force complaints.

71.     Nonetheless, based on the limited data provided, it is possible to identify a trend of comparatively high reports of excessive force among the El Paso Police Department.  Of the data provided, at least 20-27% of the Citizen Complaints involved officers' excessive force.  If this same percentage is applied to the reported 1,296 citizen complaints in 2014, it is reasonable to assume that between 259-349 complaints of excessive force were reported by officers in that year.  This number is high considering the size of the El Paso Police Department -- approximately 1,000 officers -- as it correlates to a rate of 25.9 to 34.9 citizen complaints of excessive force per officer.  The national average for such complaints is only 6.6 complaints per officer.

## CLAIMS FOR RELIEF

### EXCESSIVE FORCE

72.     Defendants Gomez, Smith, and Rivera, acting under color of state law, deprived Erik and Plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution by intentionally entering Plaintiffs' home without warrant or probable cause, and under no exigent circumstances.  Defendants Gomez and Rivera, acting under color of state law, deprived Erik of his rights under the Fourth Amendment and Fourteenth Amendment of the United States Constitution by intentionally using an objectively unreasonable and excessive amount of force.

73.     These acts deprived Erik of his clearly established and well-settled constitutional rights under the Fourth and Fourteenth amendments and in violation of 42 U.S.C. §1983.  This violation proximately caused Erik's death for which Defendants Gomez, Smith, and Rivera are liable.

## MONELL

74.     On information and belief, Defendant City of El Paso -- through the decisions of its policymaker Police Chief Gregory Allen -- encouraged the aforementioned misconduct, which proximately caused the damage to Plaintiffs, by:

- A) maintaining a policy or custom of encouraging excessive force by officers that is so common and widespread as to constitute a custom that fairly represents municipal policy;

- B) maintaining a policy or custom of encouraging or tolerating officers' failure to avoid the use of deadly force against individuals when the officer is not at risk of imminent serious bodily injury or death;

- C) maintaining a policy or custom of encouraging excessive force by officers when the officer is on notice of a victim's mental health problems that is so common and widespread as to constitute a custom that fairly represents municipal policy;

- D) failing to properly train, supervise, or discipline members of the El Paso Police Department, including Defendants Gomez, Rivera, and Smith, not to use deadly force against an individual who does not place the officer or another at risk of imminent serious bodily injury or death;

E) failing to properly train, supervise, or discipline members of the El Paso Police Department, including Defendants Gomez, Rivera, and Smith, to de-escalate incidents where their officers have notice and knowledge that the person for whom they are called has a mental illness;

F) failing to institute proper procedures to ensure that EPPD officers de-escalate situations in which it is known that an unarmed resident has a mental illness;

G) failing to classify <u>any</u> officer-involved shootings as unjustified – particularly those involving unarmed victims; and

H) failing to pursue criminal or disciplinary charges or support criminal or disciplinary action against officers, including Gomez, Rivera, and Smith, who have deprived citizens and residents of El Paso of their constitutional rights.

75. The aforementioned customs, policies, practices, and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of the City of El Paso were adopted with deliberate indifference to the constitutional rights of citizens.

76. The aforementioned customs, policies, practices, and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of the City of El Paso were a moving force and/or a proximate cause of the deprivations of Erik's clearly established and well settled constitutional rights under the Fourth amendment in violation of 42 U.S.C. §1983.

### COMPENSATORY DAMAGES

77. Because of Defendants actions, Plaintiffs are entitled to compensatory damages for their past and future pecuniary loss, past and future loss of companionship and society, past and future mental anguish, and all other compensatory damages to which they may be entitled.

### EXEMPLARY DAMAGES

78. The shooting of Erik was acted willfully, deliberately, maliciously and with reckless disregard of the rights of Erik entitling Plaintiffs to punitive damages.

### ATTORNEY FEES

79. Plaintiffs are entitled to recover his attorney fees and costs necessary to enforce his rights pursuant to 42 U.S.C. § 1988.

### JURY TRIAL

80. Plaintiffs demand trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays that this Court grant the following relief:

A. Award Plaintiffs compensatory damages for the acts described above;

B. Award Plaintiffs punitive damages against Defendant Officers;

C. Enter a finding that Plaintiffs are the prevailing party in this case and award attorney fees, litigation costs and expenses plus pre-trial and post-trial interest against Defendants pursuant to 42 U.S.C. § 1988; and

D. Grant such other and further relief in law or in equity to which Plaintiffs may be entitled.

Dated: April 28, 2017

Respectfully submitted,

THE LAW OFFICES OF ENRIQUE MORENO
701 Magoffin Avenue
El Paso, Texas 79901
(915) 533-9977
FAX (915) 533-0033

By: *__/s/Enrique Moreno*
ENRIQUE MORENO
State Bar No.: 14430500
emoreno@morenolaw.us

-AND-

THE LAW OFFICE OF LYNN COYLE, PLLC
2515 North Stanton Street
El Paso, Texas 79902
(915) 532-5544
Fax (915) 532-5566

By: ___/s/ Lynn Coyle
LYNN COYLE
Texas Bar No. 24050049
lynn@coylefirm.com
CHRISTOPHER BENOIT
Texas Bar No. 24068653
chris@coylefirm.com

***Attorneys for Plaintiff***