**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **CELIA SANCHEZ and OSCAR SALAS, Statutory Death Beneficiaries of ERIK EMMANUEL SALAS-SANCHEZ** | § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | **CIVIL ACTION NO. 3:17-CV-133-PRM** |
| **MANDO KENNETH GOMEZ, ALBERTO RIVERA, PAMELA SMITH, and the CITY OF El PASO, TEXAS,** | § § § § | |
| *Defendants*, | § | **JURY TRIAL DEMANDED** |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

### INTRODUCTION

This case concerns the unjustified, brutal shooting of an unarmed young man with mental health issues who was killed in front of his mother, sister, and newborn niece in violation of his Fourth and Fourteenth Amendment rights.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over all causes of action herein pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs' claims for relief are created by 42 U.S.C §1983.

2. Venue is proper in this court under 28 U.S.C. §1391.

### PARTIES

3. Plaintiffs, CELIA SANCHEZ and OSCAR SALAS are residents of El Paso County, Texas. They are the natural parents of ERIK EMMANUEL SALAS-SANCHEZ ("Erik"), Deceased.

4.      Defendant MANDO KENNETH GOMEZ was at all times herein relevant employed as a Police Officer by the City of El Paso Police Department ("EPPD"). He is being sued in his individual capacity.

5.      Defendant ALBERTO RIVERA was at all times herein relevant employed as a Police Officer by the City of El Paso Police Department. He is being sued in his individual capacity.

6.      Defendant PAMELA SMITH was at all times herein relevant employed as a Police Officer of the City of El Paso.  She is being sued in her individual capacity.

7.      Defendant CITY OF EL PASO, is a Texas municipal corporation.

8.      At all times herein relevant, the individual Defendants were acting within the course and scope of their authority as employees of the City of El Paso and under color of state law and the custom and usage, patterns, and practice of the State of Texas and the City of El Paso.

#### FACTUAL BACKGROUND

### I.      THE SHOOTING OF ERIK EMMANUEL SALAS-SANCHEZ

9.      On April 29, 2015 Erik Salas-Sanchez was 22 years old and lived with his family at 376 Jesuit Drive in El Paso, Texas.  Erik was five foot seven inches and weighed only 117 pounds.

10.     Prior to and including April 29, 2015, Erik was taking an anti-depressant and had been exhibiting signs of mental health issues.

11.     On April 29, 2015, Defendants Gomez and Rivera responded to a call by Luisa Yvette Romero – Erik's neighbor across the street from his house.  Upon information and belief, she informed them that Erik had been present in her home unexpectedly but left.  She did not tell

the officers that a burglary had occurred.  Erik was no longer present in Ms. Romero's home when the officers arrived.

12.     She also told the officers that she knew Erik and that he lived across the street. She did not want to pursue any legal action against Erik.  At no point did she inform the officers that Erik was a threat to her or her family when he was inside her home.

13.     After speaking with Ms. Romero, the officers went across the street to Erik's residence and began speaking with Erik's mother, Celia Sanchez, outside the home.

14.     While standing outside the home, the officers asked Mrs. Sanchez if Erik was her son, to which she said, "yes."  She immediately informed them that Erik had been acting strange lately and that she had attempted to find mental health services for him.  She also informed them that her son was not under the influence of any illicit drugs.

15.     Mrs. Sanchez was cooperative in answering the officers' questions and believed that the officers could provide advice as to how she could get mental health assistance for her son.

16.     At no point in this conversation did Defendant Officers inform Mrs. Sanchez that they were interested in arresting or questioning Erik.  Nor did Mrs. Sanchez indicate that Erik's mental health issues posed a threat.

17.     At some point during Defendants Gomez and Rivera's conversation with Mrs. Sanchez, Defendant Smith arrived at the home.[1]  All three Defendant Officers knew that Mrs. Sanchez was seeking mental health assistance for her son and that Mrs. Sanchez did not believe that her son posed a threat to anyone.

---

[1] Hereafter, Defendants Gomez, Sanchez, and Smith will be referred to as "Defendant Officers."

18.     While Mrs. Sanchez spoke with the officers outside her home, Erik began talking to his mother from inside the screen door.  His mother asked him to let her talk with the officers – telling him that the police were there to talk with her, not with him.

19.     Understanding his rights, Erik began telling the officers to leave as he believed they had no right to be at his home.  He did not have any weapons and did not threaten the police or anyone else, but insisted that they leave the home.

20.     Defendant Officers continued to talk with Mrs. Sanchez for several minutes outside the home while Erik remained in the home and continued to tell them to leave.

21.     After an extended period of time speaking with Mrs. Sanchez, and frustrated and angered by Erik's insistence that they leave the home, Defendant Officers pushed Mrs. Sanchez out of the way and entered the home without consent and without a warrant.

22.     Defendant Officers did not have a warrant to enter her home, nor did they have the consent of any of the residents of 376 Jesuit Drive to enter the home, nor was there any indication that Erik posed a substantial risk of harm or an immediate threat to the Defendant Officers, himself, Mrs. Sanchez or others.  The Defendant Officers did not have probable cause to enter the home for any purpose including for the purpose of effectuating an emergency detention.  No exigent circumstances were presented that justified the Defendant Officers entering the home.  No facts were presented to the officers that provided probable cause to seize Erik.

23.     When Defendant Officers entered the home, they did not inform Mrs. Sanchez or Erik about why they were entering the home.  The Officers also did not announce their intention to detain Erik or their reasons, if any, to detain Erik.  Erik did not engage in any conduct that provided the Defendant Officers probable cause to detain him.

24.     At the time Defendant Officers entered the home, Mrs. Sanchez's daughter, Nora Salas, was standing in the living room with her newborn infant in her arms.

25.     Immediately upon entering the home, Defendants Rivera and Gomez drew their weapons on Erik.  At no point did they announce their intention to arrest  or detain Erik.

26.     Erik had no weapon and did not make any aggressive movements toward the Officers or anyone else.  Erik was not engaged in any conduct in violation of the law and did not demonstrate any intent to engage in any behavior in violation of the law.  There was sufficient lighting conditions in the home for Defendant Officers to observe Erik's movements.

27.     Erik moved away from the officers and his family members to the kitchen to the left of the front door.  The kitchen is connected by an open entryway to the living room and back hallway.  Defendant Rivera moved to the dining area adjacent to the kitchen while Defendant Gomez stood in the living room.

28.     Though Erik had no weapon and was not threatening anyone, Defendant Rivera nevertheless deployed his taser on Erik while Erik was in the kitchen and Defendant Rivera was in the dining room.

29.     The taser connected with Erik's clothing and made contact with his skin.  Under the section entitled "Description of Blunt Force Injuries," of Erik's autopsy report, two red abrasions are described on Erik's right elbow.  Upon information and belief, Defendant Rivera caused these injuries when he tased Erik.

30.     Panicked by the unexpected and unjustified use of the taser, Erik moved away from Defendant Rivera, toward the back hallway, and away from all Defendants.  Even in the face of unfounded aggression by Defendant Rivera, Erik still did not make any aggressive movements toward Defendant Officers.

31.     As Erik moved toward the back hallway with his back to Defendant Gomez, Defendant Gomez immediately shot five rounds of ammunition at Erik.  Two of the bullets entered Erik's back while one bullet entered his left buttock.  He immediately fell to the ground.

32.     Defendant Officers kicked Erik's limp body and handcuffed him.  They did not attempt any emergency resuscitation as they waited for first responders.

33.     No firearm, knife, or any other weapon was found at the scene.

34.     El Paso Fire Department officers eventually arrived at the scene and took Erik to Del Sol Medical Center where he was pronounced deceased.  His death was caused by the three bullets that were fired by Officer Gomez's gun.

35.     All Defendant Officers lacked probable cause prior to entering Plaintiffs' home. Defendant Officers had no consent from any of the residents of 376 Jesuit Drive to enter the home when they did, and no exigent circumstances existed for them to enter the home.  Their entry of 376 Jesuit Drive on the night of April 29 was not authorized.

36.     Defendant Rivera tased Erik when the use of a taser was not necessary nor justified.  Erik posed no threat to the Defendant Officers or anyone else, did not have a weapon and was moving away from the officers when Defendant Rivera discharged the taser.  The officers had no reasonable basis to lawfully seize Erik.  Moreover, Rivera tased Erik when intermediate force was not authorized under EPPD policy.  EPPD policy provides that the use of a taser is a "Level 4" use of force only authorized to control active aggression or defensive resistance when other lesser means have failed or where the officer reasonably believes lesser means would be clearly ineffective.  Erik was not engaged in active aggression or defensive resistance, but rather was lawfully exercising his right to tell the officers to leave his home. Rivera used a taser when its use was not objectively reasonable to defend himself, defend others,

or overcome resistance.  Defendant Rivera had no reason to believe that the use of a taser was authorized or that lesser means would be clearly ineffective.  The use of the taser was objectively unreasonable and grossly excessive.  No reasonable officer would believe that what Officer Rivera did was right.

37.     Defendant Gomez shot and killed Erik when Erik posed no imminent threat of serious bodily injury or death to Defendant Gomez or others.  Defendant Gomez had no reason to believe that the use of deadly force was immediately necessary, nor that there was a substantial risk that the failure to use deadly force would cause death or serious bodily injury to him or another.  The use of deadly force was objectively unreasonable and grossly excessive.  No reasonable officer would believe that what Officer Gomez did was right.

38.      Following the incident, members of the EPPD presented misinformation to the public.  Within hours of the shooting death of Erik, on April 30, the EPPD issued a press release that mischaracterized the events leading to Erik's death.  The press release gave the impression that Erik was in the process of burglarizing a home when he was shot.  It also states that Erik was shot after he "charged at the officers" and the press release failed to mention that he was shot in the back in his own home.  The EPPD knew at the time that it issued this press release that these facts were incorrect.

39.     On February 28, 2017, after an independent El Paso County Grand Jury heard testimony about the Gomez shooting of Erik, the State of Texas indicted Gomez on manslaughter charges for "recklessly caus[ing] the death of an individual, namely Eric Salas, by shooting Eric Salas in the back with a firearm. . ."

## II. THE EL PASO POLICE DEPARTMENT'S CUSTOM, POLICY, AND/OR PRACTICE OF USING EXCESSIVE FORCE.

40.     The policies, practices, and/or customs of the EPPD constituted moving forces of the unconstitutional conduct that proximately caused Erik's death.  EPPD fails to discipline officers who use excessive deadly or intermediate force against El Pasoans in general and when they are on notice of a victim's mental health crisis.  EPPD fails to properly train officers.  EPPD has failed to implement effective procedures governing how officers should respond to mental health crises.  All of these policies were the moving force of the constitutional violations that resulted in Erik's death.

41.     The EPPD also has a persistent and widespread practice of officers using excessive deadly or intermediate force; using excessive deadly or intermediate force against El Pasoans when they are on notice of a victim's mental health issues; and using excessive force against El Pasoans generally.  These practices are so widespread that they constitute a custom that fairly represents municipal policy and are so obvious that they demonstrate the EPPD policymaker's deliberate indifference toward El Pasoans' constitutional rights.

42.     The policymaker responsible for all policies, practice, or customs listed below is Police Chief Gregory Allen.  Chief Allen is a decision-maker who possesses final authority to establish municipal policy with respect to the actions of the EPPD.  EPPD policy and City law designate him as the final authority on all matters of policy, operations, and discipline of the EPPD.

### A.     EPPD'S FAILURE TO DISCIPLINE OFFICERS FOR USE OF EXCESSIVE FORCE.

43.     First, the City has a policy of failure to discipline or investigate cases involving excessive deadly force.  Discipline of all officers for any citizen complaint is the decision of the

policymaker, Chief Gregory Allen.  He makes these decisions with the recommendation of a Disciplinary Review Board (DRB).

44.     The DRB takes action by a majority vote on whether or not to find that an officer's actions are outside policy and the sanction to apply.

45.     All decisions by the DRB are subject to the discretion of Chief Allen who may reverse or mitigate discipline as he sees fit.

46.     The DRB is comprised of officers and a few civilians.  At times over the last ten years, the DRB has had no civilian members at all.  At most, the DRB had two to three civilian members – which was nowhere near close to enough to sway the Board's decisions.  The makeup of the DRB ensures that officers will always comprise a majority of its members creating a built in bias in favor of the officers.

47.     This make-up and Chief Allen's overriding authority has resulted in an atmosphere in which officers accused of excessive force almost uniformly do not face sanctions.  Upon information and belief, of the cases brought to the DRB from 2012 to 2016, less than 10% of those cases resulted in any action by the DRB against the officer.  Of that 10%, nearly every officer in question only received counseling, including those found to have engaged in excessive force, as a consequence for their actions – which does not go on their disciplinary review card.

48.     Chief Allen also regularly mitigates discipline against officers engaged in the excessive use of force contrary to the recommendation of the DRBs.

49.     Chief Allen has continued to implement a DRB where membership consistently comprises a majority of law enforcement officers knowing that this composition leads to less accountability for officers engaged in the excessive use of force.  A DRB with a majority of

civilian members not on EPPD payroll would ensure the independence of the DRB and reduce impunity for officers involved in excessive force incidents.

50.     By maintaining a DRB that lacks independence, EPPD's disciplinary policy allows officers to use excessive force and to specifically use excessive intermediate and deadly force where officers are on notice of a victim's mental illness without suffering any disciplinary action.  The DRB stands in stark contrast to other well-known models where there is more independent and meaningful oversight of police conduct because the review boards do not include members who work for law enforcement agencies, such as the Independent Police Oversight Board in Houston.

51.     Chief Allen's failure to properly discipline officers engaged in excessive use of force is obvious and has caused the disproportionately high incidents of excessive use of force and excessive use of intermediate and deadly force when officers are on notice of mental illness described in, *infra,* Sections II(D, E, F).  Specifically, this failure to discipline actually caused the excessive use of intermediate and deadly force against Erik.  Chief Allen persisted in his failure to discipline his officers for excessive use of force and excessive use of intermediate and deadly force in situations involving persons with mental illness, in knowing disregard that such a failure presents an obvious risk that constitutional violations will occur.   For these specific reasons, this failure to discipline was the moving force that caused the constitutional violation at issue.

52.     In the case of Erik's death, despite scathing dissent from civilian members of the DRB, the officers moved to not punish Mando Kenneth Gomez.  Smith and Rivera were never subject to the DRB.

53.     Second, the Department has a policy of finding all homicides by EPPD as "Justified." Of the shooting deaths reported by the EPPD to the Texas Attorney General between 2012 and 2016, the Department classified all but one as a "Justified Homicide" with one classified as "Other Homicide." None of the shootings, including those involving unarmed victims, were classified as "Unjustified Homicide." Decisions to consider EPPD shooting deaths as "Justified" or "Unjustified" are made solely by Chief Allen. Decisions to discipline, or not discipline, all officers are also made solely by Chief Allen.

54.     When the EPPD refuses to classify any officer-involved shootings as an "Unjustified Homicide," the Department fails to hold officers accountable for discharging their firearms – thereby creating a culture where officers use excessive deadly force with impunity. This policy inflicts injury, such as the shooting death of Erik.

55.     Like all other shootings between 2012 and 2016, the shooting death of Erik Salas Sanchez was found to be "Justified" by the EPPD. Therefore, Chief Allen's failure to discipline officers as described above, and to classify shooting deaths as "Justified," are moving forces behind the constitutional violations that led to the shooting of Erik Salas Sanchez.

B.      EPPD'S FAILURE TO TRAIN OFFICERS ON RESPONDING TO MENTAL HEALTH CRISES.

56.     EPPD has routinely failed to train its officers on how to make first contact with victims of mental health crises, and how to follow procedures to ensure the safety of victims of mental health crises. EPPD failed to train its officers on responding to a victim of a mental health crisis in ways that de-escalate, rather than escalate the potential confrontation that EPPD officers might have with these victims.

57.     EPPD has failed to train officers on the steps needed to minimize the use of deadly or intermediate force when responding to a person with an obvious mental health crisis.

EPPD has also failed to train officers on how to respond to crisis intervention calls for persons with mental health crises and how to use verbal de-escalation skills.  Adequate mental health training and communication skills are completely different than standard patrol officer training.  Situations involving mentally ill persons require a greater degree of patience and with proper training officers are trained not to let the pressure of time be a factor in their decision-making.

58.    The scope and content of EPPD training in this time period is ultimately decided by the policymaker Chief Allen.  He has had direct knowledge of this training failure and has been deliberately indifferent to its consequences- officers forcing their way into homes without probable cause and using excessive force against persons experiencing a mental health crisis.

59.    This failure to train has caused officers to routinely respond to mental health crises using deadly or intermediate force to escalate the situation – actions that routinely result in excessive use of intermediate and deadly force including, but not limited to, the incidents described in, *infra,* Sections Sections II(D, E, F).  Defendant Officers were responding to a call where Erik was suffering a mental health crisis.  They entered his home without authority and exercised unauthorized intermediate and deadly force because they were not properly trained on how to respond to these situations.  Therefore, this failure to train is a direct cause in the unlawful entry into Erik's home and the unlawful use of intermediate and deadly force against Erik.  Chief Allen has knowledge of this failure to provide mental health training and knows that his actions create an obvious consequence of the risk that excessive intermediate and deadly force will be utilized yet disregards this known risk.  For these reasons, such a policy provides the moving force behind the constitutional violations that led to the shooting of Erik Salas Sanchez.

C.      EPPD'S FAILURE TO INSTITUTE DE-ESCALATION PROCEDURES FOR MENTAL HEALTH CRISES.

60.     EPPD has failed to institute procedures to ensure that when officers deal with persons in mental health crises, that they respond in a way that de-escalates, rather than escalates, encounters with those persons.

61.     Police departments throughout the country – recognizing the increased number of dispatches by officers that are caused by persons in mental health crises – have successfully implemented mental health units and crisis intervention response teams that ensure that mental health professionals or officers trained in mental  health issues and appropriate de-escalation techniques and communication tactics make the first contact with persons in mental health crises. Departments and sheriff's offices covering almost every major city in the country have crisis intervention teams as described herein.  In Texas, police departments and sheriff's offices covering Dallas, Houston, Austin, and San Antonio have all implemented crisis intervention teams.  *See, e.g.,* The City of Houston, *Police Department Mental Health Division,* available at https://www.houstontx.gov/police/divisions/mental_health (last accessed June 6, 2017); Travis County   Sheriff's   Office*,   Crisis   Resolution   Teams*,   available   at http://www.tcsheriff.org/departments/law-enforcement/central/crt (last accessed June 6, 2017); Christina Rosales, *Team handles crisis that Dallas law enforcement can't solve,* The Dallas Morning   News,   May   19,   2014,   available   at https://www.dallasnews.com/news/news/2014/05/19/team-handles-crises-that-dallas-law-enforcement-cant-solve (last accessed June 6, 2017).[2]

---

[2] *See also* Meg Kissinger, *Houston's solution to mental health problems offers a case study for Milwaukee,* June 8, 2013, available at http://archive.jsonline.com/news/milwaukee/houstons-solution-to-mental-health-system-problems-offers-a-case-study-for-milwaukee-b9928490z1-210715811.html, (last accessed June 6, 2017) (describing the history of Houston's Mental Health Unit).

62.     These procedures also regularly ensure that dispatch personnel and officers first contact with individuals who may be in a mental health crisis are able to screen potential incidents for mental health crises that may require the use of a crisis intervention response team.

63.     The implementation of these policies in Houston, for example, has resulted in a 57% decrease in the likelihood that officers would use guns during a mental health crisis. Anthony L. Colucci, JohnPatrick McCleary, and Yan Jie Ng, *Mathematical Methods in the Social Sciences: Houston Texas Police Department Project on Officer-Involved Shooting,* Northwestern University, June 4, 2014, at p. 86, available at http://www.houstontx.gov/police/department_reports/ois/HPDThesis.pdf (last accessed June 4, 2016).  In Albuquerque, the implementation of CIT in the Police Department decreased the use of SWAT teams by 58%.   Melissa Reuland, Matthew Schwarzfeld, Laura Draper, *Law Enforcement Responses to People with Mental Illnesses: A Guide to Research-Inforced Policy and Practice,* Council of State Governments Justice Center, at p. 12 (2009), available at https://csgjusticecenter.org/wp-content/uploads/2012/12/le-research.pdf.

64.     Although he is aware of these initiatives, EPPD's policy maker, Chief Allen, has refused to implement any comparable policy to de-escalate calls where police have clear notice that a person is having a mental health crisis.  The failure to implement these procedures ensures that responding officers respond to mental health crises without the ability to de-escalate the crisis non-violently.  He has full knowledge of the importance of these procedures and has been deliberately indifferent to the consequences of failure to implement these procedures.

65.     The failure to implement these procedures has caused the disproportionately high incidents of excessive use of force and excessive use of force when officers are on notice of a mental health crisis as described in, *infra,* Sections II(D, E, F).  Chief Allen with full knowledge

of his failure to implement the procedures described above and the inadequacy so likely to result in the violation of constitutional rights nevertheless proceeded with deliberate indifference to the consequences of that failure.

66.     The failure to implement these procedures was also an actual cause in the constitutional violations that resulted in Erik's death. By the time officers talked with Erik's mother and learned of her plea for mental health support for Erik, neither the officers nor Erik's family were in danger.  If the EPPD had a proper crisis intervention response team, the officers would have not entered the home without authority and would have avoided the need to use their weapons.  The Defendant Officers would have called in a mental health professional or an officer properly trained in mental health issues, appropriate de-escalation and communication tactics to address Plaintiffs' family's needs with regard to Erik.

67.     Similarly, a similar crisis intervention response team would have reduced the likelihood that officers resorted to excessive force in the incidents described in, *infra,* Sections II(D, E, F).  Therefore, EPPD's failure to institute de-escalation procedures is a direct cause of the constitutional violations that led to the shooting of Erik Salas Sanchez.  Chief Allen had knowledge that the need for de-escalation training is so obvious that the inadequacy is likely to lead to the constitutional violations that took place with Eirk and for this reason he acted with deliberate indifference.

D.     USE OF DEADLY OR INTERMEDIATE FORCE

68.     The above-mentioned policies have created a persistent and widespread practice of officers using excessive deadly or intermediate force.  EPPD Chief Gregory Allen has had direct knowledge of this practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

69.     In the fifteen years prior to 2012, there had been at least thirty-two incidents reported in which El Paso police officers used excessive deadly force.

70.     Since that time, the number has jumped.  From 2012 to 2016, based on a limited data set that does not include all instances, EPPD officers utilized excessive deadly or intermediate force at least twenty-one times – fourteen of which resulted in deaths.

71.     These rates are consistently higher than national rates.

72.     In 2015 alone, the per-capita rate of residents who died after being shot by EPPD officers was 90% higher than the national rate.[3]

73.     From 2012 to 2016, 50% percent of total deaths in EPPD custody involved unarmed victims.

74.     The percentage of residents shot and killed by EPPD officers involving unarmed victims in 2015 was 50% higher than the national percentage for the same year.  In 2016, the percentage of residents shot by EPPD officers involving unarmed victims was over 250% higher than the national rate.

75.     Chief Allen has had direct knowledge of these statistically high rates of the use of excessive deadly force and has acted with deliberate indifference to the consequences of these customs.

E.     <u>USE OF DEADLY OR INTERMEDIATE FORCE WHEN OFFICERS ARE ON NOTICE OF VICTIM'S MENTAL ILLNESS.</u>

76.     Second, the EPPD also has a persistent, widespread practice of using excessive deadly or intermediate force when officers are on notice that the victim is exhibiting signs of mental illness.  This practice is so common and widespread as to constitute a custom that fairly represents municipal policy.  EPPD Chief Gregory Allen has had direct knowledge of this

---

[3] No reliable comparative national rate exists prior to 2015.  The federal government has failed to maintain an accurate collective database of people killed by law enforcement at the national level.

practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

77. From 2012 to 2016, close to 57% of persons who died while in EPPD custody exhibited signs of mental illness and the police were on notice of those signs.

78. In 2015, over 66% of the residents shot and killed by EPPD officers exhibited signs of mental illness visible to officers prior to their deaths. Nationwide, only about 26% of victims shot and killed by the police in 2015 exhibited signs of mental illness visible to the police prior to their deaths.

79. In 2016, 100% of the residents shot and killed by EPPD officers exhibited signs of mental illness visible to officers prior to their death. This rate was close to 300% greater than the national average of 25% for the same year.

80. Examples of these deaths show a pattern by which officers consistently escalate situations where they are on notice of mental health issues rather than de-escalating the situation, thereby triggering the use of excessive deadly or intermediate force.

81. On March 8, 2013, officers arrested Daniel Rodrigo Saenz after receiving reports that he was acting strangely and threatening people. Officers were aware when called out that he had been at a mental health facility. After his arrest, in police custody, outside the local jail, unarmed, and while handcuffed behind his back, officers started dragging Saenz on the ground to take him to a medical facility for treatment of injuries. As they dragged him, he started to resist. An officer pulled out his gun and shot Mr. Saenz who died shortly thereafter as a result of the gunshot wounds.

82. In this case, upon information and belief, the City's DRB considered the facts and recommended termination of the officer involved. Nonetheless, Chief Allen kept the officer on

payroll until he was reinstated by an independent arbitrator – despite the arbitrator's finding that the officer violated use-of-force policies.

83.     In October of 2013, police responded to a call that person was screaming outside a motel and was suffering from a mental health crisis.  When they arrived, they found Fernando Gomez, also known as Mercedes Demarco, unarmed outside the motel and screaming for help. The officers immediately tasered Ms. Demarco who allegedly died in the squad car shortly thereafter.

84.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

85.     On May 21, 2015, officers received a 911 call reporting that a man was very distraught, crying, and threatening to kill himself – in the throes of a mental health crisis. Officers arrived and saw that David Alejandro Gandara did not have a weapon.   They immediately yelled at him to stop.  When he continued walking, the officers fired six shots at him, killing him on the scene.

86.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

87.     On June 23, 2015, officers received a 911 call from Daniel Ramirez's parents concerned that he was exhibiting suicidal tendencies.  The EPPD had prior knowledge of Ramirez's mental health issues.   Numerous officers arrived at the house and entered the backyard.  Upon entry into the backyard, they found Ramirez, unarmed, attempting to hang himself from a basketball net.  Rather than pulling him down from the noose, the officers immediately tased him.  Mr. Ramirez died shortly thereafter.

88.     Upon information and belief, the EPPD failed to even bring this incident to the attention of the DRB and did not take any disciplinary action against the officers involved.

89.     On April 16, 2016, El Paso Police Officers received a telephone call from a distressed Eric Wilson.  Wilson had a rapport with the EPPD from previous calls related to his mental health.  They were aware he was suffering from a mental illness.  Nonetheless, five police officers arrived at his home to find him walking back and forth in front of his residence.  The officers ordered Wilson to show his hands.  According to reports, Wilson held up a cell phone in his hand in flashlight mode.  The officers shot several rounds at him which caused his death after another eight excruciating hours.

90.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

91.     On May 9, 2016, Arthur Williams' mother called the police and the police had notice of his mental health issues.  Officers arrived and spoke with his mother, who was outside the house.  Williams' mother asked him to leave the house and speak with the officers.  Williams exited the house holding a toy BB gun and was immediately shot multiple times by several officers.

92.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

93.     Several other events involving the use of intermediate force in 2015 and 2016 that did not result in death also show a custom and practice of officers escalating the use of force when confronted with situations involving victims with disabilities.  For example, Jose Angel Acevedo alleged excessive use of force involving his arrest on August 11, 2015. According to his report, Acevedo's wife called 911 so that emergency responders could take him to the

hospital because he was in emotional distress. The responding officers entered Acevedo's residence without permission, probable cause, or exigent circumstances.  The officers allegedly beat Acevedo, threw him to the ground, and held him in a choke hold while he repeatedly told them that he was unable to breath. The officers also allegedly tased him several times.

94.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

95.     On December 6, 2015, Javier Ortega suffered a seizure while driving and crashed his vehicle into a rock wall.  Mr. Ortega was unarmed.  Allegedly, responding officers -- rather than treating him -- allegedly tased him multiple times and beat him with a police baton.  Upon information and belief, after review of the case, Chief Allen refused to terminate or suspend the officers involved.

96.     On November 5, 2016, officers received a call reporting a possible suicide in progress.  When the officers arrived, Francisco Ramirez was allegedly holding a knife.  Rather than de-escalating the situation, officers immediately drew their weapons and shot Mr. Ramirez -- who was injured but not killed from the attack.

97.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

98.     Each of these incidences shows a pattern of the police, when called to help with or on notice of a victim's mental health issues, to use excessive force to subdue the victim rather than utilizing alternative means to de-escalate the situation.  This pattern of constitutional violations puts EPPD on notice that the failure to implement proper procedures with respect to persons with mental health issues directly causes the use of excessive force and excessive intermediate and deadly force when officers are dealing with persons with mental health issues.

Chief Allen acts with deliberate indifference to these consequences and for this reason, the policy is a moving force in the constitutional violations against Erik.

      F.     <u>USE OF EXCESSIVE FORCE IN GENERAL</u>

     99.    A limited review of citizen complaints between 2014 and 2016 show a high rate of excessive force complaints reported by citizens against officers.  EPPD Chief Gregory Allen has had direct knowledge of this practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

     100.   Public data regarding Citizen Complaints is extremely limited because the City has obfuscated efforts to obtain this information publicly.

     101.   In response to a citizen request for public documents related to allegations of excessive use of force in August 2016, the City -- after five months -- only produced a fraction of the documents requested.  The initial requests sought Citizen Complaint Forms and related information as well as "Blue Team" and "IA Pro" reports.  The "Blue Team" and "IA Pro" software has previously been touted as new software that warehouses excessive force allegations and allows the department to "identify patterns of concern early on so that proactive action can be taken."  However, when asked for these documents, Defendant City claimed that this software does no such thing.

     102.   After limiting the search, the City was only asked to provide citizen complaint information for a twenty-four month period.  The City only provided sixteen months worth of data and, of that data, the City did not fully produce incident information for almost 60% of the approximately 167 citizen complaint incidents allegedly reported in that period.  This lack of documentation makes it difficult to assess the factual basis of each complaint.

103.     There is also reason to believe that the 167 incidents is a drastic underreporting of actual incidents in the sixteen month period.  In its 2014 Annual Report, the Department stated that it had investigated 1,296 citizen complaints in that year.  It seems unlikely that the following 16 months would only see 167 complaints -- under 13% of the number of complaints investigated in 2014.

104.     The lack of willingness to produce this information makes it difficult to conduct a comparative analysis of the City's excessive force complaints.

105.     Nonetheless, based on the limited data provided, it is possible to identify a trend of comparatively high reports of excessive force among the El Paso Police Department.  Of the data provided, at least 20-27% of the Citizen Complaints involved officers' excessive force.  If this same percentage is applied to the reported 1,296 citizen complaints in 2014, it is reasonable to assume that between 259-349 complaints of excessive force were reported by officers in that year.   This number is high considering the size of the El Paso Police Department -- approximately 1,000 officers -- as it correlates to a rate of 25.9 to 34.9 citizen complaints of excessive force per officer.  The national average for such complaints is only 6.6 complaints per officer.  Chief Allen's failure to discipline the officers involved, train them or otherwise remedy the problem is the moving force in the constitutional violations that took place against Erik.

## CLAIMS FOR RELIEF

### EXCESSIVE FORCE

106.     Defendants Gomez, Smith, and Rivera, acting under color of state law, deprived Erik and Plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution by intentionally entering Plaintiffs' home without warrant or probable cause, and under no exigent circumstances.  Defendants Gomez and Rivera, acting under color of state

law, deprived Erik of his rights under the Fourth Amendment and Fourteenth Amendment of the United States Constitution by intentionally using an objectively unreasonable and excessive amount of force.

107.     These acts deprived Erik of his clearly established and well-settled constitutional rights under the Fourth and Fourteenth amendments and in violation of 42 U.S.C. §1983.  This violation proximately caused Erik's death for which Defendants Gomez, Smith, and Rivera are liable.

<u>**Monell**</u>

108.     On information and belief, Defendant City of El Paso -- through the decisions of its policymaker Police Chief Gregory Allen – was directly responsible for the aforementioned misconduct, which proximately caused the damage to Plaintiffs, by:

A)     maintaining a policy or custom of excessive force by officers that is so common and widespread as to constitute a custom that fairly represents municipal policy;

B)     maintaining a policy or custom of officers' failure to avoid the use of deadly force against individuals when the officer is not at risk of imminent serious bodily injury or death;

C)     maintaining a policy or custom of the use of excessive force by officers when the officer is on notice of a victim's mental health problems that is so common and widespread as to constitute a custom that fairly represents municipal policy;

D)     failing to properly train or supervise members of the El Paso Police Department, including Defendants Gomez, Rivera, and Smith, not to use

intermediate or deadly force against an individual who does not place the officer or another at risk of imminent serious bodily injury or death;

E)    failing to properly train or supervise members of the El Paso Police Department, including Defendants Gomez, Rivera, and Smith, on mental health issues and how implement de-escalation and communication tactics during incidents where their officers have notice and knowledge that the person for whom they are called has a mental health issues;

F)    failing to institute proper procedures to ensure that EPPD officers use appropriate de-escalation and communication tactics in situations in which it is known that an unarmed resident has a mental illness;

G)    failing to classify any officer-involved shootings as unjustified – particularly those involving unarmed victims; and

H)    failing to pursue criminal or disciplinary charges or support criminal or disciplinary action against officers, including Gomez, Rivera, and Smith, who have deprived citizens and residents of El Paso of their constitutional rights.

109.    The aforementioned customs, policies, practices, and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of the City of El Paso were adopted with deliberate indifference to the constitutional rights of citizens.

110.    The aforementioned customs, policies, practices, and procedures, the failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of the

City of El Paso were a moving force and/or a proximate cause of the deprivations of Erik's clearly established and well settled constitutional rights under the Fourth amendment in violation of 42 U.S.C. §1983.

## COMPENSATORY DAMAGES

111.    Because of Defendants actions, Plaintiffs are entitled to compensatory damages for their past and future pecuniary loss, past and future loss of companionship and society, past and future mental anguish, and all other compensatory damages to which they may be entitled.

## EXEMPLARY DAMAGES

112.    The shooting of Erik was acted willfully, deliberately, maliciously and with reckless disregard of the rights of Erik entitling Plaintiffs to punitive damages.

## ATTORNEY FEES

113.    Plaintiffs are entitled to recover his attorney fees and costs necessary to enforce his rights pursuant to 42 U.S.C. § 1988.

## JURY TRIAL

114.    Plaintiffs demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays that this Court grant the following relief:

A.      Award Plaintiffs compensatory damages for the acts described above;

B.      Award Plaintiffs punitive damages against Defendant Officers;

C.      Enter a finding that Plaintiffs are the prevailing party in this case and award attorney fees, litigation costs and expenses plus pre-trial and post-trial interest against Defendants pursuant to 42 U.S.C. § 1988; and

D.      Grant such other and further relief in law or in equity to which Plaintiffs may be entitled.

Dated: June 15, 2017        Respectfully submitted,

THE LAW OFFICES OF ENRIQUE MORENO
701 Magoffin Avenue
El Paso, Texas 79901
(915) 533-9977
FAX (915) 533-0033

By:      */s/Enrique Moreno*
ENRIQUE MORENO
State Bar No.: 14430500
emoreno@morenolaw.us

-AND-

THE LAW OFFICE OF LYNN COYLE, PLLC
2515 North Stanton Street
El Paso, Texas 79902
(915) 532-5544
Fax (915) 532-5566

By:      /s/ Lynn Coyle
LYNN COYLE
Texas Bar No. 24050049
lynn@coylefirm.com
CHRISTOPHER BENOIT
Texas Bar No. 24068653
chris@coylefirm.com

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 15, 2017 I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

      */s/ Lynn Coyle*
LYNN COYLE