# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| CELIA SANCHEZ and OSCAR SALAS, statutory death beneficiaries of ERIK EMMANUEL SALAS-SANCHEZ, <br>     Plaintiffs, <br><br> v. <br><br> MANDO KENNETH GOMEZ, ALBERTO RIVERA, PAMELA SMITH, and the CITY OF EL PASO, TEXAS, <br>     Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | EP-17-CV-133-PRM |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT CITY OF EL PASO'S MOTION TO DISMISS

On this day, the Court considered Defendant City of El Paso's [hereinafter "Defendant"] "Rule 12 Motion to Dismiss Plaintiffs' First Amended Complaint" (ECF No. 22) [hereinafter "Motion"], filed on June 29, 2017, Plaintiffs Celia Sanchez and Oscar Salas's [hereinafter collectively referred to as "Plaintiffs"] "Response to Defendant City of El Paso's 12(b)(6) Motion to Dismiss" (ECF No. 33) [hereinafter "Response"], filed on July 24, 2017, and Defendant's "Reply to Plaintiffs' Response to Defendant City's Rule 12 Motion to Dismiss" (ECF No. 38)

[hereinafter "Reply"], filed on July 31, 2017, in the above-captioned cause. For the foregoing reasons, the Court will deny Defendant's Motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are the parents of decedent Erik Emmanuel Salas-Sanchez. Pl.'s Am. Compl., June 15, 2017, ECF No. 17 [hereinafter "Amended Complaint"]. Co-defendant Officers Smith, Rivera, and Gomez [hereinafter collectively referred to as "co-defendant officers"] were employed as police officers by the City of El Paso Police Department [hereinafter "EPPD"]. Am. Compl. 2. On April 29, 2015, Erik Salas-Sanchez [hereinafter "Salas-Sanchez"] was twenty-two years old and living with his family in El Paso, Texas. *Id.* On that same day, co-defendant officers arrived at Salas-Sanchez's family home and questioned Mrs. Sanchez, Salas-Sanchez's mother, about an alleged incident involving her son. *Id.* The incident involved Salas-Sanchez's uninvited presence in a neighbor's home, which prompted the neighbor to call 911. *Id.* at 2–3.

During the co-defendant officers' conversation with Mrs. Sanchez, Mrs. Sanchez informed them that her son had been acting strange and

exhibiting signs of mental illness. *Id.* at 4. Salas-Sanchez was inside the house during the conversation and intermittently interrupted to speak with his mother or the co-defendant officers. *Id.* Plaintiffs claim that Mrs. Sanchez calmly talked to the officers at her door while simultaneously speaking with her son and telling him "the police are here to talk with her, not him." *Id.* at 4. Despite this, Salas-Sanchez began telling the co-defendant officers "to leave as he believed they had no right to be at his home." *Id.* Plaintiffs then claim that "[a]fter an extended period of time speaking with Mrs. Sanchez, and frustrated by [Salas-Sanchez]'s insistence that they leave the home, [co-d]efendant [o]fficers pushed Mrs. Sanchez out of the way and entered the home without consent and without a warrant." *Id.*

Once inside the house, Plaintiffs claim that Officer Rivera used his taser in an attempt to subdue Salas-Sanchez, while Officer Gomez had his weapon drawn and pointed at Salas-Sanchez. *Id.* at 5. Then, Plaintiffs allege that despite the fact that Salas-Sanchez "moved away" from all of the officers and "did not make any aggressive movements towards them," Officer Gomez fired five rounds at him, striking him twice in the back and once in the buttocks. *Id.* at 6. The shots proved

fatal, and Salas-Sanchez was pronounced deceased upon arriving at the hospital. *Id.* No firearm, knife, or any other weapon was ever found at the scene. *Id.*

Plaintiffs claim that various failures of the EPPD and its Chief, Gregory Allen [hereinafter "Chief Allen"], were a "moving force and/or a proximate cause of the deprivations of" Salas-Sanchez's constitutional rights. Plaintiffs make eight distinct allegations in that regard:

> (A) [EPPD maintains] a policy or custom of excessive force by officers so common and widespread as to constitute a custom that fairly represents municipal policy;
>
> (B) [EPPD maintains] a policy or custom of officers' failure to avoid the use of deadly force against individuals when the officer is not at risk of imminent serious bodily injury or death;
>
> (C) [EPPD maintains] a policy or custom of the use of excessive force by officers when the officer is on notice of a victim's mental health problems that is so common and widespread as to constitute a custom that fairly represents municipal policy;
>
> (D) [EPPD failed to] properly train or supervise members of the El Paso Police Department, including [co-d]efendants Gomez, Rivera, and Smith, not to use intermediate or deadly force against an individual who does not place the officer or another at risk of imminent serious bodily injury or death;
>
> (E) [EPPD failed to] properly train or supervise members of the El Paso Police Department, including [co-d]efendants Gomez, Rivera, and Smith, on mental health

4

issues and how [to] implement de-escalation and communication tactics during incidents where their officers have notice and knowledge that the person for whom they are called has a mental health issues [sic];

(F) [EPPD failed to] institute proper procedures to ensure that EPPD officers use appropriate de-escalation and communication tactics in situations in which it is known that an unarmed resident has a mental illness;

(G) [EPPD failed to] classify <u>any</u> officer-involved shootings as unjustified – particularly those involving unarmed victims; and

(H) [EPPD failed to] pursue criminal or disciplinary charges or support criminal or disciplinary action against officers, including Gomez, Rivera, and Smith, who have deprived citizens and residents of El Paso of their constitutional rights.

Am. Compl. 23–24.

Plaintiffs provide numerous factual allegations to support their claims against Defendant City of El Paso. To avoid redundancy, these allegations will be summarized and explained in the following sections analyzing each specific claim, *infra*.

## II.   LEGAL STANDARD

### A.   General Pleading Standard for Motions to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may dismiss an action for "failure to state a claim upon which relief can be granted." In determining whether a plaintiff states a valid claim, a

court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiffs." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A pleading that offers mere "'labels and conclusions' . . . will not do," especially when it simply tenders "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (second alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

## B.   Pleading Standard for Municipal Liability

Prior to *Twombly* and *Iqbal*, the Supreme Court specifically held that plaintiffs need only state "a short and plain statement of the claim showing that the pleader is entitled to relief" and did not need to

6

conform to any sort of "heightened pleading standard . . . in civil rights cases alleging municipal liability under" § 1983. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). Courts have diverged as to how *Leatherman* can be reconciled with the more recent *Twombly* and *Iqbal* decisions. Some courts have allowed "generic or boilerplate assertions of the grounds for holding the municipality liable," consistent with earlier pleading standards, while other courts have held that suits against municipalities should be subject to the same modern pleading standards as other types of civil cases. *See Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d 826, 842 (S.D. Tex. 2011) (collecting cases illustrating the division among district courts). The Fifth Circuit does not appear to have weighed in conclusively on this divide.[1]

---

[1] The Fifth Circuit has briefly considered this issue on at least two occasions—once in a footnote and once in an unpublished decision. *See Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866 n.10 (5th Cir. 2012) (summarily rejecting the argument that *Leatherman* prevents courts from applying the *Twombly*/*Iqbal* standard in municipal liability cases); *Speck v. Wiginton*, 606 F. App'x 733, 735–36 (5th Cir. 2015) ("Speck first contends that the district court applied a heightened pleading standard for civil rights cases contrary to *Leatherman* . . . But the district court correctly stated that the proper standard was Rule 8 as interpreted by . . . [*Twombly* and *Iqbal*]. It did not purport to apply a higher standard because this case involved civil

However, it is apparent to the Court that *Leatherman* is in tension with the Supreme Court's more recent directives on the interpretation of Federal Rule of Civil Procedure 8. Other courts have highlighted this tension. *See, e.g., McCauley v. City of Chicago*, 671 F.3d 611, 623 (7th Cir. 2011) ("*Iqbal* conflicts with other recent Supreme Court decisions . . . [because it] did not overrule or question a number of the Court's prior cases on notice pleading" including *Leatherman*.); *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir.), cert. denied sub nom. *White v. City of Chicago, Ill.*, 137 S. Ct. 526 (2016) ("The *Leatherman* holding has survived the Court's later civil pleading decisions in *Iqbal* and *Twombly*, which require the pleader to allege a 'plausible' claim."); *Gearin v. Rabbett*, No. 10-CV-2227 PJS/AJB, 2011 WL 317728, at *10 (D. Minn. Jan. 28, 2011) ("Although it is difficult for this Court to understand how this aspect of *Leatherman* could survive *Twombly* and *Iqbal*, the Supreme Court cited *Leatherman* in *Twombly* and specifically

---

rights claims.") However, on both occasions, the Fifth Circuit failed to address the crux of the issue: *Leatherman* is still good law and stands for the proposition that the notice pleading requirements, and nothing further, apply to municipal liability claims. This holding is difficult to harmonize with *Iqbal* and *Twombly*.

disavowed any intent to create a heightened pleading standard under Rule 8.") (citing *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.")).

Accordingly, the Court must apply a pleading standard that reconciles these competing Supreme Court opinions. As other courts have recognized, there is middle ground between "allowing boilerplate allegations, on the one hand, or requiring plaintiffs to plead specific factual details to which they do not have access before discovery, on the other." *Thomas*, 800 F. Supp. 2d at 842; *see also Callaway v. City of Austin*, No. A-15-CV-00103-SS, 2015 WL 4323174, at *9 (W.D. Tex. July 14, 2015) ("This Court . . . agrees with the thoughtful reconciliation of *Leatherman* and *Twombly/Iqbal* articulated in *Thomas*."). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at

679. "In the context of municipal liability, as opposed to individual officer liability, it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Thomas*, 800 F. Supp. 2d at 842. Thus, while stating a claim against a municipality requires more than a barebones recitation of the elements of municipal liability, plaintiffs need not "specifically state what the [municipal] policy is" and can rely on "minimal factual allegations" at this stage in the litigation. *Id.* at 842–43.

These minimal factual allegations could include, but are not limited to, "past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy." *Id.* at 843–44.

## III. ANALYSIS

### A. Background on and Requirements for Municipal Liability in the Context of § 1983

Before engaging in an analysis of Plaintiffs' contentions regarding municipal liability, some background on the cause of action itself is necessary. Section 1983 instructs that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

In the seminal case of *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Supreme Court considered whether municipalities may be subject to suit pursuant to § 1983. *Id.* at 663. The Court's answer was yes, though a qualified one. While the Court noted that the legislative history of § 1983 "compel[led] the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies[,]" it found that "the language of § 1983, read against the background of the same legislative history, compel[led] the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 690–91. Specifically, the Court held that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Consequently, it is only "when execution of a government's policy or

11

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

In requiring the existence of an official policy or custom before municipal liability under § 1983 may attach, the Court "intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). In other words, municipal liability is "limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* at 480. As a result, the unconstitutional conduct for which the municipality is allegedly liable "must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (footnote omitted).

In interpreting the Supreme Court's guidance on municipal liability, the Fifth Circuit Court of Appeals has derived "three attribution principles" that must be alleged in support of such a claim. *Id.* "A plaintiff must identify: '(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.'" *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

Regarding the first requirement, "[t]he existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Id.* at 542. Even a single decision may qualify "if the municipal actor is a final policymaker." *Id.* A plaintiff may also demonstrate the existence of an official policy or custom based on a "persistent, widespread practice[.]" *Piotrowski*, 237 F.3d at 579. (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).

As to the second requirement, "[a]ctual or constructive knowledge of [a] custom must be attributable to the governing body of the

13

municipality or to an official to whom that body has delegated policy-making authority." *Valle*, 613 F.3d at 542 (alterations in original) (quoting *Webster*, 735 F.2d at 842). Such an official can either be a policymaker "who has 'the responsibility for making law or setting policy in any given area of a local government's business,'" *id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988)), or a decisionmaker who "possesses final authority to establish municipal policy with respect to the action ordered[,]" *id.* (quoting *Pembaur*, 475 U.S. at 481).

Finally, to satisfy the third requirement, a plaintiff must allege "'moving force' causation." *Id.* This is a two-part obligation. A plaintiff must show "that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* (quoting *Brown*, 520 U.S. at 404). Additionally, a "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* (quoting *Brown*, 520 U.S. at 411). *See also Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (noting that "*Monell*

14

plaintiffs [must] establish both the causal link ('moving force') and the city's degree of culpability ('deliberate indifference' to federally protected rights)").

Operating in concert, these three requirements "distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski*, 237 F.3d at 578.

## B. Plaintiffs' Allegations

In their Response, Plaintiffs distill their allegations into five distinct claims. The Court will address each claim in turn.

### 1. Custom or Practice of Excessive Deadly Force

Plaintiffs claim EPPD has a persistent, widespread practice of "the use of excessive deadly force in general, and more specifically, the use of deadly or intermediate excessive force when the officer is on notice of a victim's mental health problems." Resp. 8. They further allege that Chief Allen has been on notice of this practice and has failed to take any steps to remedy it. Am. Compl. 15. Finally, they allege that this policy was a "moving force in the constitutional violations against" Salas-Sanchez. *Id.* at 21.

While Plaintiffs state that this is the first of five separate theories of municipal liability, Response 3, this theory appears to combine two independent claims into one. The first claim is that the City should be held liable here for its alleged custom or practice of excessive force more generally against all citizens. The second claim is that it should be held liable for its alleged custom or practice of excessive force specifically against mentally ill individuals. Because Plaintiffs explicitly state in their Response that their Amended Complaint is limited to five separate theories of municipal liability, the Court interprets their allegation as referring only to a policy of excessive force relating to individuals displaying signs of mental illness, and not to all individuals more generally.

### a. *Policy or Custom*

A "persistent, widespread practice" is sufficient to constitute an official policy or custom. *Piotrowski*, 237 F.3d at 579. Plaintiffs support their allegations of a widespread practice with facts and statistics about EPPD's use of excessive force in instances where the EPPD officers were on notice of the victim's mental health issues. Plaintiffs cite the following statistics: from 2012–16, almost 57% of persons who died in

EPPD custody exhibited signs of mental illness of which the police were on notice; and from 2015–16, 66–100% of residents shot and killed by EPPD officers exhibited signs of mental illness visible to officers prior to their killing (the national average proportions for those years was never higher than 26%). Am. Compl. 17.

Plaintiffs then describe nine specific instances of EPPD officers using excessive force against mentally ill victims, which Plaintiffs claim support the existence of a pattern and practice of excessive force within EPPD against those exhibiting signs of mental illness. Plaintiffs provide short factual summaries of nine different instances beginning in 2013 where an individual exhibiting signs of mental health problems was either killed or seriously wounded by an EPPD officer. *Id.* at 17–20. In most of these cases the victim was unarmed, and the officer responsible for the excessive force faced no disciplinary action by EPPD resulting from the incident. *Id.* For example, Plaintiffs cite the case of Daniel Rodrigo Saenz, a case currently pending before the Court. *See Saenz v. City of El Paso*, No. EP-14-CV-244-PRM, 2015 WL 12965290, at *3 (W.D. Tex. Feb. 23, 2015), on reconsideration, No. EP-14-CV-244-PRM, 2015 WL 12976854 (W.D. Tex. Apr. 23, 2015), and aff'd, 637 F.

App'x 828 (5th Cir. 2016), and aff'd, 637 F. App'x 828 (5th Cir. 2016). In *Saenz*, officers placed a man they knew had recently been committed at a mental health facility in custody. Am. Compl. 17. While in police custody, two officers dragged the handcuffed Mr. Saenz on the ground to take him to another medical facility. *Id.* When he began to resist, an officer pulled out his gun, shot, and killed him even though he was on the ground on his stomach and his hands were behind his back. *Saenz*, 2015 WL 12965290 at *1. In *Saenz*, the Court held (and the Fifth Circuit affirmed) that the officer who had shot Mr. Saenz was not entitled to qualified immunity. *See Saenz v. Flores*, 668 F. App'x 611, 612 (5th Cir. 2016). Despite the officer's objectively unreasonable conduct and the Disciplinary Review Board's recommendation that the officer be terminated, Chief Allen ultimately reinstated the officer to active duty. Am. Compl. 17–18.

Plaintiffs highlight eight additional cases where EPPD officers quickly resorted to excessive force upon encountering individuals exhibiting signs of mental illness. One such occasion concerned Daniel Ramirez, whom officers encountered trying to hang himself and whom they immediately attempted to tase, leading to his death. Am Compl.

18

18. Plaintiffs also describe, for example, EPPD officers' encounter with Eric Wilson, who had established a rapport with EPPD from previous calls relating to his mental illness. *Id.* at 19. When officers responded to a "distress" call made by Mr. Wilson himself, they found him pacing in front of his house and ordered him to show his hands. *Id.* When he raised his hands, officers mistook a cell phone he was holding as a gun and shot him—he later died from the injuries. *Id.* Plaintiffs claim these instances and others show a pattern of police using "excessive force to subdue the victim rather than utilizing alternative means to de-escalate the situation" when the officers are on notice of the victim's mental health conditions. *Id.* at 20.

A pattern requires similarity and specificity; that is, "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009) (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)). "A pattern also requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" *Id.* (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)).

In *Saenz*, the Fifth Circuit held that pleading twenty-one separate instances of killings by police over the span of nineteen years was insufficient to show deliberate indifference to the need for proper training. 637 F. App'x at 832. The appellate court noted that the allegations did not provide details about the instances and hence "did not allow the court to draw the reasonable inference that any of these events were anything more than isolated incidents." *Id.* Courts on other occasions have denied municipal liability where plaintiffs attempt to show a pattern or practice by reciting prior incidents of similar conduct without context. *See, e.g., Peterson v. City of Fort Worth, Tex.,* 588 F.3d 838, 851 (5th Cir. 2009) (granting summary judgment for the city and holding that twenty-seven alleged instances of excessive force over a four-year period were insufficient for the court to conclude that "the City maintained an official policy of condoning excessive force"); *Gonzales v. Nueces Cty., Tex.,* 227 F. Supp. 3d 698, 705 (S.D. Tex. 2017) ("The lists of internal investigations of police misconduct charges that [Plaintiff] includes are devoid of any details to show that they share any facts similar to those involved here.").

However, courts have found that a path to properly pleading a widespread pattern or practice, while narrow, does exist. In *Flanagan v. City of Dallas*, the court held that plaintiffs pleaded sufficient facts to state a *Monell* claim for excessive deadly force where plaintiffs pleaded a combination of statistics, past incidents, and statements by city officials. 48 F. Supp. 3d 941, 953 (N.D. Tex. 2014). These allegations included statements by a city councilman, Dallas's high ranking among cities in various categories of police misconduct, the number of grand juries convened and internal affairs investigations conducted, and the number of unarmed people killed by Dallas police officers. *Id.*

Further, in *Oporto v. City of El Paso*, the Court held that alleging thirty-two prior instances of excessive deadly force over a span of fifteen years in "varying degrees of detail" was sufficient to state a claim. No. EP-10-CV-110, 2010 WL 3503457, at *5 (W.D. Tex. 2010). In support of its decision, the court collected cases that had also "found the recitation of a list of similar prior incidents to be sufficient" to state a *Monell* claim. *Id.*

Here, the Court finds plausible Plaintiffs' claim that a pattern exists of EPPD's unreasonable use of force when officers encounter

21

individuals exhibiting signs of mental illness.[2] The statistics Plaintiffs allege in addition to the detailed description of no less than nine mentally ill individuals who have been either killed or wounded by EPPD officers since 2013 support a reasonable and plausible inference of a pattern or practice of excessive force. Specifically, Plaintiffs provide statistics suggesting that from 2012 to 2016 the *majority* of individuals killed by EPPD officers were exhibiting signs of mental illness of which the officers were on notice. Resp. 12. Further, in 2015 and 2016, Plaintiffs allege that the proportion of individuals killed by police who had visible mental health issues was between double and quadruple the national average in those years. *Id.*

Further, many of the past cases of excessive force against mentally ill victims evince a strikingly similar pattern of force as that alleged in this lawsuit: EPPD first receives a report of an individual "acting strangely," "suffering from a mental health crisis," "very distraught," "exhibiting suicidal tendencies," or "in emotional distress."

---

[2] While the parties provide fairly extensive briefing on the issue of excessive force generally with respect to all individuals, the Court need not decide this issue. The Court interprets Plaintiffs' claim more narrowly to concern solely EPPD interactions with individuals suffering from mental illness, as opposed to all individuals.

Am. Compl. 17–20. Many of these reports come from the victims' families or the victims themselves. *Id.* Then, numerous officers arrive and almost immediately resort to force without attempting any sort of de-escalation. *Id.* They either tase the individual, beat the individual with batons, or shoot him or her with their service weapons. *Id.* In five of the nine cases described, these individuals died as a result of the force used. *Id.* Then, after almost all of the incidents, EPPD fails to discipline the officers involved and refuses to deem the use of force to be "unjustified." *Id.*

The statistics combined with the numerous past cases of excessive force in similar circumstances to those involved in the present case— followed by the repeated denial of wrongdoing—lead to a reasonable and plausible inference that excessive force against the mentally ill in El Paso is a widespread practice. *See Barkley v. Dillard Dep't Stores, Inc.*, 277 F. App'x 406, 413 (5th Cir. 2008) (noting that in some cases courts may properly infer that "because the officers received no reprimands or discharges from the city following such a flagrant use of excessive force, there must have been a preexisting disposition and policy of reckless disregard for life") (citing *Grandstaff v. City of Borger,*

767 F.2d 161 (5th Cir. 1985)). Thus, the Court concludes that these allegations are sufficient to satisfy the first prong of the Fifth Circuit's municipal liability test requiring a "persistent, widespread practice." *Piotrowski*, 237 F.3d at 579.

In response thereto, Defendant makes multiple arguments challenging the sufficiency of Plaintiffs' allegations. First, Defendant argues that since none of the Plaintiffs or the decedent in this case was "in custody," none of the cited cases or statistics about deaths in police custody is apposite. Mot. 15. This argument is not convincing. First, Salas-Sanchez was likely in handcuffs when he died,[3] so according to the facts as provided by Plaintiffs he was indeed in EPPD custody at the moment of his death. Am. Compl. 6. However, even if he were not in custody, the Court finds this distinction irrelevant at the present time. The reasonable implication from the Amended Complaint is that the deaths in custody were caused by police misconduct, not simply deaths that happened to occur in police custody. Thus, the statistics are illustrative of the use of excessive force by EPPD officers against the

---

[3] The facts do not indicate whether the exact moment of Salas-Sanchez's expiration occurred before or after the police handcuffed him while he lay on the floor after the shooting. *See* Am. Compl. 6.

mentally ill. If it is true, as Defendant claims, that these statistics do not accurately indicate deaths caused by police, that issue may be considered at a later stage in the litigation.

Next, Defendant claims Plaintiffs' statistics regarding the rate of people who were shot and killed in El Paso who were exhibiting signs of mental illness are "meaningless." Mot. 15. This is because, among other reasons, "the source[ ] and the underlying standards reflected in the statistics are not apparent from the pleading." *Id.* It is also because the statistics do not "demonstrate/explain how an official policy, practice, or custom has caused those statistical differences, rather than the myriad other explanations that could be behind those numbers and the data quoted." *Id.* at 20–21. These arguments also miss the mark. While the probity of a given statistic can be debated ad nauseam, it is not the Court's responsibility to settle such a debate at this time. The Court must accept Plaintiffs' allegations as true and draw reasonable inferences in their favor when deciding a motion to dismiss. It is reasonable to infer from these statistics that shootings by EPPD officers involve a much higher proportion of individuals displaying mental health issues than the national average. It is also reasonable to

combine this and other statistics with Plaintiffs' other factual allegations to infer that a widespread practice of excessive force exists.

Finally, Defendant discusses the nine alleged cases of excessive force against individuals displaying signs of mental illness. The thrust of its argument is that these cases are distinguishable and that it is impossible to determine from the pleadings that these cases represent examples of excessive force because Plaintiffs do not provide sufficient detail. Mot. 16–19. The Court disagrees with this argument. Plaintiffs provide concise paragraphs for each case of allegedly excessive force. Am. Compl. 17–20. In each, they allege that officers should have been on notice that an individual was suffering from some mental condition, that the individual never substantially threatened or attacked any officer, but was nonetheless killed, tased, or beaten by the officers. *Id.* While Plaintiffs may not allege sufficient facts to state a separate and independent claim for each of the individual cases, in the aggregate they support the reasonable inference that a pattern of excessive force exists.

### b. *Final Policymaker Aware*

Next, Plaintiffs must allege that an official to whom the governing body of the municipality "has delegated policy-making authority" had "[a]ctual or constructive knowledge of" the alleged custom or practice. *Piotrowski*, 237 F.3d at 579. Here, Plaintiffs allege that Chief Allen is such an official. Am Compl. 8. Plaintiffs allege that the "pattern of constitutional violations puts EPPD on notice . . . of excessive force and excessive intermediate and deadly force when officers are dealing with persons with mental health issues." *Id.* at 20. They further allege that "Chief Allen acts with deliberate indifference to these consequences[.]" *Id.* at 21.

Plaintiffs specifically allege that Chief Allen makes all final decisions regarding officer discipline. *Id.* at 8–9. He makes all decisions regarding whether to classify the use of force as "[j]ustified" or "[u]njustified." *Id.* at 11. He makes all decisions regarding the scope and content of EPPD officer training. *Id.* at 12. Finally, he has the ability to implement initiatives and programs to help EPPD officers handle situations involving the mentally ill. *Id.* at 14. These allegations are sufficient to state a claim that Chief Allen is a final

27

policymaker and that he had actual or constructive knowledge of the rate and past instances of excessive force towards individuals displaying signs of mental illness. Further, Defendant does not appear to contest that Police Chief Allen qualifies as an official with final policymaking authority. Thus, the Court concludes that the second element for municipal liability is satisfied.[4]

### c. Moving Force Causation

Lastly, Plaintiffs must allege that the municipal policy was the "moving force" behind the underlying constitutional deprivation. To do this, they must allege that "the municipal action was taken with the requisite degree of culpability and must . . . [allege] a direct causal link between the municipal action and the deprivation of federal rights." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). This can be accomplished by alleging that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or

---

[4] Since the policymaker is the same for each of Plaintiffs' claims, this analysis suffices for the second prong of the *Monell* test for each claim. Thus, the Court will not further address whether Chief Allen is a final policymaker for purposes of this Order.

statutory right will follow from the decision." *Id.* (quoting *Brown*, 520 U.S. at 404).

Here, Plaintiffs have adequately pleaded such causation. The facts described above support a plausible inference that the City's policy of excessive force against the mentally ill was the moving force behind the co-defendant officers' decision to use excessive force. Defendant claims that Plaintiffs have failed "to show that any of the alleged prior instances were factually similar, and therefore, fail[ed] to establish the essential causal nexus to the death of the Plaintiffs' Son." Mot. 20. Defendant further criticizes Plaintiffs' description of the prior instances of allegedly excessive force because Plaintiffs do not base their allegations on "any investigative outcomes or findings," omit any "officer statements or admissions," and fail to "relate any information about decisions by fact-finders" regarding the use of force. *Id.*

Defendant's criticisms do not defeat Plaintiffs' claims. The omission of investigative outcomes, admissions, or decisions by fact finders is not sufficient to overcome a plausible inference of causation. Based on the Amended Complaint, the Court has already determined that Plaintiffs plausibly claim that EPPD has a widespread practice of

excessive force against individuals who are exhibiting signs of mental illness. In this case, EPPD officers used excessive force against an individual who they knew was exhibiting signs of mental illness in conformity with this practice. While causation is usually difficult to prove, Plaintiffs need only provide enough facts to allow the Court to make a plausible inference that the policy was a moving force behind the harm in this case. It does not strike the Court as implausible that the widespread practice of excessive force against those exhibiting signs of mental illness directly caused this particular case of excessive force against a man exhibiting signs of mental illness.

Accordingly, the Court concludes that Plaintiffs have pleaded sufficient facts to allege moving force causation. Because Plaintiffs have pleaded sufficient facts to state a claim with respect to the policy of excessive force applied to mentally ill individuals, the court will deny Defendant's motion to dismiss this particular claim.

2. <u>Failure to Institute Proper Procedures to Ensure Officers Employ Appropriate Tactics When Confronted with Mental Health Issues</u>

Plaintiffs allege that Chief Allen "made a deliberate choice not to adopt procedures to implement communication and de-escalation tactics

in situations involving persons suffering from mental health issues."

Resp. 16. In support of this allegation, Plaintiffs allege that EPPD has

failed to take measures that many other cities have taken to prevent

the aforementioned pattern of escalation upon encountering a mental

health crisis. Am. Compl. 13. Plaintiffs highlight the fact that "Dallas,

Houston, Austin, and San Antonio have all implemented crisis

intervention teams" that "ensure that mental health professionals or

officers trained in mental health issues and appropriate de-escalation

techniques and communication tactics make the first contact with

persons in mental health crises." *Id.* Plaintiffs point to the

effectiveness of these reforms in other cities and allege that Chief

Allen's refusal to implement such reforms "ensures that responding

officers respond to mental health crises without the ability to de-

escalate the crisis non-violently." *Id.* at 14. Further, they claim that

the "failure to implement these procedures has caused the

disproportionately high incidents of excessive force . . . when officers are

on notice of a mental health crisis[.] *Id.* Finally, they allege that the

failure to implement these procedures was an "actual cause in the

constitutional violations that resulted in" Salas-Sanchez's death. *Id.* at 15.

### a. *Policy or Custom*

Rather than a "widespread practice" or pattern, this claim directly alleges a specific policy, or lack thereof, that caused the constitutional injury at issue. Plaintiffs describe policies such as the creation of Crisis Intervention Teams ("CIT") that other similar cities have implemented to address the need for appropriate responses to mental health crises. Resp. 17. Plaintiffs claim that Chief Allen is "aware of these initiatives[ ] as EPPD's policy maker" but has "refused to implement any comparable policy to de-escalate calls where police have clear notice that a person is having a mental health crisis[.]" Mot. 17.

Defendant argues that while "some larger departments may have the resources and personnel to adopt such practices, their adoption does not set the standard for all police departments." *Id.* at 12. Defendant is correct that some cities' adoption of these policies does not make mandatory every other city's adoption of similar policies. However, if a city consciously chooses not to adopt such policies, an aggrieved plaintiff

may certainly attempt to hold it accountable if that decision directly causes constitutional injuries.

Second, Defendant cites a Louisiana district court case for the proposition that "the lack of specific mental health training for officers d[oes] not establish a constitutional claim." Mot. 13 (citing *Casto v. Plaisance*, No. CV 15-817, 2016 WL 2855468, at *10 (E.D. La. May 16, 2016)). This is far too broad a rule to draw from *Casto*. The Plaintiff in *Casto* argued that a lone United States Justice Department report regarding a prison in his municipality—which had failed to provide adequate mental health care and suicide prevention programs—was sufficient evidence to defeat summary judgment on a municipal liability claim. *Casto*, 2016 WL 2855468 at *10. However, because the plaintiff's claim stemmed from an incident involving an officer on patrol, rather than in a prison, the court held that the report about prison conditions was insufficient evidence to show the policymaker's indifference to the needs of non-prisoners like the plaintiff. *Id.* The case does not, as Defendant suggests, hold that a municipality's failure to provide mental health training can never serve as the basis for a claim of municipal liability.

### b. *Moving Force Causation*

As with all of Plaintiffs' other claims, causation will be a difficult element to prove. However, Plaintiffs allege that the lack of these procedures was an "actual cause resulting in the death of" Salas-Sanchez and that "if EPPD had proper crisis intervention response teams, Defendant officers would not have entered [Salas-Sanchez's] home without authority and would have avoided the use of their intermediate and deadly weapons[.]" Am. Compl. 15. This is sufficient to state a plausible claim. After numerous incidents involving individuals exhibiting signs of mental illness that have led to death or serious injury, Chief Allen's refusal to establish a protocol to reduce the frequency of these violent encounters is a plausible cause for the constitutional violations at issue in this case.

Defendant argues that Plaintiffs have failed to state a claim because it is "rank speculation" to allege that the existence of a CIT would have reduced the likelihood that officers would have resorted to force in the present case. Mot. 13. Again, the amount of evidence that Plaintiff is able to muster at this stage in the litigation is a nonfactor. *See Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d 826, 842 (S.D.

34

Tex. 2011) ("[I]t is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery.") The Court must, at most, determine whether it is plausible that the lack of specialized procedures to handle mental health crises was a moving force behind Salas-Sanchez's death. The Court concludes that this failure to implement procedures, separate and apart from Plaintiffs' other claims, is a plausible explanation for the constitutional violation.

Because Plaintiffs have alleged a municipal policy—to which Chief Allen was deliberately indifferent despite notice of the constitutional violations it would cause—that ultimately caused the alleged constitutional injuries in this case, the Court will deny Defendant's motion to dismiss this claim.

### 3. Failure to Classify any Officer-Involved Shootings as Unjustified

Plaintiffs claim that the "City has an unwritten policy of finding all police homicides 'justified' which [wa]s the moving force in the excessive use of deadly force against" Salas-Sanchez. Resp. 20. This policy, Plaintiffs claim, "creates a culture where officers use deadly force

with impunity." *Id.* at 21. Plaintiffs support this allegation by claiming that from 2012–2016, EPPD, headed by Chief Allen, classified zero police shootings as "unjustified," categorizing them instead as "justified" and in one instance as "other" homicides. *Id.* They further incorporate the previously-discussed nine specific instances of excessive force involving individuals suffering from mental conditions and allege none of them was classified as "unjustified." Am. Compl. 17–20. Finally, Plaintiffs highlight the fact that despite co-defendant Officer Gomez's criminal indictment in state court for the use of force in this case, EPPD still refused to classify Salas-Sanchez's shooting as unjustified. Resp. 21.

   *a.* *Policy or Custom*

   Plaintiffs here pleaded sufficient facts to state a claim based on an unwritten policy that EPPD refuses to classify officer-involved shootings as unjustified. Plaintiffs allege that from 2012–2016 there were twenty-one instances of excessive force resulting in fourteen deaths. If Plaintiffs' allegations of excessive force are true, then even allowing for some reasonable disagreement, some of those instances should have been classified as unjustified. Yet, they were not.

Plaintiffs allege that this supports a plausible inference that EPPD has an unwritten policy to always classify police shootings as justified. The additional fact that EPPD allegedly refused to classify Salas-Sanchez's death as unjustified despite one of the involved officer's criminal indictment for manslaughter solidifies Plaintiffs' allegation.[5]

### b. *Moving Force Causation*

Plaintiffs allege that EPPD's policy of refusing to classify any wrongdoing as unjustified created a culture at EPPD of allowing officers to use "deadly force with impunity." Am. Compl. 11. They allege that this culture was a moving force behind the constitutional injuries in this case. *Id.*

The Fifth Circuit employs strict causal standards for a municipal liability claim. *See Valle,* 613 F.3d at 546 (noting that the connection

---

[5] The Court in no way opines on Officer Gomez's guilt or innocence in his criminal case. When deciding a motion to dismiss, the Court is required to view all the facts in a light most favorable to plaintiffs and decide whether these facts are sufficient to state a claim. It is entirely possible that EPPD and Chief Allen's decision not to deem the death of Salas-Sanchez "unjustified" in this particular case was correct. It is further possible that the charges against Officer Gomez will be dismissed or that a jury may acquit him. Nonetheless, taking Plaintiffs' allegations as true, the Court accepts as plausible the allegation that Chief Allen categorically denies wrongdoing in cases of excessive force regardless of the circumstances. Whether or not that allegation is true, of course, remains to be seen.

between the municipal policy and the constitutional injury "must be more than a mere 'but for' coupling . . . . [It] must be the actual cause of the constitutional violation") (quoting *Thompson v. Connick*, 578 F.3d 293, 300 (5th Cir. 2009)). Further, if Plaintiffs would be unable to adduce any sort of proof of this causation, the Court must dismiss this claim.

Plaintiffs argue *Releford v. City of Houston* demonstrates that plaintiffs can adduce such proof and that it can be strong enough to survive summary judgment. Resp. 22 (citing *Releford v. City of Houston*, No. 4:14-CV-2810, 2016 WL 774552, at *5–6 (S.D. Tex. Feb. 29, 2016), motion to certify appeal denied, No. 4:14-CV-02810, 2016 WL 7051662 (S.D. Tex. Dec. 5, 2016), and appeal dismissed sub nom. *Releford v. Rosemon*, 678 F. App'x 267 (5th Cir. 2017)). Further, they argue *Releford* deemed a similar causal connection between a municipality's unwritten policy and the injury alleged sufficient under the Fifth Circuit's standard despite the plaintiff's much higher burden of proof at summary judgment. *Id.*

In *Releford*, the court allowed the plaintiff's analogous "failure to classify" allegations to survive summary judgment. *Id.* To support

those allegations, the plaintiff provided the following evidence: that officer-involved shootings from 2009–2012 were classified as either justified or, in only three cases, accidental; detailed descriptions of previous incidents that were not classified as unjustified that arguably should have been; casual text messages between police officers regarding police shootings indicating the "culture of indifference" to such shootings; and expert testimony claiming it was "shocking" that the City classified almost all shootings as justified. *Id.* at 6.

The Court agrees that *Releford* provides an analogous example indicating that a plaintiff can produce sufficient evidence of causation for a failure to classify claim. As for whether such a claim satisfies the high causation standard in the Fifth Circuit, this is a closer call. Defendant does not mention *Releford* in any of its briefing or contest that the *Releford* court allowed substantially similar allegations to reach a finder of fact. Defendant does not contest that *Releford* implicitly permits such a claim even where the plaintiff has a much higher burden of proof. Based on the *Releford* court's determination that similar claims do indeed meet the Fifth Circuit's stringent causation standard, and Defendant's failure to address this case or cite

competing cases, the Court concludes that such a policy could plausibly be the moving force behind the death in this case. Thus, the Court concludes that Plaintiffs have pleaded sufficient facts to state a claim for municipal liability based on EPPD's policy of refusing to classify police shootings as unjustified.

4.    Failure to Pursue Disciplinary Action Against Officers

Plaintiffs claim that EPPD has a policy of "failing to investigate and discipline EPPD officers for engaging in excessive force[.]" Resp. 23. Specifically, Plaintiffs provide a summary of how the Disciplinary Review Board ("DRB")—which makes disciplinary recommendations for police officer misconduct and is comprised mostly of police officers—routinely fails to mete out discipline for officers accused of misconduct. Am. Compl. 9. Plaintiffs state that only ten percent of cases brought before the DRB result in any disciplinary action—and, when discipline is deemed necessary, officers normally just receive "counseling" as a punishment, even for excessive force. *Id.* Plaintiffs allege that "[b]y maintaining a DRB that lacks independence, EPPD's disciplinary policy allows officers to use excessive force and to specifically use excessive intermediate and deadly force where officers are on notice of a victim's

40

mental illness without suffering any disciplinary action." *Id.* at 10.
This, in turn, causes "disproportionately high incidents of excessive use
of force" in El Paso. *Id.* Finally, Plaintiffs highlight that in this case
and each of the nine prior instances of alleged excessive force, the
officer or officers responsible were "kept on payroll" and were, in almost
every instance, not disciplined or sanctioned in any way. *Id.* at 17–20.

### a.    *Policy or Custom*

Again, Plaintiffs have plausibly alleged the existence of an
unwritten policy of leniency towards EPPD officers who have used
excessive force against the mentally ill. While a municipality is free to
tailor its disciplinary policies to address its own unique needs,
municipalities may not habitually fail to discipline employees when
they violate individuals' constitutional rights. Doing so sends a signal
to the employees that there are only limited consequences, if any, for
misconduct, and thus, according to Plaintiffs, implicitly encourages the
misconduct.

Construing the facts most favorably to Plaintiffs, it is indeed
surprising that the officers involved in the various incidents Plaintiffs
describe were not subject to any notable discipline. This is especially

true with respect to the officers involved in the present case—where one officer has been criminally indicted for manslaughter—and the case of Daniel Saenz—where an officer alledgly shot a handcuffed man in the back while he lay face down on the ground—received no formal admonishment. Am. Compl. 10, 17–18. This alleged lack of disciplinary measures plausibly suggests to the Court that EPPD had a blanket policy of not disciplining officers who were responsible for using excessive force.

To contest this claim, Defendant argues that "[t]here is no legal basis for a claim that a DRB is required, or that a particular format or makeup is required, or that independent review by non-police officers is mandated by the [C]onstitution or laws of the United States." Mot. 8. Defendant misconstrues Plaintiffs' argument. Plaintiffs did not bring this cause of action to force Defendant to conform to any specific set of disciplinary procedures or change the constitution of the DRB necessarily. Rather, they are attempting to hold the City liable for an alleged unwritten municipal policy that caused Salas-Sanchez's death. To do this, they have highlighted numerous deficiencies and disciplinary results that lead to the plausible inference that such an

unwritten policy exists. It is of no consequence that the City is not constitutionally required to have any specific disciplinary procedures. What matters, and what Plaintiffs ultimately need to prove, is that Chief Allen either explicitly promoted or was deliberately indifferent to a policy of refusing to discipline officers guilty of excessive force. The Court concludes that Plaintiffs allege enough facts to support such a claim at this stage in the case.

### b. *Moving Force Causation*

Without appropriate consequences for excessive force, as Plaintiffs claim, it is plausible that EPPD officers felt emboldened and unafraid of the consequences for using unconstitutional tactics. It is also plausible that this confidence inspired and possibly motivated the co-defendants' unconstitutional action in the present case. Thus, Plaintiffs have pleaded sufficient facts to support an allegation of moving force causation.

Defendant argues that since there is no allegation that the DRB ever failed to discipline the co-defendants in this case, then the failure to discipline them previously could not have caused the injury that the Defendant is allegedly responsible for. Mot. 8. However, Plaintiffs are

not alleging that a failure to discipline the specific officers in this case caused the injury. Rather, they seek to raise a plausible inference that the failure to discipline other officers created a culture that emboldened the officers in this case to engage in the conduct that resulted in Salas-Sanchez's death. Thus, it does not matter that the co-defendants were never the subject of disciplinary review, and Defendant's argument is accordingly unpersuasive.

Further, Defendant argues that the DRB's failure to discipline the co-defendants in this case cannot be used as evidence of causation because the decision not to discipline occurred "*after* the incident in question." Mot. 8. However, Plaintiffs are not arguing that the lack of discipline in this case caused the misconduct to arise. Rather, they argue that the lack of discipline evinces an unwritten policy of leniency. Whether the DRB determination occurred after the alleged wrongdoing is irrelevant to showing the existence of an established policy. Thus, Defendant's argument that the lack of discipline in this case does not show causation fails.

Accordingly, the Court concludes Plaintiffs have pleaded sufficient facts to state a claim for municipal liability based on EPPD's policy of

refusing to discipline EPPD officers involved in instances of excessive force.

### 5. EPPD's Failure to Train Officers on Responding to Mental Health Crises

Plaintiffs allege that EPPD failed to train its officers in numerous respects on how to communicate with, respond to, and protect those individuals involved in mental health crises. Am. Compl. 11. According to Plaintiffs, necessary training would include training on skills "completely different than standard patrol officer training," including patience and de-escalation tactics. *Id.* at 11–12. Plaintiffs claim Chief Allen is aware of this lack of training and has been "deliberately indifferent to its consequences," causing officers to respond to mental health crises by escalating the situations and using intermediate and deadly force that could have been avoided had they been trained properly. *Id.* at 12. Plaintiffs allege that this failure to train is the direct cause of the co-defendant officers' unlawful entry and use of force against Salas-Sanchez in this case.

The standard for establishing liability for failure to train is the same standard for establishing municipal liability in general. *Valle v. City of Houston*, 613 F.3d 536, 544 (5th Cir. 2010) (citing *Roberts*, 397

F.3d at 293. "A plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing [a] violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Id.* (citing *Sanders–Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010)). "Moreover, 'for liability to attach based on an "inadequate training" claim, a plaintiff must allege with specificity how a particular training program is defective.'" *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)).

### a.    *Inadequate Training Procedure*

Plaintiffs allege that EPPD provides absolutely no training to its officers in non-violent, non-confrontational methods of interacting with mentally ill individuals. Am Compl. 11–12. Plaintiffs incorporate by reference the nine instances of past excessive force in order to demonstrate the effect of the inadequate training. *Id.* at 12. They further allege that Chief Allen knew that officers routinely encountered mentally ill individuals, knew they lacked the training to effectively respond to such situations, and was aware of the multiple lethal

instances of force against such individuals that resulted. *Id.* Despite this, they claim Chief Allen was deliberately indifferent to the consequences of the failure to train. *Id.*

While it is true that Plaintiffs provide little specific detail about the scope or nature of EPPD training, they specifically allege that EPPD failed to train its officers on how to (1) make first contact with a mentally unstable individual; (2) de-escalate mental health crises rather than escalate the confrontation; (3) take steps to minimize the use of deadly or intermediate force when dealing with such a person; and (4) respond to crisis intervention calls or use verbal de-escalation tactics. Resp. 25. These are sufficiently detailed factual allegations about the allegedly deficient training program to state a claim that the City failed to train its officers properly. "Because these allegations refer to 'the specific topic of the challenged policy or training inadequacy,' . . . they provide the City with adequate notice of the claims against it" and can thus survive a motion to dismiss. *Schaefer v. Whitted*, 121 F. Supp. 3d 701, 719–20 (W.D. Tex. 2015) (quoting *Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d 826, 844 (S.D. Tex. 2011)). Further, the pattern of past similar incidents involving excessive force

against those showing signs of mental illness supports the inference that the City lacked proper training procedures.

Defendant counters that "there is no constitutional requirement that officers be trained on policing standards or methods for persons with mental health conditions." Mot. 10. However, Plaintiffs need only show that training was inadequate and caused the constitutional injury alleged, not that the whole system of training was unconstitutional. *See Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) ("While an unconstitutional official policy renders a municipality culpable under § 1983, even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result.") (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997)).

Further, Defendant relies on *Saenz v. City of El Paso*, 637 F. App'x 828, 832 (5th Cir. 2016), to argue that listing other previous similar examples of excessive force is insufficient to plead failure to train. However, *Saenz* merely held that when listing previous similar instances of excessive force, plaintiffs must include sufficient factual detail to allow courts to draw a reasonable inference that the past

examples were more than simply "isolated incidents" of misconduct. *Id.* Here, as the Court has discussed previously, see *supra*, section B(1)(a), Plaintiffs include sufficient factual detail to demonstrate that these past incidents were substantially similar. Thus, the Court can infer that these were not just isolated incidents but rather a pattern resulting from the City's failure to properly train EPPD officers.

b.    *Moving Force Causation*

"Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405. Plaintiffs allege that the City's "failure to train is a direct cause in the unlawful entry into [Salas-Sanchez]'s home and the unlawful use of intermediate and deadly force against" him. Am. Compl. 11. Further, they claim "[t]his failure to train has caused officers to routinely respond to mental health crises using deadly or intermediate force to escalate the situation . . . result[ing] in . . . the [nine] incidents described"

previously. *Id.* at 12. Accordingly, "such a policy is the moving force that led to the constitutional violations" in this case. *Id.*

Based on these allegations, the Court can reasonably infer that failing to train EPPD officers on appropriate tactics for interactions with mentally ill individuals caused the constitutional violations in this case. While the Court recognizes the extremely rigorous standard of causation that accompanies such a claim, for purposes of properly pleading their claim, these allegations are sufficient. While there are certainly other plausible inferences for the cause of the constitutional violations at issue here, the Court need not rule out other causes for the injury alleged in order to deem this cause plausible.

On the issue of causation, Defendant argues only that "[w]ithout a showing of what training the [co-defendant o]fficers received, Plaintiffs have not, and cannot, show how the [co-defendant o]fficers' training was the moving force in causing the alleged violation of Plaintiffs' rights." Mot. 11. While this may be true at the summary judgment stage, the Court accepts Plaintiffs' allegations about the deficiencies in the training program as sufficient. Plaintiffs need not describe the existing training program in its entirety to plausibly allege how and why it is

deficient. *See Piotrowski*, 237 F.3d at 579 ("[E]ven a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result.") (quoting *Brown*, 520 U.S. at 407).

>    c.    *Municipality's Deliberate Indifference to Training Policy*

"Deliberate indifference of this sort is a stringent test, and 'a showing of simple or even heightened negligence will not suffice' to prove municipal culpability." *Piotrowski*, 237 F.3d at 579 (quoting *Brown*, 520 U.S. at 407). To show deliberate indifference, it must be "obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992). For example, arming officers with guns but failing to train them on the constitutional limits of the use of deadly force would amount to deliberate indifference. *Id.* Similarly, providing officers with firearms without training them on individuals' Second Amendment rights or how to interact with "lawfully armed citizens" amounts to deliberate indifference. *Schaefer v. Whitted*, 121 F. Supp. 3d 701, 719 (W.D. Tex. 2015).

Again, Plaintiffs plead sufficient facts to support the reasonable inference that Chief Allen was deliberately indifferent to the obvious consequences of failing to train EPPD officers in specific methods for interacting with mentally ill individuals. Police are often asked to serve many roles in our community and involve themselves in various undesirable situations for which they may not have sufficient training. However, one of those situations involves interacting regularly with mentally ill individuals who may be disturbed, confused, aggressive, depressed, or delusional. If officers are given the authority to use deadly force when they fear for their safety, they must be given the tools to adequately discern when they are in danger and how to minimize and reduce that danger when interacting with an individual suffering from mental health issues. One of these tools is adequate training in the multiple areas Plaintiffs describe. It is the City's responsibility that those armed with lethal force know how to use it appropriately, and it is the City's fault if their employees consistently misuse that force. The frequent and substantially similar uses of excessive force by EPPD against the mentally ill should have alerted Chief Allen to the need for improved training in this regard. While this

failure may have been excusable while the need for such training was gradually becoming apparent, Plaintiffs have pleaded facts suggesting the need was apparent long ago. Plaintiffs highlighted nine different occasions over the last four years where EPPD officers appear to be utterly unprepared for various encounters with individuals suffering from mental health crises. If Plaintiffs' allegations are true, a reasonable policymaker would have implemented enhanced training techniques to reduce the frequency of these outcomes, yet Chief Allen failed to do so here. Thus, the Court concludes that Plaintiffs have pleaded sufficient facts to support an inference of deliberate indifference.

### 6. Defendant's Remaining Arguments

Defendant claims that because Plaintiffs allege that co-defendant Officer Rivera "acted contrary to official city policy" when he used his taser against Salas-Sanchez, he could not have been acting consistent with a citywide custom or practice. Mot. 5. Further, Defendant argues that because Plaintiffs claim that "no reasonable officer would believe that shooting [or tasing] the Deceased was right," co-defendant Officers Gomez and Rivera could not have been following EPPD policy. Mot. 6.

These arguments are unpersuasive. First, the existence of a certain official, written policy does not automatically preclude a finding that the City encouraged or condoned behavior that was contrary to that policy. There could plausibly be an official policy condemning the use of excessive force, and an unofficial policy condoning or encouraging it. Thus, this argument fails. Second, just because an officer was acting unreasonably, it does not follow that he or she failed to adhere to City policies. Such logic begs the question of whether City policies were reasonable in the first place, one of the very facts in dispute in this case. Thus, Defendant's argument that the officers were acting unreasonably—and thus that they could not have possibly been acting pursuant to City policy—fails.

Further, Defendant mentions repeatedly in its Reply that Salas-Sanchez was "unarmed, presenting no threat, and running away" when he was shot. Reply 7–8. Defendant argues that this indicates that none of the City's policies caused the excessive force; it was instead the co-defendant officers' own independent decision. *Id.* While the co-defendant officers' decision was undoubtedly a link in the causal chain that led to the injury, this does not preclude the City's various policies

and practices from potentially being independent moving forces that caused the injury. Thus, this argument fails as well.

For the foregoing reasons, the Court finds Defendant's additional arguments unpersuasive and will deny its Motion.

## IV. CONCLUSION

Given the foregoing analysis, the Court concludes that Defendant's Motion should be denied.

Accordingly, **IT IS ORDERED** that Defendant City of El Paso's "Rule 12 Motion to Dismiss" (ECF No. 22) is **DENIED**.

SIGNED this _____6_____ day of October, 2017.

_____
PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE