IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

CELIA SANCHEZ and OSCAR SALAS,  §
Statutory Death Beneficiaries of ERIK  §
EMMANUEL SALAS-SANCHEZ,  §
                                   §
    Plaintiffs,  §
                                   §
v.                                 §   Civil Action No. 3:17-cv-00133-PRM
                                   §
MANDO KENNETH GOMEZ, ALBERTO  §
RIVERA, PAMELA SMITH, and the  §
CITY OF EL PASO, TEXAS  §
                                   §
    Defendants.  §

## PLAINTIFFS' RESPONSE TO DEFENDANT GOMEZ'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE PHILIP R. MARTINEZ, U.S. DISTRICT JUDGE:

    Come now CELIA SANCHEZ and OSCAR SALAS, Plaintiffs, and file this their response to Defendant Gomez's Motion for Summary Judgment:

### INTRODUCTION

    On April 29, 2015, El Paso Police Officer Mando Kenneth Gomez ("Gomez") shot and killed Erik Emmanuel Salas-Sanchez ("Erik") after making an unlawful forced entry into his home. That evening, Gomez and his fellow officers, Alberto Rivera and Pamela Smith, arrived at Erik's home on Jesuit Street to talk with Erik after an incident at a neighbor's home. After talking with Erik's mother for some time by the front door, the officers entered Erik's home to arrest him without a warrant, consent, or exigent circumstances. In the home, Gomez shot the unarmed, non-threatening, and 117 lb. Erik three times in the back, killing him. As a result, Plaintiffs brought this Section 1983 claim against Gomez for violations of Erik's Fourth Amendment constitutional rights including the warrantless entry, unlawful seizure, and use of excessive force.

## FACTUAL STATEMENT

The factual summary of what happened in this case is located as Exhibit A in the Factual Appendix [Doc. 161].

## ARGUMENTS AND AUTHORITIES

A motion for summary judgment is properly granted only if there are no genuine issues of material fact. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is material if its resolution could affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the Court must draw all reasonable inferences in favor of the non-moving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). The Court must disregard all evidence favorable to the moving party that a trier of fact is not required to believe. *Id.* In this case, there exist genuine issues of material fact whether Gomez unlawfully entered Plaintiffs' home or used excessive force. Further, Gomez is not entitled to qualified immunity for the unlawful entry into Erik's home and the shooting death of Erik.

**I.    Summary judgment should be denied because: (1) the evidence establishes a genuine issue of material fact that Gomez unlawfully entered Plaintiffs' home to arrest Erik; and (2) Gomez is not entitled to qualified immunity for unlawfully entering Plaintiffs' home.**

Gomez argues that the Court should grant his motion because he is entitled to qualified immunity as a law enforcement officer. A state official is not entitled to qualified immunity if "a plaintiff establishes facts showing (1) that the official violated a statutory or constitutional right and (2) that right was 'clearly established' at the time of the challenged conduct." *Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017), *as revised* (Mar. 31, 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)); *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The summary judgment standard – that the Court may not weigh the evidence and must resolve all disputed fact issues in favor of the nonmovant – constrains determinations of qualified immunity. *Tolan*, 572 U.S. at 657. This is particularly important because the question of whether a right is clearly established must be determined "on the basis of the 'specific context of the case.' … Accordingly, courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* (quoting *Saucier*, 533 U.S. at 201).

The evidence here establishes genuine issues of material fact as to whether Gomez violated a constitutional right when he unlawfully entered Plaintiffs' home to arrest Erik. The evidence, in the light most favorable to Plaintiffs, establishes the violation of a constitutional right. The right that Gomez violated when he unlawfully entered Plaintiffs' home to arrest Erik was clearly established on April 29, 2015. Therefore, Gomez is not entitled to summary judgment with regard to his unlawful entry to arrest Erik in his own home.

A.  **The record establishes a genuine issue of material fact that Gomez's entry into the home constituted an unreasonable search and seizure in violation of the Fourth Amendment.**

Entry into a home without a warrant is an unreasonable search and seizure unless a defendant can establish that the facts support one of a limited set of exceptions. *City of Ontario v. Quon*, 560 U.S. 746, 760 (2010). Among those "specifically established" exceptions are circumstances in which: (1) the resident of a dwelling provided consent to an officer to enter the home; or (2) the officers have both probable cause to believe a crime has been committed and there are exigent circumstances that demand entry into the plaintiffs' home. *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 420 (5th Cir. 2008) (citing *U.S. v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007)).

Gomez concedes that there was no warrant to enter the home to arrest Erik and that Plaintiffs did not give him consent to enter their home. [Doc. 145, Def. Gomez's MSJ, p. 15].

Instead, he seeks judgment as a matter of law that no Fourth Amendment violation occurred because, he claims, he entered the home to arrest Erik and was presented with exigent circumstances. [*Id.*]. Plaintiffs respectfully request that the Court deny Defendant Gomez summary judgment on the unlawful entry to arrest because the evidence establishes genuine issues of material fact whether: (1) Gomez or any other officer had probable cause to believe that a crime had been committed or that a mental health arrest was justified; and (2) Gomez was presented with exigent circumstances to justify his entry. The government holds the burden of demonstrating probable cause and exigent circumstances. *Gomez-Moreno*, 479 F.3d at 354.

     1.    The evidence establishes a material fact issue as to whether Gomez had probable cause to believe that any crime was committed when he entered the home.

There is a genuine issue of material fact as to whether Gomez had probable cause to believe that a crime existed when he and the other officers entered the home to arrest Erik. The standard for probable cause, for purposes of the exigent circumstances exception, is whether there were "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Therefore, the question is not whether there was probable cause in hindsight; but rather, whether the officer had facts in his or her knowledge at the time of entry that gave them probable cause to believe that a crime had been or was being committed. *See also*, *U.S. v. Lim*, 897 F.3d 673, 687 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 852 (2019).

Gomez argues he had knowledge of facts to support probable cause for three crimes: (1) burglary; (2) aggravated assault (Texas Penal Code § 22.02); and (3) threatening a public servant (Texas Penal Code § 36.06). [Doc. 145, pp. 15-17]. Here, the evidence establishes an issue of

material fact as to whether any of the officers had information at the time of the entry to arrest Erik to establish probable cause for any of these crimes.

> a.  The record establishes a material fact issue as to whether Gomez had probable cause to believe that Erik had committed a burglary.

First, the facts known to Gomez failed to establish that a burglary had occurred at Ms. Romero's home. [Doc. 145, pp. 15-16]. It is undisputed that the only knowledge of the earlier incident that Gomez had at the time of his entry into Plaintiffs' home was given to him orally by Rivera. Ex. B, Rivera Dep., p. 43:8-10; Ex. K, Gomez Supp. Report, City Bates 784. Rivera stated in his initial Investigation Report that Ms. Romero told him that she had found Erik in her home. Ex. G, Rivera Supp. Report, City Bates 822-24. She then asked him to leave, and he did—albeit after multiple requests. *Id.* Rivera was not told that Erik had a weapon when he was in Romero's home. Ex. B, p. 42:2-11. Ms. Romero did not seek Erik's prosecution; she only wanted the officers to ask him to not do it again. *Id.* at p. 42:18-23; Ex. G, City Bates 822.

When asked which facts Ms. Romero had told Rivera to support a belief that a burglary had occurred, he recounted that Erik: (1) entered the home uninvited; (2) was asked to leave the house and did not comply; (3) opened the fridge (but did not taking anything); and (4) eventually left but wanted to come back in again. Ex. B, p. 44:13-25. None of these facts establishes that a burglary of habitation had occurred. All prongs of the burglary of a habitation crime – enumerated in Texas Penal Code § 30.02(a) – require the suspect to have the intent to commit a felony, theft, or an assault.

Gomez stated that when the officers went to 376 Jesuit, he had no intention of arresting Erik. Ex. K, City Bates 784-86. The officers merely sought to tell him that he should not enter Ms. Romero's home again. *Id.* Gomez stated that he did not believe that a burglary of a habitation

had occurred "[b]ased on the information that I [Gomez] was provided by Officer Rivera at that time..." Ex. H, Gomez Admin. Statement, City Bates 789, para 5.

In his motion, Gomez relies heavily on Ms. Romero's trial testimony, which was given four years after the incident. [Doc. 145, pp. 15-16]. Ms. Romero's testimony, however, is not dispositive as to what Gomez or the other officers believed at the time of their entry into Plaintiffs' home. Her testimony, insofar as she testifies to what she told Rivera, simply adds to the fact issue regarding the "facts and circumstances within the officer's knowledge" regarding any probable cause they had to believe that a crime had been committed. *Hogan*, 722 F.3d at 731.

For these reasons, a genuine issue of material fact exists as to whether, when he entered Plaintiffs' home to arrest Erik, Gomez had any knowledge sufficient to establish probable cause that Erik had committed a burglary.

> b.     *The record establishes a material fact issue as to whether Gomez had probable cause to believe that Erik had violated Texas Penal Code § 22.02(a)(2).*

There is a disputed issue of fact as to whether Gomez had knowledge to establish probable cause that Erik violated Texas Penal Code § 22.02(a)(2) or the underlying § 22.01. Texas Penal Code § 22.01(a)(2) requires a showing that the actor threatens "another with imminent bodily injury." Texas Penal Code § 22.02(a)(2) requires that a person "uses or exhibits a deadly weapon during the commission of the assault" (i.e. the violation of § 22.01). Fact issues exist as to whether: (i) any officer reasonably believed that Erik had a deadly weapon prior to their entry of the home; and (ii) any officer reasonably believed that Erik was threatening anyone with imminent bodily injury.

i.    Officers did not believe that Erik was holding a weapon.

There is a fact issue as to whether officers believed that Erik had a weapon with

which to exhibit in violation of Texas Penal. Code § 22.02(a)(2).  First, two of the eyewitnesses

present during the entry into the home flatly deny that Erik had a weapon.

Celia testified that she never saw Erik holding anything in his hands.  Ex. D, Celia Dep.,

pp. 69:20-70:6.  The officers never told Erik to put down a weapon and never addressed him at all.

*Id.* at p. 72:9-25.  Celia, who was engaged with the officers and Erik throughout the encounter,

unequivocally testified that Erik did not have anything in his hands.

> Q. Did you ever see Erik point anything at the police officers, whether it be an
> object or his hands or his fingers?
> A. No.
> Q. While you were talking with the officers outside, did you ever notice Erik
> holding anything in his hands?
> A. Never.
> Q. At any time after the police officers came to your house, did you ever see Erik
> pick up an object or hold an object in his hands?
> A. No.

*Id.* at pp. 69:20-70:6.

Nora testified that Erik did not have anything in his hands before the officers entered the

home. Ex. F, Criminal Trial Transcript, Gomez Bates No. 146:3-22 (Erik had nothing in his hand),

143:2-145:17 (Erik was about to take my baby son to go to bed when the officers entered), 148:4-

11.[1]  Therefore, the testimony of two eyewitnesses raises a direct fact issue as to whether the

officers believed that Erik ever had a deadly weapon to support a finding that he violated Texas

Penal Code § 22.02(2)(B).

---

[1] Nora testified that Erik was asked by officers to put whatever he had in his hand on the table, he slapped his hand
on the table, and put both of his hands in the air. Ex. F, Gomez Bates No. 178:7-79:14.  However, nothing was
found on the table other than a baby bib and a tray for a high table. *Id.* at Gomez Bates No. 186:13-87:11.
Otherwise, Nora testifies that she never saw an object in Erik's hand. *Id.* at Gomez Bates No. 146:7-21.

Second, the officers' testimony regarding Erik's location and the nature of the alleged object in his hand prior to their entry is both internally inconsistent and directly contradicts the eyewitness testimony of Nora and Celia.  Though the Court should not make a credibility determination, the inconsistencies in testimony – viewed in a light most favorable to the nonmovants – do weigh in favor of leaving this issue to the jury.  *Thomas v. Great Atlantic & Pacific Tea Co.,* 233 F.3d 326, 331 (5th Cir. 2000) ("when questions about the credibility of key witnesses loom as large as they do here, summary judgment is inappropriate").[2]

Smith and Rivera claim that they thought Erik had a gun or a boxcutter before they entered the home.  Ex. B, pp. 67:6-68:9; Ex. C, p. 139:2-10.  However, their actions at the time are impossibly inconsistent with a true belief by law enforcement officers that Erik had a weapon prior to their entry into the home.

According to Rivera, five to ten minutes passed from the time that Erik first appeared to the officers' entrance into the home. Ex. B, pp. 108:13-109:4. In that period of time, Rivera claims that Erik exited the home, pointed a handgun at the officers three times, and never let go of what Rivera continued to believe was a handgun.[3] *Id.* at pp. 67:25-68:9, 73:11-14, 81:25-82:18. Rivera states that the first time that Erik appeared in a "shooting stance," Rivera pulled his firearm and pointed it at Erik, ready to shoot, because he was an imminent threat. *Id.* at pp. 70:18-71:1. Rivera then holstered his firearm and never pointed it at Erik again – despite the fact that over the next five to ten minutes Rivera claims that Erik continually threatened to kill the officers while holding the alleged weapon. *See generally Id.* at pp. 60-105. Throughout those five to ten minutes, Rivera

---

[2] *See also Hardie v. Target Corp. of Minnesota,* No. 2:05 CV 1543, 2006 WL 2356019, at *3 (W.D. La. Aug. 11, 2006) (citing *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir. 1987)) ("while not in a position to make determinations of credibility, the court may properly consider the existence of inconsistencies between depositions and affidavits").

[3] It should be noted that neither Celia nor Nora testify that Erik was ever outside the home – directly contradicting Rivera. Ex. F, Gomez Bates No. 57.

<u>never</u> ordered Erik to drop his gun, *Id.* at pp. 83:11-15, 92:22-93:2, <u>never</u> took cover, *Id.* at p. 84:17-18, and <u>never</u> told Celia to get out of the way or gave her a directive. *Id.* at pp. 85:7-86:11, 97:24-25. There was a period of five to seven seconds in which Erik was seated cradling the alleged weapon in the door frame; yet Rivera again took no steps to disarm him, and none of the officers, including Rivera, told him to drop the alleged weapon. *Id.* at pp. 94:13-95:19.

Finally, Rivera testified that, moments prior to his decision to enter the home, Rivera was not concerned for anyone's safety:

Q. Did you tell the mother to get out of the way?
A. No.
Q. Were you concerned about the mother's safety at that time?
A. No.
Q. Were you concerned about your safety at that time?
A. No.
Ex. B, pp. 97:4-98:6.

Rivera's actions that night are far afield from the state of the law and standard police practices for an officer that is faced with a deadly weapon. Ex. N, Katsaris Aff., p. 9. Rivera's actions were entirely inconsistent with any reasonable belief that he, as a law enforcement officer, believed that Erik had a weapon prior to entering the home. When viewed in this light, his testimony actually supports the eyewitness testimony of Celia and Nora that Erik did not have a weapon prior to the officers' entry into the home.

In Smith's version, she claimed that she thought Erik had a box cutter and communicated that to Rivera and Gomez. Ex. I, Smith Admin. Statement, City Bates 851-52, para. 12. She then claimed that it had an "angled edge" and "may have been a gun." *Id.* She claims she thought this weapon posed an imminent threat, but never said a single thing to Erik, his mother, or the other officers about this threat in the ensuing 5-10 minutes prior to entry. Like Rivera, Smith never told Erik to drop whatever object he had in his hands at any point. Ex. C, pp. 140:1-141:21. Nor did

she hear any other officers tell him to drop what was in his hands. *Id.* Nor did she draw her firearm – despite believing he had a deadly weapon. *Id.* at pp. 117:19-118:2, 127:25-128:2.   Then she made entry into the home to arrest Erik on the basis of an Emergency Detention Order ("EDO") without mentioning an alleged weapon. *Id.* at pp. 150:7-152:19.

While Smith claims she saw a weapon, she also states that she was scared Erik would take her weapon or that he would go into the home and find a weapon. Ex. F, Gomez Bates No. 486:3-20 ("my concern was how far was he going to go into the home to [] retrieve a weapon[.]").  In fact, Smith states that at the moment she made the decision to enter the home that she "did not see an object in his hand as he ran in to [*sic*] the kitchen. . . I believed that he would have access to a weapon if the subject ran into the kitchen." Ex. L, City Bates 855, para. 17(e) (emphasis added). These statements are not consistent with a belief by Smith that Erik had a handgun or box cutter in his hand prior to entry.

Finally, Gomez claimed that he saw a "long heavy object hanging from inside his front sweater pocket." Ex. H, City Bates 802, para. 43. He then claims that he thought it was a "heavy squared butcher knife without a handle but heavy enough to be a gun as well." *Id.* at City Bates 802, para. 43(e). He later claims that he believed the weapon to be a "sharp machete without a handle." *Id.* at City Bates 813, para. 61. Once he entered the home, he thought it was a "long knife like [*sic*] weapon . . . inside his sweater pocket" then a "dark long and curved gun shaped weapon." *Id.* at City Bates 807, para. 52, 53.

Unlike Rivera and Smith, Gomez never states that Erik pulled the object out of his pocket and pointed it at officers before they entered the home—according to Gomez, the object was in Erik's pocket the entire time. *Id.* at City Bates 803, para. 45. Contrary to Rivera, Smith, or Celia, Gomez claims that he told Celia to take the weapon away from Erik. *Id.* at City Bates 803-04,

para. 46. He also claims that Celia attempted to take the alleged weapon from Erik—no other eyewitness makes this claim, including Celia. *Id.* at 812, para. 60(d). When asked why he entered the home, however, Gomez makes no mention of the weapon. He claims that the sole reason for his entry was Celia pushing Erik – not the existence of a weapon. "The reason I entered was because at this time I am observing Eric's [*sic*] mother to be attempting to push Eric into the hall way area with both her hands . . . I observed both to be assaulting each other as they are both struggling and pushing each other." *Id.* at City Bates 805, para 49(d).[4]

Taking into account the testimony of all eyewitnesses, and their inconsistencies, the record establishes a clear issue of material fact as to whether Gomez believed Erik to have a weapon prior to entry into the home to support probable cause for assault under the Texas Penal Code.

> ii.    Gomez did not perceive that Erik was threatening him or anyone else with imminent bodily injury.

There is also a stark fact issue as to whether anyone present at the scene thought Erik was threatening imminent bodily injury on anyone. Neither Celia nor Nora were afraid of Erik and they agree that he did not "threaten another with imminent bodily injury." TEX. PEN. CODE § 22.01(a)(2). According to Celia, after she asked the officers to help her with Erik's mental illness, he appeared in the living room and loudly told the officers to leave. Ex. D, pp. 148:19-49:3. He called them dogs twice. *Id.* at 63:24-65:2. Nora states that Erik came out of his room twice, but only called the officers "dogs" the second time that he left his room. Ex. F, Gomez Bates No. 132:8-13, 137:21-140:9. When his mother and sister told him to stop saying that, he told Nora that

---

[4] According to Gomez, the reason Celia approached Erik in the first place was because he had "told her to control him and place him inside his room." Ex. K, City Bates 785; *see, also* Ex. H, City Bates 804, para 46(b) ("under my direct order, the mother proceeded toward Eric [sic] in an attempt to hopefully convince him or take away the weapon. . .") In essence, he alleges that he entered the home because he was worried about imminent threat of Erik moments after he assessed the threat as minimal enough to request that a civilian, Celia, approach Erik and send him to his room. This only undercuts any reasonable belief by the officers that they believed that Erik had a weapon or posed an imminent threat.

he was going to take her son to bed.  Nora was, in fact, about to hand her son to Erik when the officers entered the home.  *Id.* at Gomez Bates No.  145:6-146:20.

Celia and Nora agree that Erik never told the officers that he was going to kill them and he did not wave a weapon at them.  Ex. D, p. 68:13-69:19; Ex. E, p. 57:17-19.  He did not challenge the officers to come into the house.  Ex. D, p. 68:13-69:19; Ex. E, p. 57:17-19..  Nor did he exit the house, pointing his fingers at the officers.  Ex. F, Gomez Bates No. 57:3-58:8.  Nora makes clear that Erik was not angry and was not yelling at the officers when he told them to leave.  *Id.* at Gomez Bates No. 177:7-18.  Celia states that when Erik told the officers to leave, he spoke in a strong tone of voice but did not yell.  *Id.* at Gomez Bates No. 101:3-103:23, 110:8-20.  The officers not once responded to her son's request that they leave.  *Id.* at Gomez Bates No. 102:15-20.

Smith agrees that Celia never expressed to the officers that she was afraid of her son.  Ex. C, pp. 151:25-152:19, 153:20-154:12.  In fact, Nora was handing her son to Erik so Erik could take him to bed when the officers entered the home.  Ex. F, Gomez Bates No. 145:6-146:20.

Finally, Smith and Rivera have testified that they did not believe they had probable cause to arrest Erik for <u>any</u> crime when they entered the home.  Ex. B, p. 101:3-19; Ex. C, pp. 151:25-152:7 (when asked whether she entered the home based on Erik's commission of a crime, Smith stated "[N]o, ma'am, not – not a crime that – that – you know, that I was aware of.").  In sum, there are stark fact disputes as to whether Gomez had knowledge of any facts to support probable cause that Erik committed a burglary or violated Texas Penal Code §§ 22.01(a)(2), 22.01(b)(1).

> iii.   The evidence establishes a material fact issue as to whether Gomez had probable cause to believe that Erik had violated Texas Penal Code 36.06(a)(1)(A).

It is a violation of Texas Penal Code § 36.06(a)(1)(A) if a person "intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account

of the status of another as a public servant." TEX. PEN. CODE § 36.06(a)(1)(A).  As stated in, *supra*,

Section (I)(A)(1)(b)(ii), there is a genuine issue of material fact whether Erik threatened to harm

the officers by an unlawful act.  Further, there is no evidence presented in the record, or argued in

Gomez's motion, that Erik ever acted in retaliation on account of Gomez's status as a public

servant.  For these reasons, there are genuine issues of material fact as to whether Gomez had

knowledge of any facts to support probable cause that Erik had violated Texas Penal Code §

36.06(a)(1)(A).

In sum, there are genuine issues of material fact exists as to whether Gomez had any

knowledge sufficient to establish probable cause that Erik had committed a burglary, an assault,

or violated Texas Penal Code § 36.06(a)(1)(A).

> iv.     The evidence establishes a material fact issue as to whether Gomez
>         had probable cause to execute a mental health arrest and transport
>         to a mental health facility.

Gomez also relies on the El Paso Police Department ("EPPD") EDO policy to justify the

unlawful entry into the home.  The policy itself only addresses the arrests of persons with mental

illness and not the circumstances under which an officer may make a warrantless entry.  However,

Gomez argues that in addition to the alleged criminal conduct, Gomez was authorized to detain

Erik to transport him to a mental health facility.  [Doc. 145, p. 6].  A mental health arrest is only

authorized when there exists probable cause that the individual is: (1) mentally ill; and (2) poses

an imminent substantial risk of serious harm to himself or others.  *Cantrell v. City of Murphy*, 666

F.3d 911, 923 (5th Cir. 2012).  For all the reasons set forth in, *infra,* Sec. I(A)(2), there are genuine

disputed fact issues as to whether Erik posed an imminent substantial risk of serious harm to

himself or others.  For this reason, there are disputed fact issues as to whether Gomez had probable

cause to effectuate a mental health arrest and transport Erik to a mental health facility.

2. *The evidence establishes a material fact issue as to whether exigent circumstances existed when Gomez entered to home to arrest Erik.*

Even if a jury were to find that Gomez had knowledge of facts sufficient to support probable cause of a crime or to make a mental health arrest, the evidence establishes a genuine issue of material fact as to whether any exigencies existed to justify entry into the home.

Gomez first argues that exigent circumstances justified entry into the home as a matter of law because Erik posed a "risk that the officers or innocent bystanders [would] be endangered." [Doc. 145, p. 17] (quoting *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997)) (alteration in original); or because Gomez was justified under the emergency aid doctrine.

Whether persons "would be endangered" is not the correct standard for exigent circumstances that allow for warrantless entry in this context. Instead, exigent circumstances exist if officers reasonably believe that entry into a home is necessary to stop an imminent threat of serious injury. *U.S. v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403-04 (2006)).

Plaintiffs acknowledge the existence of an emergency aid doctrine under federal jurisprudence. *Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *Brigham City*, 547 U.S. at 403 (2006).[5] The emergency aid doctrine is extremely limited and to be "strictly circumscribed to the exigencies which justify its initiation." *Mincey*, 437 U.S. at 392. The emergency aid doctrine allows an officer to enter a residence if she has a belief that she must act to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City*, 547 U.S. at 403 (citing *Mincey*, 437 U.S. at 392). "The need to assist persons who are seriously injured or threatened with such injury is an exigency." *Troop*, 514 F.3d at 409 (citing *Brigham*

_____

[5] It should be noted that the emergency aid doctrine is sometimes analyzed separately from the exigent circumstances exception. *See, generally, Brigham City*, 547 U.S. at 403. Nonetheless, given their similarities, Plaintiffs analyze them together.

*City,* 547 U.S. at 403-04).   Where officers have knowledge of some previous danger to the

occupants of a home but that knowledge is not specific regarding an immediate serious harm, entry

into a home is not justified by the emergency aid exception. *Gates,* 537 F.3d at 422.[6]

The evidence here establishes that there are genuine issues of material fact whether Erik

posed a risk of imminent serious injury to anyone on the night of his death.   First, the officers'

own testimony establishes a fact issue as to whether Erik posed an immediate threat to the officers

or his mother.   Smith, Rivera, and Gomez have all explained numerous times in interviews,

affidavits, and depositions their reasons for entering the home – none of those reasons involve Erik

posing an imminent threat of serious bodily injury or death.   Smith was unequivocal when asked

numerous times why she entered the home – she did not consider an imminent threat as a factor

justifying her decision.   Ex. C, pp. 150:12-152:19 (describing every reason why she entered the

home without mention of Erik being an imminent threat).   Rivera takes a similar position.   He

entered the home to conduct an EDO because Erik was angry that the officers were there, Erik

needed an assessment, and the mother told Rivera that she was trying to get Erik help.   Ex. B, pp.

101:3-102:16.   When asked, "Was there any other reason you decided to EDO him?" he answered,

"No." *Id; see also* Ex. J, Rivera Admin. Statement, City Bates 835 ("I made the decision to go in

after Erik because I felt it was the best and only opportunity to gain control of him was at that time

due to him not posing an immediate threat toward us . . .") (emphasis added).

Gomez claims he entered the home to arrest Erik because he witnessed an assault.   Ex. H,

City Bates 805, para 49(d).   Gomez claims that he saw Celia assault Erik.   His statement is directly

contradicted by: (1) Celia, Ex. F, Gomez Bates No.  108-09; (2) Nora, *Id.* at Gomez Bates No. 134;

and (3) Smith, Ex. L, City Bates 854, para. 17.   Celia has consistently testified that neither she nor

---

[6] Gomez appears to rely on the EPPD EDO policy to justify his entrance into the home.   As mentioned in, *supra,* Sec. I(A)(1)(b)(iv), this policy only addresses the detention and transport of individuals.

Erik touched each other – that she merely motioned for him to go back to his room. Ex. F, Gomez

Bates No. 109:7-10. Nora also states that she never saw Celia or Erik hit each other. *Id.* at Gomez

Bates No. 134:11-23. Smith testified that she only saw Celia "slapping or pushing" Erik but that

she "did not see [Erik] strike back at his mother. I did not see the mother flinch or make a motion

that led me to believe [Erik] had struck her." Ex. L, City Bates 854, para. 17. Therefore, the record

does not support that Gomez saw violence or an imminent threat of assault between Erik and Celia.

This Court previously ruled that the facts in Plaintiffs' First Amended Complaint did not

establish that Erik posed a threat of imminent injury to himself, his family, or the officers as a

matter of law. [Doc. 45, pp. 13-15]. Those facts included: (1) Celia's indication to the officers

that Erik needed mental health help, [Doc. 17, ¶¶14, 15]; (2) Erik's statement to his mother and

her request that he let her talk with the police, [*Id.* at ¶18]; (3) Erik's statements to the officers that

they should not be at his home and telling them to leave [*Id.* at ¶19]; and (4) Erik did not have

weapons and did not threaten anyone while he told the officers to leave [*Id.*]. Now that the record

has been developed, the Court is faced with material fact issues as to each of these allegations.

This Court stated that "[d]efendants are unable to point to facts as alleged by Plaintiffs that

could lead a reasonable police officer to more than a vague, generalized suspicion that Mr. Salas-

Sanchez, the officers, or the residents inside Plaintiffs' home were in danger." [Doc. 45, p. 15].

Similarly, the Court today should deny Gomez's Motion regarding the unlawful entry claim

because the evidence before the Court, viewed in the light most favorable to Plaintiffs, is replete

with fact issues as to whether Erik truly posed a risk of imminent serious injury or death when the

officers entered the home to arrest Erik.

On the contrary, viewed in the light most favorable to Plaintiffs, the officers were faced

only with a person in mental health distress who was unarmed, briefly and loudly told the officers

that he wanted them to leave, and was not pushing or otherwise exhibiting violence toward his family inside the home. The officers were not faced with an imminent threat to themselves, family, or others. In fact, the record supports that the only source of Erik's agitation was the officers' presence at Erik's home. Viewed in this light, the officers could have "retreat[ed] cautiously" and sought a warrant without entering the home. *Troop,* 514 F.3d at 410. Therefore, there is a genuine issue of material fact whether Gomez violated Plaintiffs' Fourth Amendment constitutional right when he entered Erik's home to arrest Erik.

**B.   Gomez is not entitled to Qualified Immunity because his unlawful entry into Erik's home to arrest Erik violated clearly established search and seizure jurisprudence at the time.**

Next, Gomez's violation of Erik's Fourth Amendment rights based on his entry into Erik's home to arrest Erik violated clearly established law. As stated in, *supra,* Sec. I(A), there is no dispute that Gomez did not have a warrant to enter Plaintiffs' home on April 29, 2015. For the same reasons stated in, *supra,* Sec. I(A), viewing the facts in the light most favorable to Plaintiffs, the officers did not have probable cause nor were they faced with exigent circumstances when they entered Plaintiffs' home. Therefore, Gomez's entry into the home was an unlawful entry in violation of the Fourth Amendment.

The manner in which Gomez and the other officers entered the home to arrest Erik was outside the contours of clearly established search and seizure jurisprudence at the time of the violation. The officers cannot justify a warrantless entry on the basis of exigency if they lack "reliable information of an 'urgent, ongoing emergency.'" *Rice v. ReliaStar Life Ins. Co.,* 770 F.3d 1122, 1132 (5th Cir. 2014) (citing *U.S. v. Timmann,* 741 F.3d 1170, 1180-81 (11th Cir. 2013)).

On one end of the spectrum, warrantless entry is justified by exigency where officers are faced with a person who is exhibiting some form of physical violence or threatening physical

violence. In *Rice*, an officer was faced with a defendant possessing a gun, in a clear drunken state, and holding the gun to his head, which the court held was sufficient to establish exigent circumstances to enter the defendant's home to save his life. *Id.* The court in *Rice*, however, made clear that such an entry would not be justified under the circumstances presented in *Timmann*— where there was evidence that the officer did not see or hear that a fight had taken place, and observed no violent behavior. *Id*; *see also Timmann*, 741 F.3d at 1181. Similarly, in *Rockwell v. Brown*, exigent circumstances existed to enter a man's personal bedroom when (1) his mother was worried about her son's physical safety, (2) the man was physically shaking a door and pounding walls, and (3) he verbally threatened the officers. 664 F.3d 985, 996 (5th Cir. 2011).     On the other end of the spectrum, where there is not a sign of imminent danger or threats by occupants of a home, an officer is not faced with exigent circumstances and must obtain a warrant before entering a home. In *Gates v. Texas Department of Protective & Regulatory Services*, the defendants had received complaints of violence by a father against his son in the morning. 537 F.3d 404, 411-17 (5th Cir. 2008). The court found that those earlier complaints were not sufficient grounds to enter the home in the afternoon without a warrant. *Id.* at 420-23.

Here, construing the facts in the light most favorable to Plaintiffs, the officers were: (1) aware that Erik had mental health problems; (2) did not see him with a weapon; (3) did not see him use threatening gestures; (4) did not see him threaten his mother; and (5) heard him tell them to leave but not threaten them or his mother with imminent harm. Under these facts, Gomez did not reasonably believe that Erik posed an imminent risk of serious injury to himself, his mother, or the officers. Therefore, in light of clearly established contours of Plaintiffs' Fourth Amendment rights as set forth in *Rice*, *Gates*, and *Timmann*, Gomez violated clearly established law.

This case is akin to the circumstances in *Kincheloe v. Candle*, No. A-09-CA-010LY, 2009 WL 338047, at *12 (W.D. Tex. Oct. 16, 2009), *report and recommendation adopted*, No. A-09-CA-010LY, 2009 WL 106699745 (W.D. Tex. Dec. 7, 2009). In that case, the chief of police approached the plaintiff's home alleging that he was concerned for the welfare of a minor because the father was wearing soiled clothing, had a messy house, and was "agitated." *Id.* The chief had no information that the father was violent or that the child was in danger and asked the father to go wake the child up. *Id.* As the father went to wake up the minor, the chief kicked open the door and entered. *Id.* The court found that these facts did not constitute a showing of imminent danger sufficient for the chief to avail himself of the exigency exception to the warrant requirement and that his unlawful entry violated clearly established law. *Id.*[7]

Here, it was clearly established on April 29, 2015 that officers cannot enter homes to arrest people when they are faced with someone who is not threatening themselves or others with imminent serious injury. Gomez entered the home in violation of clearly established law. Therefore, the Court should deny Gomez's qualified immunity defense.

**II.** **Summary judgment should be denied because: (1) the evidence establishes a genuine issue of material fact that Gomez violated the Fourth Amendment when he shot Erik three times in the back; and (2) Gomez is not entitled to qualified immunity for his use of excessive force.**

Gomez's motion for summary judgment should be denied because there is evidence that the fatal shooting of Erik in his home violated Erik's clearly established Fourth Amendment rights

---

[7] *See also, U.S. v. Hastings*, 246 F. Supp. 3d 1163, 1167 (E.D. Tex. 2017) (finding that general knowledge of mental illness and a generalized fear of "suicide by cop" is not sufficient to establish exigent circumstances to protect occupants from imminent injury); *Osborne v. Harris Cty.*, 97 F. Supp. 3d 911, 919 (S.D. Tex. 2015 (finding that exigency did not exist where officers had a generalized concern for a victim of domestic violence but lacked particularized facts to support that there was any imminent danger other than the fact that the alleged abuser was nervous and uncomfortable when he opened the door).

to be free from excessive force.[8]  For these reasons, Gomez is not entitled to qualified immunity or summary judgment.

**A.      There is a material fact dispute whether Gomez's deadly shooting of Erik in his home violated the Fourth Amendment.**

To establish a Section 1983 excessive force claim, a plaintiff must first show that he was seized. *See Graham v. Connor*, 490 U.S. 386, 388 (1989).  Once a plaintiff has shown seizure, he must show "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable." *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013).  Gomez does not dispute that Erik was seized by the gunshot nor that he suffered an injury—death—that resulted from the use of force.  Further, as Plaintiff discusses in Section I(A)(1), the officers did not have probable cause to arrest when they shot Erik. Therefore, the two issues the court must resolve are whether there is a material fact dispute that: (1) Gomez's use of force was clearly excessive; and (2) the use of force was objectively unreasonable.  Because there are stark issues of material fact, summary judgment is inappropriate.

    1.      Gomez's shooting in the back of the unarmed, non-threatening, and 117 lb. Erik was clearly excessive to the need.

In an excessive-force claim, the "inquiry is confined to whether [the officer] was in danger at the moment of the threat that resulted in the [officer's] shooting." *Bazan v. Hidalgo*, 246 F.3d 481, 493 (5th Cir. 2001).  "Where the suspect poses *no immediate threat* to the officer and *no threat to others*, the harm resulting from failing to apprehend him does not justify the use of deadly

---

[8] Gomez seeks summary judgment claiming that his use of a deadly weapon did not constitute excessive force but does not separately seek summary judgment on whether his use of a deadly weapon constituted an unlawful seizure. It should be noted that use of a gun against Erik also constitutes a seizure under the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (a seizure occurs when an officer applies some level of physical force on another). An officer may only seize someone for protective custody purposes if probable cause exists that the individual is: (1) mentally ill; and (2) poses an imminent substantial risk of serious harm to himself or others. *Cantrell v. City of Murphy*, 666 F.3d 911 (5th Cir. 2012). For the reasons stated in Sec. II, there is a fact dispute as to both of these elements. *See* [Doc. 17, p. 4] (alleging that "[n]o facts were presented to the officers that provided probable cause to seize Erik.").

force to do so." *Cole v. Carson*, 905 F.3d 334, 344 (5th Cir. 2018) (emphasis in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). Here, there is a genuine issue of material fact about whether Gomez perceived Erik as a serious threat, immediate or otherwise, when Gomez shot him three times in the back. Gomez alleges that Erik was an immediate threat because: (1) Erik threatened the officers from the doorway of his home; (2) he pointed what officers believed to be a handgun at them multiple times; (3) the officers were concerned for the safety of Celia and her family; and (4) immediately prior to the shooting, Erik unexpectedly jumped out of the hallway and lunged at Gomez with a dark object in his hands and his arms over his head. [Doc. 145, 18-22]. The evidence establishes genuine disputes as to each of these material facts.

a.      *There is a material fact issue as to whether Erik threatened the officers from the doorway of his home.*

First, there is a disputed fact issue whether Erik threatened the officers from the doorway of his home. As discussed in Section I(A), there is a fact issue as to whether Erik threatened the officers throughout the interaction. For the reasons stated earlier, this is a material fact issue.

b.      *There is a material fact issue as to whether Erik pointed what the officers believed was a handgun at them multiple times.*

There is also a genuine issue of material fact whether Erik pointed an object that could be construed as a weapon at the officers at any time. As stated in, *supra,* Section I(A), the various eyewitness testimony establish a genuine issue of material fact that any of the officers saw Erik with a weapon and whether it was ever pointed at an officer. Further, while in his motion Gomez alleges that the officers believed that Erik was holding a dark object in the shape of a handgun or machete, no such object was found at the scene. Therefore, there was a genuine issue of material fact whether Erik had an object in his hands and whether he pointed any object at the officers.

c.      *There is a material fact issue as to whether the officers were concerned for the safety of Celia and her family.*

There is also a genuine issue as to whether the officers were concerned for the safety of the Salas Sanchez family.   Celia never told the officers she was afraid of Erik at any point in the interaction. Ex. C, p. 152:8-19. Gomez claims that he ordered Celia into the home to control Erik and put him in his room – an action that is inconsistent with his claim that he was confronted with imminent threat of serious bodily injury or death. Ex. H, City Bates No. 804, para. 47.c.

Smith testified that no officer instructed Celia not to enter the home after Erik. Ex. C, pp. 132:21-133:1. While Celia was in the home, the officers did not hear Erik threatening his mother nor Celia pleading for help. Ex. C, pp. 148:21-149:18. Rivera also testified that he chose to tase Erik, rather than shoot him, because Erik was not a threat to the officers. Ex. B, p. 109:17-21. Therefore, there is a genuine issue of material fact whether the officers were concerned for the safety of Celia and her family.

> d.     *There is a material fact issue as to whether, immediately prior to the shooting, Erik unexpectedly jumped out of the hallway and lunged at Gomez with a dark object in his hands and his arms over his head.*

Finally, there is a material fact dispute that immediately before the fatal shots, Erik "unexpectedly jumped out of the hallway with the dark object in his hands above his head." [Doc. 145, p. 22]. Gomez fired five shots and Erik was struck three times: in the right back, in the left back, and in the right buttock. Ex. M, Autopsy Report, pp. 1063-1065; Ex. O, City Bates No. 3573. The location of the entry wounds indicates that all shots were fired in quick succession. Ex. N, pp. 17-18. Had Erik been jumping and lunging forward toward Gomez when he began firing, as Gomez alleges, Erik would not have had time to turn a full 180 degrees for the bullets to strike

Erik's back. *Id.* at pp. 17-19. This is true even if Gomez's first two shots missed Erik, something for which there is no evidence.[9] *Id.*

Gomez points to a single item found in the home – a brake shoe – and claims that it is, as a matter of law, the alleged dangerous object. [Doc. 145, p. 9]. This object, however, was not found in the living room, anywhere near Erik's body, nor was it found where Erik would have landed had he been jumping and lunging at Gomez. Ex. H., City Bates No. 817-18, para. 70-71. The object was in fact found in the kitchen behind a wall:



Ex. O, Photos, City Bates No. 698 (arrow added).  When he shot Erik, Gomez was standing in the living room next to the couch and claims that the object, which he alleges Erik was holding, was

---

[9] Although we cannot know which shots were fired first, it is unlikely that Gomez's first two shots missed because, by all accounts, Gomez began shooting in a standing position and in the course of the shooting started to fall back. Ex. N, p. 18.

one foot away from his face. Ex. K, City Bates No. 786. Gomez does not provide evidence of a

fingerprint analysis that this brake shoe was ever held by Erik at any time. More importantly, this

brake shoe, which is approximately 15 centimeters long (5.9 inches), does not at all resemble the

"heavy squared butcher knife" or "sharp machete" that Gomez previously claimed Erik had in his

sweater. Ex. H, City Bates 803, para. 43(f), 52, and 53; Ex. O, City Bates No. 4143.

This lack of physical evidence corroborates Nora's testimony that she would have seen

Erik had he come toward Gomez:

> Q.  How do you know that your brother was walking towards his room prior to
> getting shot?
> A.  Because he went walking on the hallway towards the bedroom. He wasn't
> coming forward, walking towards the living room. I would have seen him,
> because I was very close. I was right there, so – because he was walking on
> the hallway to the bedroom – towards the bedroom

Ex. E, 118:11-118:18.

The fact that Nora did not see Erik lunging at the officer and that he was shot in the back

supports a reasonable inference that Erik was not lunging at Gomez, but was moving away from

him, when he was shot. Therefore, there is a genuine issue of material fact whether, immediately

before the fatal shots, Erik jumped and lunged at Gomez with an object in his hand.

Based on the above, there is a genuine issue of material fact as to whether Erik posed an

imminent threat of death or serious bodily injury when Gomez shot Erik three times in the back.

> 2.  Gomez's shooting in the back of the unarmed, non-threatening, and 117 lb. Erik
> was not only excessive but also objectively unreasonable.

Gomez's actions were also objectively unreasonable. Reasonableness is measured "in

objective terms by examining the totality of the circumstances." *Peterson v. City of Fort Worth,*

588 F.3d 838, 844 (5th Cir. 2009) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). "Whether

the force was reasonable under the Fourth Amendment is determined from the perspective of a

reasonable officer on the scene, rather than with 'the 20/20 vision of hindsight.'" *Ramirez*, 716

F.3d at 377 (quoting *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)).  In determining whether use of force is unreasonable, courts must carefully consider the facts and circumstances of each case including (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers and others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

1.      The severity of the crime at issue.

First, the crime at issue here, if any, was minor.  The officers were responding to a minor property trespass that resulted in no stolen property and no injuries.  *See* Ex. F, Gomez Bates No. 29:14-21.  As stated in, *supra,* Section I(A)1)(a), there is a fact dispute as to whether the officers had facts to support that a crime had been committed.  Therefore, the first *Graham* factor weighs against Gomez.

2.      Whether Erik posed an immediate threat to the safety of the officers and others.

Second, there is a material fact dispute whether Erik posed a threat to Gomez or anyone else.  Erik insisted that the officers leave his home, but he did not threaten them.  Ex. D, pp. 68:13-69:19; Ex. E, p. 57:17-19.  As stated in, *supra*, Section I(A)(1)(a)(ii), there is a fact dispute as to whether the officers believed that Erik posed an immediate threat of serious bodily injury or death to the officers or others.  Therefore, the second *Graham* factor weighs against Gomez.

3.      Whether Erik was actively resisting arrest or attempting to evade arrest by flight.

Finally, Erik was moving away from the officers when he was shot but he was not actively resisting or trying to evade arrest.  First, for a person to be actively resisting or evading arrest, a person must know that officers are attempting to arrest him.  *See Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (holding that a plaintiff's behavior did not rise to active resistance when he was never given commands).  Here, no officer told Erik, Celia, or Nora that anyone was under

arrest at any point. Ex. D, p. 88:8-22. A person is also not resisting arrest when he fails to comply with physical force from the officers without commands or other instructions. *See Newman*, 703 F.3d at 763 (holding that a plaintiff's failure to comply with an officer's physical blows by not falling to the ground did not rise to active resistance). There is no evidence that any officer attempted to make physical contact to restrain or control Erik until he was tased and shot. Therefore, the three *Graham* factors indicate that Gomez's use of force was unreasonable.

The facts, as the Court must view them in the light most favorable to Plaintiffs and resolving all reasonable inferences in Plaintiffs' favor, are as follows: Gomez shot an outnumbered, mentally ill, unarmed, non-threatening, 117-pound Erik in the back while he posed no danger to anyone present. Therefore, the Court should, as it did in its order on Gomez's motion to dismiss, have "little trouble in concluding that shooting an outnumbered, mentally-ill, 117-pound young man in the back when the young man posed no danger to any of the people present in Plaintiffs' residence was objectively unreasonable." [Doc. 45, p. 49].

**C.      Gomez's shooting of Erik violated clearly established law at the time of the incident.**

Construing all reasonable inferences in favor of the Plaintiffs and disregarding all evidence favorable to Gomez that the jury isn't required to believe, Plaintiffs must show that it was clearly established that Gomez could not shoot the unarmed, non-threatening, 117-pound Erik in the back while he was walking away. At the time of the shooting, Gomez did not reasonably perceive any immediate threat of serious bodily injury or death from the unarmed, non-threatening, 117-pound, Erik as he walked away from the officers. Therefore, the inquiry is whether it was clearly established on April 29, 2016 that officers may not use deadly force against a suspect who the officers do not reasonably perceive to be an immediate threat.

It is clearly established that an officer may not use deadly force unless he is faced with serious physical harm or deadly force to the officer or others. *Mason v. Lafayette City-Parish Consul. Gov't*, 806 F.3d 268, 275 (5th Cir. 2015) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

In *Cole v. Carson*, the Fifth Circuit considered whether officers who shot a seventeen-year old young man in 2010 violated the man's clearly established rights. 905 F.3d at 336-37, 341-42. In that case, officers searched for the plaintiff, who was armed and suicidal, for most of the day. *Id.* at 337. The officers located Cole backing out of brush, facing away from the officers, unaware of the officers, and holding a handgun to his temple. *Id.* at 338. The officers did not instruct Cole to freeze or drop his gun. *Id.* Cole began to turn counterclockwise and, at this point, one of the officers fired his weapon – the rest followed suit. *Id.* The Court held that under these facts, Cole posed no threat to the officers or anyone when the officers shot him. *Id.* at 343. The Court held that it was clearly established that "officers are prohibited from using deadly force against a suspect where the officers reasonably perceive no threat." *Id.*

The Fifth Circuit has repeatedly found that use of deadly force against someone who is headed away from officers and does not pose a sufficient threat of death or serious physical injury to anyone is unconstitutional. *See Lytle v. Bexar Cty.,*560 F.3d 404, 417 (5th Cir. 2009); *Graves v. Zachary*, 277 F. App'x 344, 347 (5th Cir. 2008), (quoting *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004)) (denying qualified immunity for an officer who shot someone holding a gun, explaining that "it is objectively unreasonable to use deadly force unless it is necessary to

prevent a suspect's escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others").[10]

Similarly, here, in the light most favorable to Plaintiffs, Erik posed no threat of deadly force when Gomez shot him three times in the back. Immediately before the shooting, Erik had his back to Gomez and was walking away from the officers. *See, supra,* II(A)(5). Nor did he threaten the officers or have a weapon. *See, supra,* I(A)(1)(a)(ii). In light of the clearly established contours of Plaintiffs' Fourth Amendment rights as set forth in *Cole, Lytle,* and *Graves,* Gomez violated clearly established law. For this reason, the Court should deny Gomez's qualified immunity defense.

## CONCLUSION

There are genuine issues of material fact whether Gomez violated Erik's constitutional rights when he unlawfully entered Erik's home, unlawfully seized Erik, and unlawfully shot and killed Erik inside his home. Clearly established law prohibited Gomez's entry into the home and use of excessive force against Erik. For these reasons, Plaintiffs respectfully request that the Court deny Gomez's motion for summary judgment.[11]

---

[10] *See also Mason v. Faul,* No. 6:12-CV-2939, 2017 WL 2656191, at *4 (W.D. La. May 2, 2017) (denying qualified immunity where an officer shot the plaintiff in locations on his body that indicated that the plaintiff was not threatening the officer).

[11] To date, for numerous reasons outside counsel's control, the transcript of Grand Jury testimony has not been produced to the parties. *See, e.g.,* [Doc. 136]. Plaintiffs reserve the right to supplement this motion upon receipt of such testimony.

Dated: June 13, 2019

Respectfully submitted,

THE LAW OFFICES OF ENRIQUE MORENO
701 Magoffin Avenue
El Paso, Texas 79901
(915) 533-9977
Fax (915) 533-0033

By:      /s/ Enrique Moreno
ENRIQUE MORENO
State Bar No. 14430500
emoreno@morenolaw.us
ELENA A. ESPARZA
State Bar No. 24101736
eesparza@morenolaw.us

and

THE LAW OFFICE OF LYNN COYLE, PLLC
2515 N. Stanton St.
El Paso, Texas 79902
(915) 532-5544
Fax (915) 532-5566

By:      /s/ Lynn Coyle
LYNN COYLE
Texas Bar No. 24050049
lynn@coylefirm.com
CHRISTOPHER BENOIT
Texas Bar No. 24068653
chris@coylefirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2019 I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

     /s/ Lynn Coyle
LYNN COYLE