# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| CELIA SANCHEZ and OSCAR SALAS, statutory death beneficiaries of ERIK EMMANUEL SALAS-SANCHEZ,<br>    Plaintiffs,<br><br>v.<br><br>MANDO KENNETH GOMEZ, ALBERTO RIVERA, PAMELA SMITH, and the CITY OF EL PASO, TEXAS,<br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | EP-17-CV-133-PRM |

## MEMORANDUM OPINION AND ORDER

On this day, the Court considered the following submissions filed in the above-captioned cause:

- Defendant Pamela Smith's [hereinafter "Defendant Smith"] "Motion for Summary Judgment" (ECF No. 140) [hereinafter "Smith Motion"], filed on April 30, 2019;

- Defendant Alberto Rivera's [hereinafter "Defendant Rivera"] "Motion for Summary Judgment" (ECF No. 141) [hereinafter "Rivera Motion"], filed on April 30, 2019;

- Defendant Mando Kenneth Gomez's [hereinafter "Defendant Gomez"] "Motion for Summary Judgment" (ECF No. 145) [hereinafter "Gomez Motion"], filed on May 1, 2019;

- Plaintiffs Celia Sanchez and Oscar Salas, statutory death beneficiaries of Erik Emmanuel Salas-Sanchez's [hereinafter "Plaintiffs"] "Response to Defendant Smith's Motion for Summary Judgment" (ECF No. 170) [hereinafter "Response to Smith"], filed on June 14, 2019;

- Plaintiffs' "Response to Defendant Rivera's Motion for Summary Judgment" (ECF No. 171) [hereinafter "Response to Rivera"], filed on June 14, 2019;

- Plaintiffs' "Response to Defendant Gomez's Motion for Summary Judgment" (ECF No. 172) [hereinafter "Response to Gomez"], filed on June 14, 2019;

- Defendant Smith's "Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment" (ECF No. 178) [hereinafter "Smith Reply"], filed on June 28, 2019;

- Defendant Rivera's "Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment" (ECF No. 179) [hereinafter "Rivera Reply"], filed on June 28, 2019;

- Defendant Gomez's "Reply in Support of His Motion for Summary Judgment" (ECF No. 184) [hereinafter "Gomez Reply"], filed on July 1, 2019; and

- Plaintiffs' "Surreply to Defendant Gomez's Reply in Support of His Motion for Summary Judgment" (ECF No. 187) [hereinafter "Surreply to Gomez"], filed on July 8, 2019.

In their Motions, Defendants argue that they are entitled to summary judgment because their actions are covered by qualified immunity. After due consideration, the Court is of the opinion that Defendants Gomez's and Rivera's Motions should be denied and

Defendant Smith's Motion should be granted, for the reasons that follow.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an officer-involved fatal shooting on April 29, 2015.  Erik Sanchez-Salas was shot inside his family home and died as a result of the shooting.[1]  In this section, the Court first describes the incident at Louisa Romero's home that gave rise to police officers responding to a call regarding Mr. Salas-Sanchez.  Then, the Court discusses the facts surrounding the officer Defendants' interactions with Mr. Salas-Sanchez and his mother, Celia Sanchez, at Sanchez's home before officers entered her home.  The Court then describes the parties' allegations about what happened after the officers entered the home, including the use of force.  Finally, the Court briefly describes relevant procedural history related to this suit.

---

[1] Several factual disagreements exist.  For purposes of Defendants' instant summary judgment motions, all fact issues must be resolved in favor of Plaintiffs, the non-moving party.  Nonetheless, the Court provides background information regarding each party's allegations.

## A.  Factual Background

### 1.  The Incident at Romero's Home

On April 29, 2015, Romero found Mr. Salas-Sanchez inside her home and sitting on her living room couch.  Rivera Mot. Ex. E (Trial Tr.), at 25:17–26:9.  Romero recognized Mr. Salas-Sanchez as her neighbor, but she did not know him personally and had not previously spoken with him.  *Id.* at 35:1–6.

During a state court proceeding related to the occurrences giving rise to this case, Romero testified that she "was scared" when she found Mr. Salas-Sanchez.  *Id.* at 26:21.  She also testified that Mr. Salas-Sanchez stood up from the couch and "started walking to where [Romero's] son was" and that Mr. Salas-Sanchez stared at her son while touching his own face and legs but did not threaten her son.  *Id.* at 27:1–19.  Further, Romero did not see a weapon while Mr. Salas-Sanchez was present in her home and recalled that Mr. Salas-Sanchez did not threaten anybody in the home nor appear to be looking around the home.  *Id.* at 28:6–9, 29:1–2.

According to Romero, she "told him on several occasions to get out of the house," and eventually Mr. Salas-Sanchez left.  *Id.* at 28:20–29:9.

After Mr. Salas-Sanchez left the home, Romero locked her door. *Id.* at 29:22–23. Mr. Salas-Sanchez returned to Romero's home and attempted to reopen her door several times before finally walking across the street to his mother's home, where Mr. Salas-Sanchez resided. *Id.* at 30:4–18.

Romero called the police and reported the incident. *Id.* at 30:1–2. Officer Rivera drove to Romero's home and spoke with Romero. *Id.* at 31:22–24. Romero told Rivera that she did not want Mr. Salas-Sanchez to return to her home but indicated that she also did not intend to press charges. *Id. at* 31:2–12. Rivera then left Romero's home and walked across the street to Sanchez's home. *Id.* at 31:13–19.

### 2. Officers' Initial Approach of Sanchez's Home

During his deposition, Rivera testified that he saw Officer Gomez arrive at the scene as he approached Sanchez's home.[2] Rivera Dep. Tr.[3] at 45:7–12. Rivera informed Gomez that Mr. Salas-Sanchez had

---

[2] Officer Smith did not arrive until after Officers Rivera and Gomez initially approached Sanchez's home.

[3] Rivera's deposition transcript can be found in Rivera's Motion Exhibit C, Smith's Motion Exhibit C, Plaintiffs' Appendix Exhibit B, and Gomez's Motion Exhibit B.

entered a home where he was unwanted and attempted to return after leaving and that the homeowner "didn't want anything done other than us going across the street and letting him know not to do that again." *Id.* at 46:3–19. Officers Rivera and Gomez then approached Sanchez's home. *Id.* at 46:22. Rivera had no intent of arresting Mr. Salas-Sanchez at that time. *Id.* at 48:1–3.

Plaintiff Sanchez was at home on April 29, 2015, along with her daughter, Nora Salas-Sanchez, who was Mr. Salas-Sanchez's twin sister. *See* Sanchez Dep. Tr.[4] at 48:5–11. Sanchez testified that, after she went outside to respond to the officer who knocked on her door,[5] the officer asked Sanchez if Mr. Salas-Sanchez was home and whether he was okay. *Id.* at 50:10–22. At this time, Mr. Salas-Sanchez was inside the home. *See id.* After confirming that Mr. Salas-Sanchez was inside the home, Sanchez returned to talk to the officers. *Id.* at 58:25–59:9.

---

[4] Sanchez's deposition transcript can be found in Plaintiffs' Appendix Exhibit D, Gomez's Motion Exhibit C, Smith's Motion Exhibit B, and Rivera's Motion Exhibit B.

[5] Sanchez's front door contains both an outer screen door and an inner wooden door.

### 3. Mr. Salas-Sanchez's Conduct While the Officers were Outside the Home

The parties agree that Sanchez and the officers spoke to each other in front of Sanchez's home. However, the witnesses' individual recollections of Mr. Salas-Sanchez's behavior and interactions with the officers and his mother vary significantly.

#### a. *Defendant Gomez's allegations*

According to Defendant Gomez, after he arrived at the home, Sanchez stepped outside to speak to the officers and told Gomez that her son had been exhibiting behavioral issues and she believed her son might be using drugs or having a mental breakdown. Pl. App. Ex. H (Sealed Report), at 8. Gomez reported that Mr. Salas-Sanchez then came to the door and said, "[W]hat do you want [f**kers]?" Pl. App. Ex. K (Sealed Report), at 1. Then, after being asked to step outside, Mr. Salas-Sanchez replied, "[N]o way [f**ker] you know who I am, all of you know who I am." *Id.* Then, Sanchez told her son to "shut up" and go back inside, and her son closed the door. *Id.* at 2.

Gomez reported that Mr. Salas-Sanchez reopened the door and told Gomez that he would take Gomez's gun and shoot him with it. *Id.* Mr. Salas-Sanchez proceeded to open and close the door "six to eight

times" while the officers spoke with his mother. Pl. App. Ex. H (Sealed Report), at 13. During one of the times that he opened the door, Mr. Salas-Sanchez formed his hand into a "gun-like shape, pointing at [the officers], and laughing" while stating he would kill the officers. Pl. App. Ex. K (Sealed Report), at 2.

Later, Gomez observed "some type of long heavy object hanging from inside [Mr. Salas-Sanchez's] front sweater pocket as he opened the door." *Id.* Gomez told Rivera to watch out for the object. *Id.*

Gomez stated that he then asked Sanchez to control Mr. Salas-Sanchez and to bring Mr. Salas-Sanchez back to his room. *Id.* Gomez also told Sanchez that her son had made a gun-like gesture with his hand. Pl. App. Ex. H (Sealed Report), at 18. Then, the mother begged Mr. Salas-Sanchez to go to his room and began to push her son toward his room. Pl. App. Ex. K (Sealed Report), at 2. Gomez recalled that Sanchez began to "pound and hit" her son, who "proceeded to push the mother back." Pl. App. Ex. H (Sealed Report), at 18.

### b. *Defendant Rivera's allegations*

According to Rivera, while the officers were talking to Sanchez, Mr. Salas-Sanchez yelled at the officers "to leave, that he didn't

[f\*\*king] want us there, to come to the door because he was going to take our weapons and kill us." Rivera Dep. Tr. at 61:23–25. After closing the door, Mr. Salas-Sanchez then "opened the door and said '[f\*\*k] you' and he gets into a stance with a black object in his hands, in a shooting manner." *Id.* at 64:5–8. Rivera perceived the black object to be a gun. *Id.* at 67:6–68:2. Mr. Salas-Sanchez later reopened the door, assumed a shooting stance, and threatened the officers; his mother then ran towards Mr. Salas-Sanchez and "blocked" the officers and "shield[ed]" her son. *Id.* at 73:12–19.

Further, Rivera testified that Mr. Salas-Sanchez then reopened the door and walked outside the home and that Sanchez then "kind of hugged him and was pushing him inside the house." *Id.* at 75:1–14. Mr. Salas-Sanchez brandished the black object while Sanchez was hugging her son; Rivera pointed his service weapon at Mr. Salas-Sanchez during this time but did not shoot the weapon because "the mother's right on top of him." *Id.* at 76:7–77:17. Rivera reported that he ordered Mr. Salas-Sanchez to drop the unknown black object but did not recall any other officer giving any verbal commands. Pl. App. Ex. J (Sealed Report), at 5.

Additionally, Rivera testified that, after Mr. Salas-Sanchez returned inside the home, Mr. Salas-Sanchez and his mother began "playing tug-o-war . . . with the door" as Mr. Salas-Sanchez attempted to open it and the mother held it shut. Rivera Dep. Tr. at 84:25–85:6.

Rivera reported that Mr. Salas-Sanchez moved the curtains near the front window, yelling that he would kill the officers, and that Sanchez told her son to stop and to close the curtains. Pl. App. Ex. G (Sealed Report), at 2. After closing the curtain, Mr. Salas-Sanchez then allegedly sat with his back against the door frame and began to rock back in forth while holding the black object in his hand. Rivera Dep. Tr. at 91:6–12. A few seconds later, Mr. Salas-Sanchez got up and again told the officers they were going to die and then began to walk toward the officers outside the home. *Id.* at 96:20–14. Sanchez pushed her son back into the home with both hands on his chest.[6] *Id.* at 97:19–98:17.

Rivera believed that Mr. Salas-Sanchez was "angry" and not "in the right state of mind." *Id.* at 101:5–12. Thus, Rivera determined that

---

[6] In a written report, Rivera recalled the mother's interaction somewhat differently and stated that she pushed her son back into the house "with her back" and used her hands to block Gomez from getting to her son. Pl. App. Ex. J (Sealed Report), at 7.

an emergency detention order ("EDO")[7] would be appropriate based on Mr. Salas-Sanchez's actions coupled with his mother's prior statement that she had tried to get her son help. *Id.*

### c. *Defendant Smith's allegations*

Smith asserts that, after she arrived at the home, Sanchez appeared to be upset and told the officers that her son had not been acting like himself and that Sanchez did not know what to do in response. Smith Dep. Tr. at 101:2–102:17. Smith stated that she arrived at the home while Gomez and Rivera were talking with Sanchez and that she greeted the mother after arriving. *Id.* at 99:4–100:19.[8]

Smith testified that, from behind the home's screen door, Mr. Salas-Sanchez threatened that he would take the officers' weapons and kill them. *Id.* at 109:6–9. Mr. Salas-Sanchez opened the door and was holding a large black object. *Id.* at 111:6–13. Further, Smith perceived the object to be similar in size to a handgun. *Id.* at 113:11–14. Mr.

---

[7] An EDO is a mechanism under Texas law that allows officers to detain a person who is perceived to need mental health treatment in specified circumstances. *See generally* TEX. HEALTH & SAFETY CODE ANN. § 573.001.

[8] However, Sanchez does not recall seeing Smith until after Mr. Salas-Sanchez had been shot. Sanchez Dep. Tr. at 68:1–12.

Salas-Sanchez then lifted the black object before closing the door. *Id.* at 115:10–14. After Mr. Salas-Sanchez appeared at the door, Sanchez was screaming at her son to go inside and telling him to stop acting in this manner. *Id.* at 118:16–23. Then, Mr. Salas-Sanchez continued to yell at the officers from inside the screen door. *Id.* at 119:16–23.

Mr. Salas-Sanchez reopened the door, sat down along the doorframe, and moved "in a rocking motion" with his arms near his feet and ankles. *Id.* at 122:1–14. After a few seconds of sitting in the doorway, Mr. Salas-Sanchez quickly stood up and closed the door. *Id.* at 123:21–124:3. Mr. Salas-Sanchez appeared in a window and then quickly reopened the wooden door. *Id.* at 129:6–19.

Smith did not tell Mr. Salas-Sanchez to put down the object or ask what he was holding in his hands; she also did not recall hearing another officer ask Mr. Salas-Sanchez about the object or direct that he drop it. *Id.* at 140:13–141:21.

Then, Mr. Salas-Sanchez and Sanchez were both inside the home; Mr. Salas-Sanchez was angry and shouting at his mother, but Smith did not hear him threaten his mother while he was shouting. *Id.* at 148:1–5, 149:7–14. Based on Mr. Salas-Sanchez's actions, Smith stated

that she believed an EDO would be appropriate and quickly agreed with the other officers to effectuate an EDO. *See id.* at 148:6–9. According to Smith, after the officers decided to effectuate the EDO, they entered the home. *Id.* at 170:17–25.

### d. *Plaintiff Sanchez's allegations*

Sanchez agrees with Defendants that Mr. Salas-Sanchez yelled to the officers outside while the officers were speaking with her. Sanchez Dep. Tr. at 60:1–13. However, Sanchez disagrees with Defendants about what Mr. Salas-Sanchez said to the officers. Sanchez recalled that Mr. Salas-Sanchez told the officers "to leave, that they have no business being there, that there's no reason for them to be there." *Id.* at 60:1–13. Further, Sanchez stated that Mr. Salas-Sanchez "insulted" the officers by calling them "dogs" but that Mr. Salas-Sanchez never challenged the officers to enter the home, never threatened the officers, and never said that he would kill the officers. *Id.* at 64:7–12, 68:13–25.

Additionally, Sanchez stated that Mr. Salas-Sanchez never opened and closed the door and that she never had to hold the door shut to prevent Mr. Salas-Sanchez from opening it. *Id.* at 65:1–15. Sanchez did not recall pushing her son back inside the house or physically

touching him in any way; she recalled only moving her hands to indicate that he should go back down the home's hallway. *Id.* at 65:20–66:25. Sanchez did not see her son pick up or hold any object in his hands. *Id.* at 70:3–6.

e. *Witness Ms. Salas-Sanchez's allegations*

According to Ms. Salas-Sanchez, her brother called the officers "dogs" but never cursed at or threatened the officers. Salas-Sanchez Dep. Tr.[9] at 110:1–20. Further, she never saw her mother attempt to push or hit her brother, never saw her brother attempt to push or hit her mother, and never saw her mother and brother disagree about her brother going back inside the home. *Id.* at 60:21–4.

4. Officers' Entry into the Home and Use of Force

The officers entered Sanchez's home without a warrant or consent. The parties do not dispute that Defendant Rivera deployed his taser at Mr. Salas-Sanchez. The taser hit but did not immobilize Mr. Salas-Sanchez. Additionally, the parties agree that Defendant Gomez shot his service weapon. The injuries from the gunshots resulted in Mr.

---

[9] Ms. Salas-Sanchez's deposition transcript can be found at Plaintiffs' Appendix Exhibit E, Smith's Motion Exhibit D, Rivera's Motion Exhibit D, and Gomez's Reply Exhibit C.

Salas-Sanchez's death.

However, individual recollections differ regarding what happened while the officers entered the home and what occurred leading up to Rivera's and Gomez's uses of force. Below, the Court describes each witness's allegations.

### a. Defendant Gomez's allegations

According to Defendant Gomez, he entered the home "because [he] observed [Mr. Salas-Sanchez]'s mother attempting to push [Mr. Salas-Sanchez] into the hallway with both of her hands." Pl. App. Ex. H (Sealed Report), at 19. Mr. Salas-Sanchez and his mother were "assaulting each other as they [were] both struggling and pushing each other." *Id.*

After entering the home, Gomez observed that Mr. Salas-Sanchez was holding an object. According to Gomez,

> As he held [the object] over his mother's head with both hands, [Mr. Salas-Sanchez] held it like a normal person would hold a gun. Officer Rivera advised me that the weapon was indeed a gun and at that time I truly believed that I was about to get shot and going to die. It was not until I stepped a few steps to the right into the living room area that I observed the weapon was a machete type knife without a handle.

*Id.* at 22. Additionally, Gomez reported that, while the mother was

pushing her son toward his room, Mr. Salas-Sanchez "produced a long knife-like weapon from inside his sweater pocket and pointed it at us over his mother's head as if he was holding a gun at a sideways angle." Pl. App. Ex. K (Sealed Report), at 2.

Gomez and Rivera "both gave [Mr. Salas-Sanchez] loud and clear verbal commands" to put down the weapon. Pl. App. Ex. H (Sealed Report), at 26. Gomez stated that he told Ms. Sanchez-Salas to go in another room with her baby, but that Ms. Salas-Sanchez declined to leave the room and responded, "don't worry it's not a gun." *Id.*; Pl. App. Ex. K (Sealed Report), at 2. Gomez responded to her, "I don't care he better put whatever he has in his hand down right now." Pl. App. Ex. K (Sealed Report), at 2. Gomez asserted that Mr. Salas-Sanchez's mother and sister were also telling him to put down the weapon. *Id.* Specifically, Sanchez attempted to take away her son's weapon and yelled at him to calm down and let go of the object. Pl. App. Ex. H (Sealed Report), at 23.

Gomez reported that the officers then proceeded further into the residence, and Gomez told Sanchez, "get out of the way senora watch out." Pl. App. Ex. K (Sealed Report), at 3. Sanchez moved out of the

way and stood by Ms. Salas-Sanchez. *Id.* Then, Mr. Salas-Sanchez held a knife, giggled, and said, "I'm going to kill you [expletive]." *Id.* Rivera then deployed the taser, but it was ineffective. *Id.*

Gomez alleged that Mr. Salas-Sanchez then came "out of the kitchen with his arm raised up, pointing [a knife] directly at me." *Id.* Gomez then slipped on a rug and fired his weapon four times while falling backward onto the couch. Pl. App. Ex. H (Sealed Report), at 33. Mr. Salas-Sanchez was then lying on the ground—after the gunshots had hit his body—and Gomez holstered his weapon and summoned medical assistance to the scene. Pl. App. Ex. K (Sealed Report), at 3.

### b. *Defendant Rivera's allegations*

According to Rivera, while both he and Mr. Salas-Sanchez were outside the home, he pulled out his taser and informed Gomez he had his taser ready. Rivera Dep. Tr. at 104:4–9. Mr. Salas-Sanchez saw the taser's small red light and "turn[ed] around and trie[d] to go back inside the house." *Id.* at 104:9–13. Additionally, Rivera testified that the taser takes five seconds to deploy; therefore, while the five seconds were "counting down," Mr. Salas-Sanchez had "time to walk inside his

residence."[10]  *Id.* at 104:14–21.  By the time the taser deployed, Mr. Salas-Sanchez was inside the home.  *Id.* at 112:1–3.

After deploying, the taser probes "hooked up onto . . . [Mr. Salas-Sanchez's] sweater" but because the sweater was "overlarge," the taser probe did not make contact with Mr. Salas-Sanchez's skin and "didn't give him the full effect of him actually falling to the ground with it."  *Id.* at 112:6–11.  Rivera further stated that Mr. Salas-Sanchez "did feel a little bit of [the taser's effect] . . . so he yelled out an 'ah,' like – like a grunt.  But he kept on running towards the back of the house."  *Id.* at 112:12–15.  The taser wires stayed connected to Mr. Salas-Sanchez.  *Id.* at 115:21–22.

Mr. Salas-Sanchez ran into the dining room area when the taser's probe hit him and then continued into the kitchen.  *Id.* at 115:15-19, 117:23–25.  Mr. Salas-Sanchez then moved toward the hallway while inside the kitchen, and Rivera saw a black object in Mr. Salas-Sanchez's hands that was pointed down toward the ground.  *Id.* at 118:22–119:9.

---

[10] During his deposition, Rivera testified that he pulled the taser's trigger while still outside the residence.  However, in a prior written report, Rivera stated that he first "walked in after [Mr. Salas-Sanchez] who was walking toward the back of the kitchen" and then pulled the taser's trigger.  Pl. App. Ex. G (Sealed Report), at 2.

Rivera retreated with the intent to use the taser again if Mr. Salas-Sanchez moved in his direction. *Id.* at 119:17–22, 121:2–5. The other officers were out of his line of sight when Rivera heard gunshots. *Id.* at 121:6–20. Rivera turned and saw Mr. Salas-Sanchez "turn at the same time" and get hit. *Id.* at 123:1–3.

After Mr. Salas-Sanchez was handcuffed and while the officers waited for medical assistance, Rivera did not search for an object that might have been the weapon Mr. Salas-Sanchez was holding. *Id.* at 159:2–7. Additionally, although Rivera believed Mr. Salas-Sanchez had been holding a pistol, Rivera testified that he never saw an object found at the scene that he believed to be the alleged weapon. *Id.* at 159:8–16.

### c. *Defendant Smith's allegations*

According to Smith, she entered the home and saw Sanchez pushing her son back into the home's hallway. Smith Dep. Tr. at 178:2–15. She then saw Ms. Salas-Sanchez walk through the hallway holding her young son, and Smith asked Ms. Salas-Sanchez to go outside. *Id.* at 179:1–21. Smith recalled that Ms. Salas-Sanchez exited the door to go outside. *Id.* at 179:20–21. Then, Smith asked Sanchez to leave the home and walked Sanchez outside the home. *Id.* at 180:7–16. After

escorting Sanchez out of the home, Smith stayed inside and joined the officers. *Id.* at 181:25–182:5.

Smith saw Mr. Salas-Sanchez running into the kitchen and away from the officers. *Id.* at 189:14–20. Then, Smith heard the sound a taser makes before deploying and heard Rivera tell the other officers that he was going to tase Mr. Sanchez-Salas. *Id.* at 190:8–11. She then heard Mr. Salas-Sanchez make a "grunt" noise which indicated that the taser probes had made contact. *Id.* at 190:13–16. Mr. Salas-Sanchez continued to run, and Smith was unable to see his hands or ascertain whether he was holding any object. *Id.* at 195:5–13.

According to Smith, Mr. Salas-Sanchez ran into the kitchen and Smith lost sight of him; then, Mr. Salas-Sanchez "jumped back out" into sight and was facing the officers. *Id.* at 200:5–11. Mr. Salas-Sanchez began moving toward Gomez while clasping an object that appeared to be a weapon[11]; he then leapt toward Gomez. *Id.* at 200:14–20, 204:24–205:5.

---

[11] Smith testified that the object Mr. Salas-Sanchez was holding while moving toward Gomez appeared to be a different object than the one Mr. Salas-Sanchez had previously held while standing at the door frame. *Id.* at 208:12–18.

Smith alleges that she then tripped while stepping backwards and Gomez stepped backwards as well. *Id.* at 205:10–17. While falling backwards, Smith saw flashes from Gomez's firearm. *Id.* at 205:17–20. Smith stated, "the last that I saw was of [Mr. Salas-Sanchez] moving forward with – with his hands out." *Id.* at 205:25–206:1. Smith could not recall how many shots she heard inside the home. *Id.* at 209:18–23. Additionally, Smith asserted that she did not remember hearing either Rivera or Gomez give any commands or warnings to Mr. Salas-Sanchez before using force. *Id.* at 209:1–14.

### d. *Witness Ms. Salas-Sanchez's allegations*

Ms. Salas-Sanchez testified that her mother was standing in front of the door when an officer "told her Ma'am, move to the side, and he pushed her with his hand to that side." Salas-Sanchez Dep. Tr. at 60:13–20. When the officers entered the home, both she and her brother were standing near the front door. *Id.* at 61:5–18. Ms. Salas-Sanchez only saw the two male officers—Rivera and Gomez—enter the home. *Id.* at 61:23–62:12.

According to Ms. Salas-Sanchez, an officer asked Mr. Salas-Sanchez what was in his hands and Mr. Salas-Sanchez then put

something[12] on the table and then raised his hands as he walked. *Id.* at 63:6–20. Ms. Salas-Sanchez also stated that her brother placed his hands on the table but was not holding anything. *Id.* at 64:22–24. Based on the testimony provided, it is unclear whether Ms. Salas-Sanchez recalls that her brother placed an object or his hands on the table. After placing an object (or his hands) on the table, Mr. Salas-Sanchez then walked away from the table with his hands raised. *Id.* at 64:5–6. Mr. Salas-Sanchez then turned around and "ended up facing forward . . . towards the officer" while leaving his hands in the air. *Id.* at 66:10–23. Eventually, by the time he was facing the officer, his hands were down. *Id.* at 67:10–13.

Ms. Salas-Sanchez testified that she was standing in the living room and then saw that "the shorter officer shot [Mr. Salas-Sanchez] with the electricity" while her brother was in the kitchen near the refrigerator. *Id.* at 67:18–68:7. Her brother "complained" by making a sound in response but did not say words nor fall down. *Id.* at 69:1–11.

---

[12] Ms. Salas-Sanchez did not focus on what her brother placed on the table and is unsure of what the object might have been. *Id.* at 65:14–19. She also testified that she had not "noticed or looked for anything in his hands" until he placed an object on the table. *Id.* at 66:3–5.

Then, he continued walking toward his room. *Id.* at 69:13–18. Ms. Salas-Sanchez could not see her brother after he began to walk down the hall; the officer then fired shots. *Id.* at 70:1–22.

### e. *Plaintiff Sanchez's allegations*

Sanchez states that, while standing with her back to the screen door, she was "pushe[d] to the side" by the officer who first entered her home and that another officer entered immediately after. Sanchez Dep. Tr. at 75:2–17. Sanchez did not see the officers open the door but assumed that an officer opened the door to enter the home because she recalled leaving the door closed. *Id.* at 75:2–17. According to Sanchez, when the officers entered her home, her son was inside the home, but she could not see her son and was unsure exactly where he was inside the home. *Id.* at 75:18–76:8.

Sanchez testified that, after the officers entered the home, she saw "a blue light pass through the dining room towards the kitchen." *Id.* at 76:17–21. Sanchez saw her son "around the refrigerator, more or less" and saw the blue light crossing in his direction. *Id.* at 78:22–79:7. Sanchez was unsure of what emitted the blue light when she saw it, but later—after talking to her daughter—Sanchez came to believe that the

light was from the taser.  *Id.* at 79:1–23.

Sanchez then saw Mr. Salas-Sanchez standing near the refrigerator and heard a very loud noise.  *Id.* at 88:19–22.  After hearing the loud noise, Sanchez remembers putting her hands to her head, turning, seeing something red or yellow cross by, and eventually trying to go outside.  *Id.* at 89:1–19.

5.   <u>Mr. Salas-Sanchez's Autopsy Report</u>

An autopsy confirmed that Mr. Salas-Sanchez died as the result of multiple gunshot wounds.  Pl. App. Ex. M (Autopsy Report).  Mr. Salas-Sanchez suffered three gunshot wounds, each on the backside of his body:  one bullet entered his right back, one entered his left back, and one entered his left buttock.  *Id.* at 3–4.  Additionally, Mr. Salas-Sanchez had "two superficial red abrasions" on his right elbow.  *Id.* at 5.

**B.  Relevant Procedural Background**

Plaintiffs filed their "Original Complaint" (ECF No. 1) on April 28, 2017, and a "First Amended Complaint" (ECF No. 17) on June 15, 2017. In their First Amended Complaint, Plaintiffs allege that the City of El

Paso has a custom, policy, or practice of using excessive force.[13]

Additionally, Plaintiffs allege that the officers involved in the incident deprived Mr. Salas-Sanchez of his constitutional rights in violation of 42 U.S.C. § 1983 because

> Defendants Gomez, Smith, and Rivera, acting under color of state law, deprived [Mr. Salas-Sanchez] and Plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution by intentionally entering Plaintiffs' home without warrant or probable cause, and under no exigent circumstances. Defendants Gomez and Rivera, acting under color of state law, deprived [Mr. Salas-Sanchez] of his rights under the Fourth Amendment and Fourteenth Amendment of the United States Constitution by intentionally using an objectively unreasonable and excessive amount of force.

First. Am. Compl. 22–23.

At an earlier stage in the litigation, Defendants filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) alleging that they should be entitled to qualified immunity. *See* Mem. Op. & Order Denying Def. Mando Kenneth Gomez's, Alberto Rovera's, and Pamela Smith's Mots. To Dismiss, ECF No. 45, Sept. 1, 2017. The Court denied the motions to dismiss. *Id.*

---

[13] The City has also filed a motion for summary judgment, which remains pending on this case's docket.

Now, in their instant Motions, Defendants again argue that they are entitled to qualified immunity and, accordingly, seek summary judgment in their favor.

## II. LEGAL STANDARDS

### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute will be found to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Rogers v. Bromac Title Servs., LLC*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Pursuant to Federal Rule of Civil Procedure 56(c), "the party moving for summary judgment bears the initial burden of . . . 'identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Rule 56(c) mandates the entry of summary judgment . . . upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Where this is the case, "there can be 'no genuine issue as to any material fact,' since complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323 (quoting Rule 56(c)). In adjudicating a motion for summary judgment, a court "consider[s] evidence in the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in favor of that party." *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014).

## B. Qualified Immunity

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011)). "[A] plaintiff seeking to overcome qualified immunity must show: (1) that the official violated a statutory or constitutional right,

and (2) that the right was clearly established at the time of the challenged conduct." *Id.* (citing *Ashcroft*, 131 S. Ct. 2080). "A right is clearly established when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (citing *Jones v. Lowndes Cty., Miss.*, 678 F.3d 344, 351 (5th Cir. 2012)). "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

## III.  ANALYSIS

### A.    Defendants' Entry into the Home

Plaintiffs allege that Defendants entered Sanchez's home without consent, a warrant, or a valid exception to the warrant requirement. Accordingly, Plaintiffs contend that the officers' entry into the home violated the Fourth Amendment.

While Defendants concede that they had no warrant or consent, they argue that their conduct was permissible based on the exigent

circumstances exception to the warrant requirement. As discussed below, the Court determines that fact issues exist regarding whether Defendants' entry was justified. However, the Court determines that Plaintiffs cannot establish that Defendant Smith's entry into the home caused an injury and concludes that summary judgment should be granted in Smith's favor.

1.  <u>Fact issues exist regarding whether a reasonable officer would believe that entry was permissible because of exigent circumstances.</u>

"A warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment." *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001). "In order to enter a person's residence, even under exigent circumstances, law enforcement first must have probable cause that contraband is inside or that an illegal act is taking place." *United States v. Newman*, 472 F.3d 233, 236 (5th Cir. 2006). Accordingly, in order to demonstrate that their warrantless entry into the home was reasonable, Defendants must establish that they had probable cause to believe a felony was occurring and that exigent circumstances existed.

For the reasons discussed below, the Court concludes that fact issues exist regarding both probable cause and exigent circumstances. Drawing reasonable inferences in favor of Plaintiffs, the Court determines that Defendants are not entitled to qualified immunity.

> a.   *Whether probable cause existed.*

In this section, the Court considers whether Officers Gomez, Rivera, and Smith had probable cause to believe that Mr. Salas-Sanchez had committed a felony. Defendants aver that a reasonable officer would believe that Mr. Salas-Sanchez committed burglary of Romero's habitation, aggravated assault, and obstruction.

Plaintiffs argue that material issues of fact exist regarding whether the officers had probable cause. In part, Plaintiffs buttress their position with officer testimony supporting that the officers did not actually believe that Mr. Salas-Sanchez had committed a crime and they did not intend to arrest Mr. Salas-Sanchez. *See, e.g.,* Resp. to Rivera 6.[14] However, the inquiry regarding whether an officer would have probable cause is objective and not subjective. That is, courts

---

[14] For example, Smith stated that she did not believe that Mr. Salas-Sanchez committed a felony. Additionally, Rivera testified that he did not intend to arrest Mr. Salas-Sanchez for any crime.

consider whether a hypothetical reasonable officer would believe the person committed a felony and do not focus on the officer's perspective at the time. *See Messerschmidt,* 565 U.S. at 565 ("The operative question in this case, therefore, is whether . . . a reasonable officer nonetheless could have believed he had probable cause to seek a warrant."). Accordingly, the officers' testimony about their actual opinions is not dispositive of whether probable cause existed. Below, the Court considers whether a reasonable officer would have objectively believed there was probable cause that a felony had occurred.

i. <u>Burglary of a Habitation</u>

Texas law provides that a person commits the offense of burglary if the person:

> (1) enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a felony, theft, or an assault; or
> (2) remains concealed, with intent to commit a felony, theft, or an assault, in a building or habitation; or
> (3) enters a building or habitation and commits or attempts to commit a felony, theft, or an assault.

TEX. PENAL CODE § 30.02(a). In arguing that the officers reasonably believed that Mr. Salas-Sanchez had committed a felony, Defendants focus on testimony demonstrating that Romero—the neighbor whose

home Mr. Salas-Sanchez had entered—expressed that she felt afraid when she found Mr. Salas-Sanchez in her home and when he attempted to reenter her home. *See, e.g.,* Gomez Mot. 15–16. Thus, Defendants argue that "this was not a simple property crime." Smith Mot. 12.

However, Defendants fail to proffer evidence tending to establish that Mr. Salas-Sanchez had the intent to commit a felony inside the habitation. Notably, the elements of burglary under Texas law do not focus on the fear of a home's occupant. Instead, the elements require that the offender intend to commit a felony, theft, or assault inside the residence. A fact issue exists regarding whether the officers had probable cause to believe that Mr. Salas-Sanchez committed burglary. During his deposition, Defendant Rivera stated that he believed a burglary had occurred when he left Romero's home. Rivera Mot. Ex. C (Rivera Dep. Tr.), at 44:1–2. However, a jury could determine that Rivera's conclusion was not reasonable in light of the Texas statute.

Taken in the light most favorable to Plaintiffs, the facts do not establish probable cause that a burglary happened. A jury may conclude that Mr. Salas-Sanchez entered Romero's home, and Romero felt afraid because a person had come into her home uninvited.

However, she did not witness him attempt or threaten to harm anyone, steal anything from her home, or otherwise commit a felony. In fact, Romero testified that she did not see any type of weapon, that Mr. Salas-Sanchez did not threaten anybody, and that Salas-Sanchez did not appear to be looking around the home.[15] Additionally, while Romero did not want Mr. Salas-Sanchez to return to her home, she also did not attempt to press charges. Based on these facts, a jury could conclude that no reasonable officer would determine that Mr. Salas-Sanchez intended to commit a felony, theft, or assault within the home.

To be clear, officers are not required to make perfect conclusions based on the available facts; they only need to make reasonable ones.

---

[15] Defendant Rivera testified that, after speaking with Romero, his understanding was that Mr. Salas-Sanchez had opened Romero's refrigerator and closed it without taking anything. Rivera Mot. Ex. C (Rivera Dep. Tr.), at 41:12–13. Thus, Rivera concluded Mr. Salas-Sanchez was "obviously looking for something." *Id.* at 44:18–19. However, even if Salas-Sanchez looked inside the refrigerator, a jury may find that his behavior was consistent with his other bizarre conduct but not consistent with an intent to steal. Further, Romero testified that Mr. Salas-Sanchez did not look around the home. And reports written by Rivera and Gomez indicate that they understood that Mr. Salas-Sanchez entered Romero's kitchen before leaving her home, but the reports do not reflect that he ever looked inside the refrigerator. *See* Pl. App. Ex. G (Sealed Report), at 1; Ex. H (Sealed Report), at 3. A jury may disbelieve Rivera's contention altogether in light of the contradictory testimony.

Courts are hesitant to second-guess officers' determinations by substituting another reasonable interpretation of the facts with the benefit of hindsight. *Messerschmidt*, 565 U.S. at 565 ("Qualified immunity analysis does not direct courts to play the role of crime scene investigators, second-guessing police officers' determinations . . . . Indeed, we have warned courts against asking 'whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.'" (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam)). However, while an officer's determinations need not be perfect, the Court is unaware of—and Defendants do not cite—precedent supporting that a reasonable officer could have probable cause to believe that a person committed a felony if the facts do not support an inference that each element of the felony occurred.

In sum, if Mr. Salas-Sanchez did not look around the home and did not otherwise show any intent to commit a felony, theft, or assault inside the home, then a reasonable officer would not believe that a felony occurred. Because the facts taken in the light most favorable to Plaintiff do not suggest that Mr. Salas-Sanchez demonstrated the

required intent to commit burglary, the Court declines to find that the officers had probable cause to believe he had committed felony burglary pursuant to Texas Penal Code § 30.02.

## ii. <u>Aggravated Assault</u>

Defendants contend that they had probable cause to believe Mr. Salas-Sanchez committed a felony pursuant to Texas Penal Code §§ 22.02(a)(2) and (b)(2)(B). Rivera Mot. 11, Smith Mot. 13, Gomez Mot. 16. Texas Penal Code § 20.01(a)(2) provides that a person commits an assault if he "intentionally or knowingly threatens another with imminent bodily injury." This underlying offense is a misdemeanor.[16] *See id.* § 20.01(c). Section 22.02(a)(2) provides that assaults committed by a person who "uses or exhibits a deadly weapon during the

---

[16] Defendants Rivera and Smith assert that, if a threat is directed against a public servant, then it becomes a felony pursuant to Texas Penal Code § 22.01(b)(1). Rivera Mot. 11, Smith Mot. 13. However, Defendants Rivera and Smith mischaracterize the statute. Texas Penal Code § 22.01(b)(1) makes only violations of subsection (a)(1)—which refers to an offense that "causes bodily injury to another"—a felony when committed against an officer. On the other hand, threats are covered by subsection (a)(2). Section 22.01(b)(1) does not make violations of subsection (a)(2) a felony. In this case, Defendants allege that Mr. Salas-Sanchez threatened the officers, but they do not allege that he caused them bodily injury. Accordingly, a reasonable officer would not believe that Mr. Salas-Sanchez's threats were a felony pursuant to Texas Penal Code § 22.01(b)(1).

commission of the assault" are felony aggravated assaults.

Additionally, an aggravated assault pursuant to § 20.01(a)(2)—that is, a threat of imminent bodily injury while the person uses or exhibits a weapon—is a felony of the first degree when committed "against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty." TEX. PENAL CODE § 22.02(b)(2)(B).

Taken all together, Defendants must show that they had probable cause to believe that Mr. Salas-Sanchez was making threats of imminent bodily injury while using or exhibiting a deadly weapon. If the threats were directed at public servants, then the felony becomes one in the first degree.

As a threshold matter, a fact issue exists regarding whether Mr. Salas-Sanchez threatened the officers with imminent bodily injury. While Defendants recall that Mr. Salas-Sanchez verbally threatened them, Plaintiffs testified that he did not threaten the officers. Sanchez and Ms. Salas-Sanchez recall that Mr. Salas-Sanchez called the officers "dogs" and told them to leave but do not recall him ever threatening the officers. Accordingly, there is a disputed issue of fact regarding whether

Mr. Salas-Sanchez committed the predicate misdemeanor offense of threatening a person with imminent bodily injury, which is incorporated into the felony offense of aggravated assault.

Moreover, fact issues exist regarding whether Mr. Salas-Sanchez brandished a deadly weapon. Although Defendants testified that they observed Mr. Salas-Sanchez holding a black object which they believed to be a weapon while assuming a "shooting stance," Sanchez and Ms. Salas-Sanchez asserted that they never saw any object in Mr. Salas-Sanchez's hands while the officers were outside the home.

Defendants aver that Plaintiffs' proffered testimony is insufficient to create a fact issue. Specifically, Defendants believe that, because Sanchez did not recall everything that occurred during the evening and because Ms. Salas-Sanchez was not at the front door throughout the entirety of the interaction, a fact question should not exist. *See, e.g.,* Rivera Mot. 4. The Court disagrees. The clarity and accuracy of the witnesses' recollection of the night's events may affect their credibility. However, courts do not make credibility determinations when reviewing summary judgment evidence. Accordingly, the Court declines to decide whether the witnesses' recollections reflect full or accurate memories of

the incident.

In addition, although Rivera reported that he had ordered Mr. Salas-Sanchez to drop the object, Smith testified that she did not acknowledge the object nor hear another officer do so. A jury could reasonably determine that nobody ever acknowledged any object in Mr. Salas-Sanchez's hands. This determination might support an inference that Mr. Salas-Sanchez was not holding any object that the officers reasonably believed could be a deadly weapon. If Mr. Salas-Sanchez had no such object in his hands, then no reasonable officer would believe that Mr. Salas-Sanchez was committing assault with a deadly weapon. Accordingly, the Court concludes that a jury could find that a reasonable officer would not have probable cause to believe that Mr. Salas-Sanchez committed the felony of aggravated assault.

### iii.  Obstruction

Further, Defendant Gomez argues that he had probable cause to believe that Mr. Salas-Sanchez committed a felony pursuant to Texas Penal Code § 36.06(a)(1)(A), which provides that a person commits the offense of obstruction or retaliation if he "intentionally or knowingly . . . threatens to harm another by an unlawful act . . . on account of the

service or status of another as a . . . public servant . . . ." As stated, conflicting testimony exists regarding whether Mr. Salas-Sanchez threatened the officers. If the factfinder were to determine that Mr. Salas-Sanchez did not threaten the officers, then the factfinder would also conclude that Defendants did not have probable cause to believe a felony pursuant to Texas Penal Code § 36.06(a)(1)(A) occurred.

In sum, the parties' varied recollections make it extraordinarily difficult to ascertain what actually happened during the events leading up to the officers' entry into the home. Importantly, the Court is not tasked with determining which version of the story is most accurate. Resolving the factual disputes in Plaintiffs' favor, a reasonable jury could believe that Mr. Salas-Sanchez did not threaten the officers and was not holding any object. Accordingly, viewed in a light favorable to Plaintiffs, the facts indicate that the officers did not have probable cause to enter the home.

       b.     *Whether an exigent circumstance existed to ensure officer or occupant safety.*

Next, the Court considers whether exigent circumstances existed. In the Fifth Circuit, whether exigent circumstances exist "is essentially a factual determination, there is no set formula for determining when

exigent circumstances may justify a warrantless entry." *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006) (*United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997)). Though not an exhaustive list, some factors courts may consider include:

> (1) the degree of urgency involved and amount of time necessary to obtain a warrant; (2) a reasonable belief that contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of contraband while a search warrant is sought; (4) information indicating the contraband's possessors know police are on their trail; and (5) the ready destructibility of the contraband.[17]

*United States v. Vasquez*, 953 F.2d 176, 180 (5th Cir. 1992).

The risk of harm to persons—including officers—may give rise to an exigency. "Immediate safety risks to police officers and others are exigent circumstances that may excuse a warrantless entry into a residence." *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 421 (5th Cir. 2008). Regarding officer safety, exigent circumstances will be found "if the agents' fear for their safety was reasonable." *Newman*, 472 F.3d at 237–38.

---

[17] Because Defendants allege that they had probable cause to enter the home in order to effectuate an arrest—but not because they sought to search for or preserve evidence—any factors regarding the destruction of contraband are inapplicable here.

Providing emergency aid can be an exigency. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). The emergency aid doctrine is narrow and applies when there is a "need to assist persons who are seriously injured or threatened with injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (determining that an exigent circumstance existed when officers observed an altercation taking place inside a home). When offering aid, officers may intervene proactively when it becomes clear that violence is occurring, as "[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." *Id.* at 406. To determine whether an officer would reasonably believe that emergency aid is needed, courts consider whether the circumstances objectively justify the action—the individual officer's subjective motivation is irrelevant. *Id.* at 404–05.

Similarly, Texas law recognizes provides that, "as part of the police officer's community caretaking functions to protect and preserve life and prevent substantial injury, an officer may enter and search a

private residence without a warrant for the limited purpose of serving those functions when it is objectively reasonable." *Laney v. State*, 117 S.W.3d 854, 855 (Tex. Crim. App. 2003).

In their Motions, Defendants argue that an exigent circumstance existed because Mr. Salas-Sanchez was holding an object which they believed to be a deadly weapon and the object, coupled with Mr. Salas-Sanchez's threats, posed a significant risk of danger to both the officers and Mr. Salas-Sanchez's mother. *See, e.g.,* Rivera Mot. 12.

As the Court has already detailed, fact issues exist regarding whether Mr. Salas-Sanchez threatened the officers and whether a reasonable officer would have believed he was holding a weapon. Specifically, Sanchez and Ms. Salas-Sanchez testified that they did not hear Mr. Salas-Sanchez threaten the officers. Additionally, Sanchez and Ms. Salas-Sanchez testified that he was not holding an object. If a jury believes that Mr. Salas-Sanchez had no weapon and did not threaten the officers, then the jury may conclude that the officers could not have had a reasonable fear of imminent injury.

Defendant Gomez argues that Ms. Salas-Sanchez's testimony regarding whether her brother placed an object down on the table is

"conflicting and inconsistent." Gomez Resp. 4–6. Thus, Gomez appears to argue that the Court should not accord weight to her testimony. Gomez relies on *Cross v. FFP Operating Partners, LP*, 73 F. App'x 46 (5th Cir. 2003), to support his contention that the Court may determine that Ms. Salas-Sanchez's testimony is not credible. In *Cross*, plaintiffs brought a claim against their employer and—after a bench trial—the district court determined that the witnesses who testified at trial provided inconsistent testimony and were motivated by a dislike for their former supervisor. *Id.* at *2. Thus, the judge, acting as factfinder, determined the testimony was not credible. *Id.* The Fifth Circuit held that the district court's factual findings were not clearly erroneous. *Id.*

The procedural differences between this case and *Cross* are obvious. Here, the Court considers summary judgment briefing; the Court is not presiding over a bench trial. During a bench trial, the judge sits as the factfinder. Accordingly, bench trials—like the one in *Cross*—function as an exception to the general rule that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255. In this case, the Court does not

sit as the finder of fact. Therefore, the Court will not disregard Ms. Salas-Sanchez's testimony even if some internal inconsistencies exist.

Moreover, genuine fact issues exist regarding whether a reasonable officer could believe that Mr. Salas-Sanchez posed a threat to his mother. For example, Ms. Salas-Sanchez testified that she never saw her brother push or hit her mother. And Officer Smith never heard Mr. Salas-Sanchez threaten his mother. A sufficient factual basis exists for a jury to conclude that no reasonable officer would believe any injury to Sanchez was imminent.

Defendants make clear that they disagree with Plaintiffs' characterization of the facts. For example, Gomez avers that "Plaintiffs downplay the intense situation with which the officers were faced on the night of April 29, 2015. . . . The officers were clearly reasonable in feeling that they faced an imminent threat to themselves and others which justified a warrantless entry on the basis of exigency." Gomez Resp. 8. However, the Court is of the opinion that Plaintiffs' testimony does not simply "downplay" threats of violence. To the contrary, Plaintiffs tell a wholly different story than Defendants—one where threats of imminent violence never occurred. Plaintiffs argue that they

never saw an object in Mr. Salas-Sanchez's hands; that he did not threaten to kill the officers; and that he did not threaten, push, or hit his mother.

In sum, if Mr. Salas-Sanchez did not threaten the officers and was not holding an object that the officers reasonably believed was a weapon, then a jury may determine that there was no immediate threat to officer safety. Similarly, if he did not assault or threaten his mother, then a jury could conclude that there was no threat to the safety of the home's occupants.

> c. *The officers' decision to effectuate an EDO does not support a warrantless entry based on the "emergency doctrine."*

Additionally, the officers appear to argue that an EDO—a mechanism under Texas law which allows law enforcement officers to detain a mentally ill person without a warrant in order to transport the person to a psychiatric facility—is the type of exigency that would trigger the emergency doctrine. Texas law provides:

A peace officer, without a warrant, may take a person into custody if the officer:
   (1) has reason to believe and does believe that:
        (A) the person is a person with mental illness; and
        (B) because of that mental illness there is a substantial risk of serious harm to the person

> or to others unless the person is immediately restrained; and
>
> (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody.

TEX. HEALTH & SAFETY CODE ANN. § 573.001. This statute is incorporated into the El Paso Police Department's policies. *See* Gomez Mot. 17 (quoting El Paso Police Operations Procedures Manual).

Notably, the Texas statute does not authorize warrantless *entry* into a home. Courts are hesitant to determine that a mechanism authorizing arrest will also authorize warrantless entry into a home. *See Steagald v. United States*, 451 U.S. 204, 213 (1981) ("In the absence of exigent circumstances, we have consistently held that such judicially untested determinations are not reliable enough to justify an entry into a person's home to arrest him without a warrant."). For these reasons, the Court concludes that an officer's belief that an EDO should be effectuated does not necessarily justify entry into the home. Accordingly, the officers' testimony that they thought an EDO was appropriate does not affect the Court's analysis of whether there was an exigency. That is, even if a home's occupant exhibits mental health symptoms, the inquiry regarding whether officers may enter the home stays the same: Without a warrant, an exigency must exist.

To be sure, situations may exist that justify an EDO and establish exigent circumstances. Since the Texas statute provides that an EDO may be issued when there is "a substantial risk of serious harm to the person or to others unless the person is immediately restrained," a person who will be the subject of an EDO may also show an imminent risk of harm to a home's occupant that would give rise to an exigency.

Here, however, fact issues exist regarding whether Mr. Salas-Sanchez showed a risk of imminent harm. As discussed, a reasonable jury could conclude that Mr. Salas-Sanchez did not threaten to harm the officers or his mother. Thus, even if Mr. Salas-Sanchez exhibited mental health symptoms and the officers were aware that his mother was concerned about his mental health, the Court's determination regarding exigent circumstances remains undisturbed.

In sum, resolving factual disputes in favor of Plaintiffs, the Court declines to determine that the officers' entry was justified based on the exigent circumstances exception to the warrant requirement.

2. <u>Plaintiffs have not established that Smith's entry caused an injury.</u>

In her Motion, Smith argues that Plaintiffs refute that she entered their home and, accordingly, that Plaintiffs' summary judgment

evidence fails to establish a violation of their Fourth and Fourteenth Amendment rights. Smith Mot. 9–10. Moreover, Smith asserts that her presence caused no injury. *Id.* at 17. The Court determines that a fact issue exists regarding whether Smith entered the home. Nonetheless, the Court determines that summary judgment should be granted in Smith's favor because her actions were not a proximate cause of Mr. Salas-Sanchez's injuries.

      a.     *A fact issue exists regarding whether Smith entered the home.*

First, Smith posits that the summary judgment evidence shows that Plaintiffs refute that she entered the home. Smith Mot. 9. To be sure, Sanchez and Ms. Salas-Sanchez testified that they did not see the female officer enter the home (the female officer is, undisputedly, Smith). Accordingly, Smith asserts that, because the Plaintiffs testified that they did not see Smith in the home, "neither Plaintiff can offer any competent summary judgment evidence as to what Officer Smith observed or heard." Smith Resp. 2.

However, Plaintiffs are not limited to offering their own deposition testimony as evidence. Plaintiffs are certainly welcome to rely on Smith's own testimony. Specifically, Smith testified that she entered

the home, escorted Sanchez outside of the home, and then reentered the home. Taken in the light most favorable to Plaintiffs, a reasonable jury could find that Smith entered the home.

> b. *Mr. Salas-Sanchez's death was not a foreseeable consequence of Smith's entry into the home.*

Nonetheless, even if Smith entered the home, Plaintiffs have not shown that Smith's entry caused any type of injury to Plaintiffs. According to Plaintiffs, a genuine fact issue exists regarding "whether [Mr. Salas-Sanchez's] shooting death was a foreseeable consequence of Smith's unlawful entry." Resp. to Smith 21. The Court disagrees.

When evaluating whether an injury was foreseeable, courts must "identify the foreseeable risks associated with the *relevant* constitutional violation (the warrantless entry)" and determine whether that precise constitutional violation caused an injury. *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1549 (2017). In doing so, courts should avoid relying on "only a murky causal link between the warrantless entry and the injuries attributed to it." *Id.* Importantly, when determining whether an officer is immune from suit, courts "evaluate each officer's actions separately, to the extent possible." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

Here, there is at most a murky link between Smith's entry and Mr. Salas-Sanchez's death (more likely, there is no link). Plaintiffs do not allege that Smith ever drew any weapon, either prior to entering the home or while in the home. *See* Pl. App. Ex. A (Factual App.), at 13–14. Instead, Plaintiffs emphasize that "two of the officers had weapons drawn" and argue that it should have been foreseeable to Smith that her entry would result in a shooting. Resp. to Smith 23. However, Smith is only legally responsible for her own actions. Thus, even if it was foreseeable that Smith's colleagues' entry into the home with their weapons drawn could result in an injury, Smith cannot be shoehorned into responsibility for the other officers' constitutional torts.

Additionally, Plaintiffs note that, though the Fifth Circuit has not addressed the issue, sister circuits have determined that unlawful entry can be a proximate cause of personal injury or death. Resp. to Smith 22. However, the cases that Plaintiff relies on—*Attocknie* and *Bodine*—fail to support that any link existed between Smith's entry and Mr. Salas-Sanchez's injuries.

In *Attocknie*, the Tenth Circuit determined that a jury may determine that an officer's unlawful entry was the proximate cause of

the plaintiff's injuries when the officer "sped to the front door of the house *with gun drawn*, pushed the door open, and fired his gun" at the plaintiff. *Attocknie v. Smith,* 798 F.3d 1252, 1254–58 (10th Cir. 2015) (emphasis added). Here, Smith did not enter the home with her gun drawn. Because Smith may not be held liable for her colleagues' actions, *Attocknie* does little to support Plaintiffs claims.

Further, in *Bodine*, the Third Circuit held that the district court erred in determining that "since the officers had entered the house illegally, any use of force was unlawful, and the officers were liable for all of the harm that ensued." *Bodine v. Warwick*, 72 F.3d 393, 399 (3d Cir. 1995). Instead, "even if the entry was unlawful, this would mean, under basic principles of tort law, that the troopers would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." *Id.* The Third Circuit emphasized that

> the illegal entry and unlawful force claims must be kept separate. Thus, if the troopers are found to have entered [Plaintiff's] residence illegally, they should be held liable for the harm proximately caused by the illegal entry. Similarly, if the troopers are found to have used unlawful force, they should be held liable for the harm proximately caused by this use of force. The harm proximately caused by these two torts may overlap, but the two claims should not be conflated.

*Id.* at 400–01. Here, by seeking to hold Smith liable for Gomez's and

Rivera's uses of force, Plaintiffs conflate their constitutional claims as well as the individual Defendants' actions. Thus, *Bodine* does not support that a fact issue exists regarding whether Smith's conduct caused Plaintiffs' injuries. To the contrary, *Bodine* highlights why Smith should not be held liable.

In sum, Mr. Salas-Sanchez's death was not a foreseeable consequence of Smith's illegal entry. Smith did not enter the home with her weapon drawn or otherwise act in a way that would suggest her entry was connected to any use of force. Accordingly, no causal connection exists. Moreover, any constitutional violations committed by Officers Gomez or Rivera may not be imputed to Smith.

Having determined that Smith's actions should be evaluated individually and that her actions did not proximately cause an injury, the Court is of the opinion that no constitutional violation occurred. Accordingly, summary judgment should be granted in Smith's favor.

## B.    Use of Force

Plaintiffs allege that Defendants Rivera and Gomez unlawfully seized Mr. Salas-Sanchez because Rivera and Gomez used excessive force in violation of the Fourth Amendment when they fired their taser

and firearm, respectively.

"[A] plaintiff seeking to overcome qualified immunity must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Whitley*, 726 F.3d at 638.

To satisfy the first prong—that the official violated a right—when alleging "a Fourth Amendment excessive-force claim, 'a plaintiff must first show that she was seized.[18] Next she must show that she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'" *Carroll v. Ellington*, 800 F.3d 154, 173 (5th Cir. 2015) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and

---

[18] When deadly force is intentionally used against a person, the person has been seized pursuant to the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968) (stating that when an officer "has in some way restrained the liberty of a citizen" either "by means of physical force or show of authority," a seizure has occurred). Accordingly, Mr. Salas-Sanchez was seized.

circumstances of each particular case.'"[19] *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Regarding the second prong—that the right infringed was a clearly established constitutional right—the Fifth Circuit has recognized that people have "a clearly established right to be free from excessive force" and that the amount of force an officer may use "depend[s] on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee." *Deville*, 567 F.3d at 169 (quoting *Tarver v. City of Edna*, 410 F.3d 745, 753–54 (5th Cir. 2005), and then *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)).

---

[19] To be sure, claims regarding an excessive of force are grounded in the Fourth Amendment protection against unreasonable seizures and not in the substantive due process protection against conscious-shocking behavior. *See, e.g., Mason*, 806 F.3d at 278. Defendants contend that, to the extent that Plaintiffs allege that Defendants' use of force violated rights secured by the Fourteenth Amendment rights rather than the Fourth Amendment, their claims should not proceed. *See, e.g.,* Smith Mot. 20. The Court agrees and analyzes Plaintiffs' claims pursuant to the Fourth Amendment reasonableness standard.

For a right to be clearly established, the doctrine establishing the right may not be overly generalized. *See Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014) ("[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."). Accordingly, "[w]here constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force [and] deny qualified immunity." *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018).

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015). A right may be clearly established without "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Hanks v. Rogers*, 853 F.3d 738, 746–47 (5th Cir. 2017) (quoting *White v. Pauly*, 137 S.Ct. 548, 551 (2017)). "[O]utside of 'an obvious

case,' the law is only 'clearly established' if a prior case exists 'where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" *Id.* (quoting *White*, 137 S.Ct. at 551). Though rare, courts have occasionally recognized circumstances where an officer's conduct is so "clearly prohibit[ed]" by precedent that the constitutional "violation is obvious" even if no directly on-point case law exists. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (determining that shackling inmates to a hitching post, without bathroom breaks and while exposed to the sun for a seven-hour period, was a clear violation of the Eighth Amendment).

### 1. Defendant Rivera's Use of His Taser

#### a. *Whether a constitutional violation occurred*

To establish a constitutional violation, Plaintiffs must show that (1) Mr. Salas-Sanchez suffered an injury, (2) the injury resulted directly from the use of force that was excessive to the need, and (3) the use of force was objectively unreasonable. *Carroll*, 800 F.3d at 173.

##### i. Whether Mr. Salas-Sanchez suffered an injury

Although a plaintiff need not show significant injury to establish that excessive force was used, the plaintiff must show that the injury

was more than de minimis. *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005). In the Fifth Circuit, "certain injuries are so slight that they will never satisfy the injury element"—for example, handcuffing too tightly does not constitute excessive force. *Flores*, 381 F.3d at 397–98 (citing *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001)). Whether an injury is de minimis "must be evaluated in the context in which the force was deployed." *Glenn*, 242 F.3d at 314. Thus, an injury may be de minimis in one circumstance but actionable in another.

In some contexts, courts have held that marks left by a taser are not an actionable injury. For example, a district court determined that red marks caused by a taser which neither required medical treatment nor caused subsequent pain were de minimis "[w]hen considered in the context in which the Taser was used." *Stanley v. City of Baytown, Tex.*, No. CIV.A. H-04-2106, 2005 WL 2757370, at *6 (S.D. Tex. Oct. 25, 2005). In *Stanley*, the plaintiff began kicking and punching emergency medical technicians and firemen who were unable to subdue the plaintiff's violent outburst while treating him for a seizure. *Id.* at *2. Then, after police officers arrived, the officers warned the plaintiff that they may use their taser if his aggressive behavior did not change. *Id.*

at *3.  After the plaintiff was unable to calm down, the officer used his

taser.  *Id.*  The plaintiff "became cooperative and appeared to regain full

control of his mental faculties."  *Id.*  In that situation, the court

concluded that the plaintiff's injury was de minimis.

Here, Mr. Salas-Sanchez's autopsy report reflected that he had

"two superficial[20] red abrasions" on his right elbow.[21]  Additionally,

several witnesses recalled that Mr. Salas-Sanchez made some type of

noise—possibly a grunting sound—when the taser probes connected to

him, which indicated that Mr. Salas-Sanchez experienced some

immediate pain.  Mr. Salas-Sanchez subsequently died as a result of

---

[20] The Ninth Circuit has determined that "puncture wounds through
the skin" caused by taser prongs "are classified as 'superficial' rather
than as 'serious' or 'life-threatening,'" but that such a classification
"does not mean that such wounds are insignificant."  *Bryan v.
MacPherson*, 630 F.3d 805, 813–14 (9th Cir. 2010).

[21] Plaintiffs assert that "[t]aser injuries that cause bruises, strains, and
contusions constitute more than a de minimis injury."  Resp. to Rivera
18.  Plaintiffs rely on *Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017).
However, the facts in *Hanks* were quite different than those at issue
here.  In *Hanks*, during a traffic stop, the officer "administered a blow to
Hanks's upper back or neck . . . [which] forced Hanks's upper body onto
the trunk of his vehicle."  853 F.3d at 743.  As a result, the plaintiff
suffered "contusions, acute strains, and bruised ribs."  *Id.* at
745.  Notably, although the officer had drawn his taser, it appears the
officer did not actually use his taser.  *See generally id.* at 742–43.  Thus,
*Hanks* has little to do with the case at hand.

gunshot wounds. Therefore, it is unclear whether the abrasions inflicted by the taser prongs would have required further treatment or caused subsequent pain if Mr. Salas-Sanchez had lived.

Further, context matters. Resolving factual disputes in favor of Plaintiffs, a jury could determine that: Mr. Salas-Sanchez had insulted the officers and asked them to leave but not threatened them. Then, after the officers entered the home, Mr. Salas-Sanchez walked away from them. Additionally, he was not holding any object or refusing to comply with any commands when—without warning—Defendant Rivera deployed his taser against Mr. Salas-Sanchez.

Drawing inferences in favor of Plaintiffs, the Court concludes that the abrasions inflicted by the taser are not de minimis in this context and that Plaintiffs have alleged an actionable injury.

ii. <u>Whether the injury directly resulted from excessive and unreasonable force</u>[22]

Moreover, the jury may infer that the red abrasions were a direct result of the taser shock. Witnesses agree that the taser probes made

---

[22] In this section, the Court analyzes both the second and third elements—whether the force was excessive to the need and whether the force was objectively unreasonable—together.

contact with Mr. Salas-Sanchez. Rivera testified that the taser probes attached to Mr. Salas-Sanchez's sweater and stayed attached to the sweater. Based on this testimony, a jury may conclude that the abrasions on Mr. Salas-Sanchez's right elbow were caused by the taser.

Further, a jury may conclude that the force was excessive and unreasonable. Drawing inferences in Plaintiffs' favor, the jury might believe: Mr. Salas-Sanchez was not under arrest for a crime and was in his own home. The officers believed he might be exhibiting symptoms of mental illness. He raised his empty hands so the officers could see them, and he walked away from the officers. If Mr. Salas-Sanchez was neither resisting nor threatening the officers, then no force was necessary. The amount of force used—a taser shock—would be excessive to the nonexistent need. Similarly, if Rivera used a taser against a person who exhibited signs of mental illness but who was not under arrest, resisting authority, or posing a threat to the officers, then a jury could determine that the force was objectively unreasonable.

In conclusion, a reasonable jury may conclude that Mr. Salas-Sanchez suffered an actionable injury that was directly caused by an excessive and objectively unreasonable use of force.

### b. *Whether the constitutional rights that Rivera violated were clearly established*

Accordingly, the Court must next consider whether Rivera violated "clearly established" constitutional law. A right is clearly established if "existing precedent [has] placed the statutory or constitutional question beyond debate." *Hanks*, 853 F.3d at 746–47.

First, it is clearly established that the amount of force an officer may use "depends on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee." *Bush*, 513 F.3d at 502 (citing *Graham*, 490 U.S. at 396). Resolving facts in Plaintiffs' favor, the officers did not intend to arrest Mr. Salas-Sanchez for a crime—instead, they intended to detain him with the intent of seeking mental health treatment. Moreover, Mr. Salas-Sanchez had not threatened the officers with harm. Mr. Salas-Sanchez was walking away from the officers, but he was not actively resisting arrest. Further, since he was enclosed inside a home and walking toward his bedroom, Mr. Salas-Sanchez was not credibly attempting to flee. Thus, the use of a taser violated clearly established law because it was objectively unreasonable in light of the factors set out in *Graham*.

Additionally, Rivera violated more precise formulations of clearly established law within the Fifth Circuit. Specifically, it is clearly established that officers may not use a taser against a person who is not resisting the officers' authority. In *Carroll*, the Fifth Circuit held that it is clearly established that "once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive."[23] *Carroll*, 800 F.3d at 177. If officers may not use a taser on a person who has stopped resisting arrest, then it is equally clear that the officer may not use a taser against a person who never resisted arrest in the first place. Similarly, in *Newman*, the Fifth Circuit determined that it was "objectively unreasonable" for officers to "immediately resort[] to taser and nightstick without attempting to use physical skill, negotiation, or even commands" when the plaintiff alleged that he was tased "in response to nothing more than an off-color joke" but had not resisted the officers' authority or refused to comply with their commands. *Newman v. Guedry*, 703 F.3d 757, 761–63 (5th Cir. 2012). Both *Carroll* and *Newman* demonstrate that tasing a person

---

[23] *Carroll* considered a claim based on events that occurred in 2006. The events giving rise to this case occurred on April 29, 2015. Thus, any rights that were clearly established in 2006 predate this case.

who is not resisting an officer's authority is objectively unreasonable in light of clearly established law.

Here, the facts most favorable to Plaintiff depict that Mr. Salas-Sanchez insulted the officers but did not threaten them. Moreover, Rivera did not give commands to Mr. Salas-Sanchez. Instead, Mr. Salas-Sanchez—who was not under arrest for any crime—was tased while walking away from officers inside his home. Thus, Plaintiffs' version of the facts suggests that Mr. Salas-Sanchez did not refuse to cooperate with or resist the officers' commands: simply walking away from officers who had not commanded that he stay in the room is not resistance. Accordingly, a jury could determine that Rivera's conduct violated clearly established principles of constitutional law.

### 2. Defendant Gomez's Deadly Force

Additionally, Plaintiffs allege that Gomez used excessive force against Mr. Salas-Sanchez when Gomez shot his firearm, which resulted in Mr. Salas-Sanchez's death.

#### a. *Whether a constitutional violation occurred*

Plaintiffs must demonstrate that Mr. Salas-Sanchez (1) suffered an injury, (2) which was directly the result of the use of force that was

excessive to the need, and (3) that the use of force was objectively unreasonable. *Carroll*, 800 F.3d at 173. Defendant Gomez does not dispute that Mr. Salas-Sanchez suffered death as a result of the gunshot wounds. *See generally* Gomez Mot. 19–22. Accordingly, the court only considers whether the use of force was excessive to the need and objectively unreasonable.

As discussed above, if a jury determines that Mr. Salas-Sanchez was not threatening the officers, was not under arrest for any crime, and was not resisting or credibly fleeing from the officers, then no force was necessary. *See Bush*, 513 F.3d at 502. If no force was needed, then fatal force would unquestionably exceed the need.

Additionally, fact issues exist regarding whether the use of force was objectively unreasonable. Whether force is unreasonable is a fact-intensive inquiry. A jury could believe the following: Mr. Salas-Sanchez never threatened to harm the officers. Mr. Salas-Sanchez placed the object he was holding (or his hands, if no object existed) on the table and then put his empty hands in the air while walking away from the table. He walked into the kitchen, where he was hit by Rivera's taser probes. Then, Mr. Salas-Sanchez entered the hallway

and walked toward his bedroom.  When Gomez shot Mr. Salas-Sanchez, Mr. Salas-Sanchez was facing away from the officers.

Defendant Gomez argues that no material fact issues exist and that it is clear that Mr. Salas-Sanchez posed a threat to Gomez and lunged at Gomez with an object in his hands.  Gomez Reply 10–11.  Specifically, Gomez argues that Sanchez and Ms. Salas-Sanchez were unable to see Mr. Salas-Sanchez at the time that he was shot, so their testimony cannot credibly refute Defendants' allegations.  *Id.*  Gomez also contends that Ms. Salas-Sanchez's testimony during a trial related to this case is inconsistent with her deposition testimony.  *Id.*

It is true that Sanchez and Ms. Salas-Sanchez testified that they did not see Mr. Salas-Sanchez at the moment that he was shot.  Additionally, Rivera stated that he saw Mr. Salas-Sanchez turn after the shots were fired and before the bullets hit his back.  Nonetheless, the Court is of the opinion that sufficient evidence exists for the jury to disbelieve Rivera's testimony and find that Mr. Salas-Sanchez was walking away from Gomez when Mr. Salas-Sanchez was shot.

Specifically, even though Ms. Salas-Sanchez could not see her brother at the moment he was shot, her testimony that Mr. Salas-

Sanchez entered the hallway and went toward his bedroom could support a reasonable inference that he was walking away from the officers. Significantly, Mr. Salas-Sanchez's autopsy report revealed three gunshot wounds, and each of the bullets entered the back of his body. Thus, Plaintiffs' proffered facts support an inference that Mr. Salas-Sanchez was moving away from the officers when Gomez discharged the firearm.

In addition, fact issues exist regarding whether Mr. Salas-Sanchez was holding an object that could be perceived to be a deadly weapon. Ms. Salas-Sanchez testified that her brother had put down any object he might have been holding (or put his hands on the table). He then raised his hands in the air, demonstrating that he was not holding any object.

Notably, Defendants are unable to produce a weapon, and fact issues exist regarding whether an item was found that could have been the object Mr. Salas-Sanchez was allegedly holding. The officers did not find a knife or gun that Mr. Salas-Sanchez may have brandished. Defendant Gomez contends that a brake pad found on the floor of the home was the object brandished by Mr. Salas-Sanchez. Gomez Mot. 9. However, Plaintiffs argue that the brake pad was not found near Mr.

Salas-Sanchez's body or near the location where he would have landed if he had jumped and lunged at Gomez. Resp. to Gomez 23. If Plaintiffs' contentions are correct, then no object was ever recovered that would substantiate Defendants' claims that Mr. Salas-Sanchez appeared to be armed when Gomez used deadly force. And if the jury concludes that no object was found near the location where Mr. Salas-Sanchez allegedly lunged toward Gomez, then the jury's determination would seriously undercut Gomez's argument that Mr. Salas-Sanchez posed a threat to officer safety.

In conclusion, if a jury determines that Mr. Salas-Sanchez was not holding anything that might be a deadly weapon, had not threatened Gomez, and was walking away from Gomez when he was shot, then Gomez's use of lethal force was clearly unreasonable and excessive.

> b. *Whether the constitutional rights that Gomez violated were clearly established*

The Court next considers whether Mr. Salas-Sanchez's Fourth Amendment rights were clearly established at the time that the conduct occurred.

In *Garner*, the Supreme Court held that "[deadly] force may not be used" against an unarmed suspected felon "unless it is necessary to

prevent the [suspect's] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). Accordingly, "deadly force is unconstitutional when a 'suspect poses no immediate threat to the officer and no threat to others.'" *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 278 (5th Cir. 2015) (quoting *Garner*, 471 U.S. at 11). "The excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force]." *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011) (citing *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir. 2001)) (alterations in original). In sum, constitutional law clearly prohibits the use of deadly force against an unarmed person who is not attempting to escape and who does not pose a significant threat of death or serious physical injury at the moment that force is used.

The Court has discussed the factual disputes underlying this case in detail. Relevant here, for summary judgment purposes, Mr. Salas-Sanchez was unarmed: he was not holding an object, and no deadly weapon was recovered in his body's vicinity. In addition, Mr. Salas-

Sanchez was not under arrest for any crime, was not resisting arrest, and was not credibly trying to flee. Further, Mr. Salas-Sanchez never pushed, hit, or threatened anyone. And Mr. Salas-Sanchez did not pose a significant threat of death or injury to the officers at the time that he was shot, as he was walking away from the officers without a weapon. Thus, resolving all factual disputes in Plaintiffs' favor, the Court concludes that Gomez's use of force violated clearly established constitutional law.

## IV. CONCLUSION

In sum, a jury may determine that Defendants had neither probable cause to believe a felony occurred nor exigent circumstances under which to enter the home. Thus, at this stage in the litigation, Defendants cannot show that a reasonable officer would believe entry into the home was lawful. Notwithstanding the illegal entry, the Court concludes that Plaintiffs' claims against Defendant Smith should be dismissed because Mr. Salas-Sanchez's injury was not a foreseeable consequence of her entry.

Additionally, a jury could determine that Officers Rivera and Gomez's uses of force violated clearly established constitutional law.

Specifically, if the jury concludes that Rivera used a taser against a nonviolent person who was not resisting arrest, then the jury may determine his force caused an excessive and unreasonable injury in violation of clearly established law. Further, if the jury determines that Gomez used lethal force against a person who did not pose a threat of immediate harm to the officers, then Gomez used lethal force in violation of clearly established law.

Accordingly, **IT IS ORDERED** that Defendant Pamela Smith's "Motion for Summary Judgment" (ECF No. 140) is **GRANTED** and that Plaintiffs Celia Sanchez and Oscar Salas, statutory death beneficiaries of Erik Emmanuel Salas-Sanchez's claims against Defendant Pamela Smith are **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendant Alberto Rivera's "Motion for Summary Judgment" (ECF No. 141) is **DENIED**.

**IT IS FINALLY ORDERED** that Defendant Mando Kenneth Gomez's "Motion for Summary Judgment" (ECF No. 145) is **DENIED**.

**SIGNED** this **24th day** of **July, 2019**.

_____
**PHILIP R. MARTINEZ**
**UNITED STATES DISTRICT JUDGE**