# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| **CELIA SANCHEZ and OSCAR SALAS, statutory death beneficiaries of ERIK EMMANUEL SALAS-SANCHEZ,** § § § § § § § | | |
| **Plaintiffs,** § § | | |
| **v.** § § | | **EP-17-CV-133-PRM** |
| **MANDO KENNETH GOMEZ, and the CITY OF EL PASO, TEXAS,** § § § § | | |
| **Defendants.** § | | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CITY OF EL PASO, TEXAS' MOTION FOR SUMMARY JUDGMENT

On this day, the Court considered Defendant City of El Paso, Texas' [hereinafter "Defendant City of El Paso"] "Motion for Summary Judgment" (ECF No. 143) [hereinafter "Motion"], filed on May 1, 2019; Plaintiffs Celia Sanchez and Oscar Salas's [hereinafter "Plaintiffs"] "Response to Defendant City of El Paso's Motion for Summary Judgment" (ECF No. 181) [hereinafter "Response"], filed on June 28, 2019; Defendant City of El Paso's "Reply to Plaintiffs' Response to Defendant City of El Paso's Motion for Summary Judgment" (ECF No.

192) [hereinafter "Reply"], filed on August 6, 2019; and Plaintiffs'
"Surreply to Defendant City of El Paso's Reply in Support of its Motion
for Summary Judgment" (ECF No. 196) [hereinafter "Surreply"], filed
on August 12, 2019, in the above-captioned cause. For the foregoing
reasons, the Court will grant in part and deny in part Defendant City of
El Paso's Motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an officer-involved fatal shooting on April
29, 2015. A police officer of the El Paso Police Department [hereinafter
"EPPD"] shot Mr. Erik Emmanuel Salas-Sanchez [hereinafter "Mr.
Salas-Sanchez"] inside the Salas-Sanchez's residence. Mr. Salas-
Sanchez died from his wounds. The parties' allegations regarding the
events surrounding Mr. Salas-Sanchez's death on April 29, 2015, are
summarized in detail in the Court's recent "Memorandum Opinion and
Order" regarding Defendant EPPD Officers Mando Kenneth Gomez's,
Alberto Rivera's, and Pamela Smith's motions for summary judgment.
*See* Mem. Op. and Order, July 24, 2019, ECF No. 189.

At the summary judgment stage, the Court must resolve all
factual disputes in favor of the non-moving party. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). Accordingly, the description of the events on April 29, 2019, are the facts taken in the light most favorable to Plaintiffs, as originally identified in the Court's July 24, 2019, Memorandum Opinion and Order.

## A. Factual Background

On April 25, 2015, Ms. Louisa Romero found her neighbor, Mr. Salas-Sanchez, inside her home and sitting on her living room couch. Mem. Op. and Order 4. After Ms. Romero demanded Mr. Salas-Sanchez leave her home, Mr. Salas-Sanchez walked across the street to his mother's home, where Mr. Salas-Sanchez resided. *Id.* at 5. Ms. Romero called the EPPD and reported the incident. *Id.* Shortly thereafter, Defendant EPPD Officers Mando Kenneth Gomez, Alberto Rivera, and Pamela Smith [hereinafter collectively referred to as "Defendant Officers"][1] responded to the report and arrived at the Salas-Sanchez's residence. *Id.* at 7.

---

[1] Both Defendant Officers Rivera and Smith are no longer parties to this suit. *See* Order of Dismissal—Defendant Alberto Rivera, Nov. 8, 2019, ECF No. 218 (dismissing Defendant Officer Rivera pursuant to a joint stipulation of dismissal); Mem. Op. and Order, July 24, 2019, ECF No. 189 (granting summary judgment for Defendant Officer Smith).

Mr. Salas-Sanchez and his mother, Plaintiff Celia Sanchez [hereinafter "Plaintiff Sanchez"], interacted with the Defendant Officers in front of the Salas-Sanchez's home. *Id.* As the Court noted in its prior Memorandum Opinion and Order, the details of this interaction present numerous fact issues that cannot be determined at the summary judgment stage. *See generally id.* (discussed in detail throughout the Court's Memorandum Opinion and Order). At some point during this interaction, Plaintiff Sanchez informed the Defendant Officers that Mr. Salas-Sanchez had been acting strangely and that she believed her son needed help from mental health services. Mot. 16; Resp. 1.

Subsequently, Mr. Salas-Sanchez entered the Salas-Sanchez's residence. Mem. Op. and Order 14. After assessing the situation, Defendant Officers Gomez and Rivera effectuated what is known as an "emergency detention order"[2] [hereinafter "EDO"], making a warrantless entry into the home to pursue Mr. Salas-Sanchez and detain him. *Id.* Once again, the details of what took place inside the

---

[2] An EDO is a mechanism under Texas law that allows officers to detain a person who is perceived to need mental health treatment in specified circumstances. *See generally* Tex. Health & Safety Code Ann. § 573.001.

Salas-Sanchez's residence create various fact issues that cannot be determined at the summary judgment stage. *See generally id.* (discussed in detail throughout the Court's Memorandum Opinion and Order). Ultimately, these events culminated in Defendant Officer Rivera firing a ranged taser at Mr. Salas-Sanchez, and Defendant Officer Gomez firing his service weapon thereafter. *Id.* at 14. Both uses of force made contact with Mr. Salas-Sanchez, and he later died from three gunshot wounds he sustained as a result of Defendant Officer Gomez's use of force. *Id.* at 14–15.

## B. Procedural Background

Plaintiffs are the parents of decedent Mr. Salas-Sanchez. First Am. Compl., June 15, 2017, ECF No. 17. Plaintiffs filed their "Original Complaint" (ECF No. 1) on April 28, 2017, and their "First Amended Complaint" (ECF No. 17) [hereinafter "Amended Complaint"] on June 15, 2017.

In their Amended Complaint, Plaintiffs allege that the officers involved in the incident— Defendant Officers Gomez, Rivera, and Smith—deprived Mr. Salas-Sanchez of his constitutional rights pursuant to the Fourth and Fourteenth Amendments of the United

States Constitution, in violation of 42 U.S.C. § 1983.  Am. Compl. 22–23.

Additionally, Plaintiffs bring a *Monell* municipal liability claim against Defendant City of El Paso, alleging that:

> [The] customs, policies, practices, and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of the City of El Paso were adopted with deliberate indifference to the constitutional rights of citizens . . . [and] a moving force and/or a proximate cause of the deprivations of [Mr. Salas-Sanchez]'s clearly established and well settled constitutional rights under the Fourth amendment in violation of 42 U.S.C. § 1983.

*Id.* at 24–25; *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (setting the standard for determining whether a municipality may be held liable for a constitutional injury).

### 1. Plaintiffs' Claims Against Defendant Officers

Regarding Plaintiffs' claims against Defendant Officers, Plaintiffs allege, first, that Defendant Officers deprived Mr. Salas-Sanchez and Plaintiffs "of their rights under the Fourth and Fourteenth Amendments to the United States Constitution by intentionally entering Plaintiffs' home without warrant or probable cause, and under no exigent circumstances."  Am. Compl. at 22.  Second, Plaintiffs allege

that Defendant Officers Gomez and Rivera deprived Mr. Salas-Sanchez "of his rights under the Fourth Amendment and Fourteenth Amendment of the United States Constitution by intentionally using an objectively unreasonable and excessive amount of force." *Id.* at 23.

At an earlier stage in the litigation, Defendant Officers filed motions to dismiss pursuant to the Federal Rules of Civil Procedure Rule 12(b)(6), arguing that Defendant Officers are entitled to qualified immunity. *See* Mem. Op. & Order Den. Def. Mando Kenneth Gomez's, Alberto Rivera's, and Pamela Smith's Mots. to Dismiss, Sept. 1, 2017, ECF No. 45. The Court denied these motions to dismiss. *Id.*

Subsequently, in April 2019, Defendant Officers filed motions for summary judgment, again arguing that they are entitled to qualified immunity and, accordingly, seeking summary judgment in their favor. Defendant Officer Mando Kenneth Gomez's Mot. for Summ. J., Apr. 30, 2019, ECF No. 145; Defendant Alberto Rivera's Mot. for Summ. J., Apr. 30, 2019, ECF No. 141; Defendant Pamela Smith's Mot. for Summ. J., Apr. 30, 2019, ECF No. 140. On July 24, 2019, the Court entered a single opinion denying the motions for summary judgment filed by Defendant Officers Gomez and Rivera, but granting the motion for

summary judgment filed by Defendant Officer Smith.  Mem. Op. and Order, July 24, 2019, ECF No. 189.

Specifically, the Court determined that "Mr. Salas-Sanchez's death was not a foreseeable consequence of [Defendant] Smith's illegal entry." *Id.* at 52.  Therefore, Plaintiffs could not establish that Defendant Officer Smith's entry into the home caused an injury. *Id.* 47–52.  Additionally, the Court determined that there were fact issues regarding whether Defendant Officers' entry was justified. *Id.* at 28–47.  Furthermore, a jury could determine that Defendant Officers Gomez and Rivera's uses of force violated clearly established constitutional law. *Id.* at 52–69.  Thus, the Court concluded that Defendant Officers Gomez and Rivera were not entitled to qualified immunity as a matter of law, and denied their summary judgment motions. *Id.*

2. <u>Plaintiffs' Claims Against Defendant City of El Paso</u>

Here, Defendant City of El Paso moves for summary judgment pursuant to the Federal Rules of Civil Procedure Rule 56, arguing that "[t]he facts of this case do not meet the standard for municipal liability under *Monell*." Mot. 2.  In Plaintiffs' Amended Complaint, Plaintiffs

claim that various failures of Defendant City of El Paso and its Chief, Gregory Allen [hereinafter "Chief Allen"], were a "moving force and/or a proximate cause of the deprivations of" Mr. Salas-Sanchez's constitutional rights. Am. Compl. 25. Specifically, Plaintiffs make eight distinct allegations:

(A) [EPPD maintains] a policy or custom of excessive force by officers so common and widespread as to constitute a custom that fairly represents municipal policy;

(B) [EPPD maintains] a policy or custom of officers' failure to avoid the use of deadly force against individuals when the officer is not at risk of imminent serious bodily injury or death;

(C) [EPPD maintains] a policy or custom of the use of excessive force by officers when the officer is on notice of a victim's mental health problems that is so common and widespread as to constitute a custom that fairly represents municipal policy;

(D) [EPPD failed to] properly train or supervise members of the El Paso Police Department, including [co-d]efendants Gomez, Rivera, and Smith, not to use intermediate or deadly force against an individual who does not place the officer or another at risk of imminent serious bodily injury or death;

(E) [EPPD failed to] properly train or supervise members of the El Paso Police Department, including [co-d]efendants Gomez, Rivera, and Smith, on mental health issues and how [to] implement de-escalation and communication tactics during incidents where their officers have notice and knowledge that the person for whom they are called has a mental health issues [sic];

(F) [EPPD failed to] institute proper procedures to ensure that EPPD officers use appropriate de-escalation and

communication tactics in situations in which it is known that an unarmed resident has a mental illness;

(G) [EPPD failed to] classify <u>any</u> officer-involved shootings as unjustified—particularly those involving unarmed victims; and

(H) [EPPD failed to] pursue criminal or disciplinary charges or support criminal or disciplinary action against officers, including Gomez, Rivera, and Smith, who have deprived citizens and residents of El Paso of their constitutional rights.

*Id.* at 23–24.

In June 2017, Defendant City of El Paso moved to dismiss Plaintiffs' First Amended Complaint for failure to state a claim pursuant to the Federal Rules of Civil Procedure Rule 12(b)(6). Def. City of El Paso, Texas' Rule 12 Mot. to Dismiss Pls.'s First Am. Compl., June 29, 2017, ECF No. 22. The Court denied the motion. Mem. Op. & Order Den. Def. City of El Paso's Mot. to Dismiss, Oct. 6, 2017, ECF No. 46. As explained in the Court's order, Plaintiffs' response to the motion to dismiss distilled Plaintiffs' allegations into five distinct claims. The Court determined that Plaintiffs pleaded sufficient facts to state a claim regarding the following five theories:

(1) EPPD's policy of excessive force applied to mentally ill individuals;

(2) EPPD's failure to institute proper procedures to ensure officers employ appropriate tactics when confronted with mental health issues;

(3) EPPD's policy of refusing to classify police shootings as unjustified;

(4) EPPD's policy of refusing to discipline EPPD officers involved in instances of excessive force; and

(5) EPPD's failure to train officers on responding to mental health crises.

*Id.* at 30, 35, 40, 44, 53. Defendant City of El Paso now renews its challenge to these theories, requesting the Court reconsider each as a matter of law.

## II. LEGAL STANDARD

### A. Summary Judgment

Pursuant to the Federal Rules of Civil Procedure Rule 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute will be found to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Rogers v. Bromac Title Servs., LLC*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248). Additionally, "the party moving for summary judgment bears the initial

burden of . . . 'identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Rule 56(c) mandates the entry of summary judgment . . . upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Where this is the case, "there can be 'no genuine issue as to any material fact,' since complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323 (quoting Rule 56(c)). In adjudicating a motion for summary judgment, a court "consider[s] evidence in the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in favor of that party." *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014).

## B. Municipal Liability in the Context of § 1983

Before analyzing Plaintiffs' theories regarding municipal liability, some background on the cause of action itself is necessary. Section 1983 instructs:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. In the seminal case of *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Supreme Court considered whether municipalities may be subject to suit pursuant to § 1983. *Id*. at 663. The Court's answer was yes, though a qualified one. While the Court noted that the legislative history of § 1983 "compel[led] the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies[,]" it found that "the language of § 1983, read against the background of the same legislative history, compel[led] the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id*. at 690–91. Specifically, the Court held that "a

municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Consequently, it is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

In requiring the existence of an official policy or custom before municipal liability pursuant to § 1983 may attach, the Court "intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). In other words, municipal liability is "limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* at 480. As a result, the unconstitutional conduct for which the municipality is allegedly liable "must be directly attributable to the municipality through some sort of official action or

imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (footnote omitted).

In interpreting the Supreme Court's guidance on municipal liability, the Fifth Circuit Court of Appeals has derived "three attribution principles" that must be established in support of such a claim. *Id.* "A plaintiff must identify: '(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.'" *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

Regarding the first requirement, "[t]he existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Id.* at 542. Even a single decision may qualify "if the municipal actor is a final policymaker." *Id.* A plaintiff may also demonstrate the existence of an official policy or custom based on a

"persistent, widespread practice." *Piotrowski*, 237 F.3d at 579 (quoting

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).

As to the second requirement, "[a]ctual or constructive knowledge

of [a] custom must be attributable to the governing body of the

municipality or to an official to whom that body has delegated policy-

making authority." *Valle*, 613 F.3d at 542 (alterations in original)

(quoting *Webster*, 735 F.2d at 842). Such an official can either be a

policymaker "who has 'the responsibility for making law or setting

policy in any given area of a local government's business,'" *id.* (quoting

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988)), or a

decisionmaker who "possesses final authority to establish municipal

policy with respect to the action ordered[,]" *id.* (quoting *Pembaur*,

475 U.S. at 481).

Finally, to satisfy the third requirement, a plaintiff must allege

"'moving force' causation." *Id.* This is a two-part obligation. A plaintiff

must show "that the municipal action was taken with the requisite

degree of culpability and must demonstrate a direct causal link between

the municipal action and the deprivation of federal rights." *Id.* (quoting

*Brown*, 520 U.S. at 404). Additionally, a "plaintiff must demonstrate

that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* (quoting *Brown*, 520 U.S. at 411); *see also Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (noting that "*Monell* plaintiffs [must] establish both the causal link ('moving force') and the city's degree of culpability ('deliberate indifference' to federally protected rights)").

Operating in concert, these three requirements "distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski*, 237 F.3d at 578.

## III.  ANALYSIS

In their Response to Defendant City of El Paso's Motion, Plaintiffs distill their allegations into four theories of *Monell* liability and argue that the evidence raises sufficient material fact issues regarding each theory, making summary judgment improper.  Resp. 41.  Specifically, Plaintiffs argue that there are fact issues as to the following four theories of *Monell* liability:

(1) failure to institute proper procedures to ensure officers employ appropriate tactics when dealing with persons suspected of suffering from mental illness;

(2) failure to properly investigate and discipline officers involved in excessive use of force;

(3) failure to properly train officers in dealing with the mentally ill; and

(4) the excessive use of force when dealing with persons suffering from mental health crises.

*Id.* (formatted as single paragraph in original).[3]  The Court will address each claim in turn.  As described above, in order to succeed on their municipal liability claim, Plaintiffs must establish that there is "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation

---

[3] The Court is mindful that Plaintiffs articulate these four theories differently than the eight theories Plaintiffs pleaded in their Amended Complaint, and the five theories the Court permitted Plaintiffs to prosecute when considering the earlier-filed Motion to Dismiss.  *See supra* pp. 10–11.  After due consideration, the Court is of the opinion that Plaintiffs' theories as presented in their Response are substantively similar to those Plaintiffs' pleaded in their Complaint. Therefore, the Court will consider Plaintiffs' four theories as presented most recently in this case.

Additionally, Plaintiffs' four theories overlap because the facts are intertwined.  Any determination on one theory will inherently impact a determination on another.  When appropriate, the Court will identify where it declines to repeat its analysis.

whose 'moving force' is that policy or custom." *Valle*, 613 F.3d at 541–42 (quoting *Pineda*, 291 F.3d at 328).

At the summary judgment stage, the initial burden is on Defendant City of El Paso to identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Norman*, 19 F.3d at 1023 (quoting *Celotex*, 477 U.S. at 323). When the moving party has met its initial burden, "the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). After due consideration, the Court concludes that the parties have met their respective burdens as to each of Plaintiffs' theories. Defendant City of El Paso has identified portions of the record sufficient to support its Motion, and Plaintiffs' have responded with a showing of sufficient evidence to survive summary judgment in part.

As a preliminary matter, for the purpose of making its determination, the Court must consider whether Chief Allen is a policymaker who can be charged with actual or contructive knowledge of the alleged official policies or customs within the EPPD. To succeed

on their claims, Plaintiffs must prove that Chief Allen is an official to whom Defendant City of El Paso "has delegated policy-making authority" and who would have "[a]ctual or constructive knowledge of" each alleged policy or custom that forms the basis of municipal liability for Mr. Salas-Sanchez's death. *See Piotrowski*, 237 F.3d at 579. At the summary judgment stage, the Court finds that Plaintiffs have sufficiently established Chief Allen as a policymaker with such knowledge.

Plaintiffs have presented a number of facts that suggest that Chief Allen, in his capacity as head of the EPPD, has an integral role in (1) developing and implementing EPPD procedures for responding to situations involving the mentally ill; (2) investigating EPPD officer misconduct and determining discipline; and (3) developing the scope and content of EPPD officer training. Resp. 2–39. Furthermore, Defendant City of El Paso "does not challenge that Chief Allen is the final policymaker for purposes of establishing municipal liability with respect to all of Plaintiffs' asserted theories of liability." *Id.* at 40–41. Having considered Plaintiffs' factual showing and Defendant City of El Paso's acquiescence, the Court is of the opinion that Plaintiffs have

presented sufficient facts, for the purpose of summary judgment, that

Chief Allen is a policymaker who satisfies the second element for all

four claims of municipal liability. Therefore, the Court will only

address the first and third elements of each claim for the remainder of

its analysis.

### A. Failure to Institute Proper Procedures to Ensure Officers Employ Appropriate Tactics When Dealing with Persons Suspected of Suffering from Mental Illness

Plaintiffs' first theory—that the EPPD failed to institute proper

procedures to ensure officers employ appropriate tactics when dealing

with persons suspected of suffering from mental illness—is based on

two distinct claims. First, Plaintiffs aver that the EPPD's "Emergency

Detention" policy in effect at the time of the shooting governing mental

health arrests is facially unconstitutional because it directs officers to

make warrantless mental health arrests on less than probable cause.

Resp. 41. Second, Plaintiffs claim that the EPPD deliberately chose not

to implement a mental health unit, creating a fact issue as to whether

Defendant City of El Paso failed to institute proper procedures when

dealing with persons suffering from mental illness and whether that

failure was the moving force of the unconstitutional conduct resulting in Mr. Salas-Sanchez's death. *Id.* at 46.

### 1. EPPD's Policy of Permitting Officers to Execute a Warrantless Emergency Detention of Mentally Ill Individuals Without Probable Cause

Plaintiffs' argue that the EPPD failed to ensure officers employ appropriate tactics when confronted with persons suspected of suffering from mental health crises. Specifically, Plaintiffs contend that Defendant City of El Paso's "emergency detention" policy was unconstitutional because it failed to require that officers have probable cause that the subject detainee poses a substantial risk of serious harm. Resp. 42–43. Accordingly, resolving a fact issue regarding whether the policy required probable cause would determine whether it was facially unconstitutional as a matter of law.

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. A Fourth Amendment seizure is reasonable only if it is supported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 214 (1979). Furthermore, the probable cause standard applies in the context of a

seizure of the mentally ill. *Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir. 2012) (citing *Maag v. Wessler,* 960 F.2d 773, 776 (9th Cir. 1991)).

Pursuant to Texas law, both currently and at the time of the shooting, emergency detention of a person suspected to be mentally ill is permitted in the following circumstances:

> Sec. 573.001. APPREHENSION BY PEACE OFFICER WITHOUT WARRANT.
> (a) A peace officer, without a warrant, may take a person into custody if the officer:
>> (1) has reason to believe and does believe that:
>>> (A) the person is a person with mental illness; and
>>> (B) because of that mental illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and
>> (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody.
> (b) A substantial risk of serious harm to the person or others under Subsection (a)(1)(B) may be demonstrated by:
>> (1) the person's behavior;  or
>> (2) evidence of severe emotional distress and deterioration in the person's mental condition to the extent that the person cannot remain at liberty.
> (c) The peace officer may form the belief that the person meets the criteria for apprehension:
>> (1) from a representation of a credible person;  or
>> (2) on the basis of the conduct of the apprehended person or the circumstances under which the apprehended person is found.

7 Tex. Health & Safety Code § 573.001.

Accordingly, "[a]n officer has probable cause to detain if the two requirements for emergency detention under Texas law are satisfied." *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (citing *Cantrell*, 666 F.3d at 923). In the context of seizing the mentally ill, "probable cause exists where the facts and circumstances within the officer's knowledge at the time of the seizure are sufficient for a reasonable person to conclude that an individual is mentally ill and poses a substantial risk of serious harm." *Cantrell*, 666 F.3d at 923.

Also, at the time of the shooting, the EPPD Police Procedures Manual [hereinafter "Manual"] "Special Situations" section identified how officers should interact with persons suspected of suffering from mental illness. Expressly, at Section 3-402, the Manual directed officers to "adhere to Title 7 of the Texas Health and Safety Code when dealing with persons suspected of suffering from mental illness." Mot. Ex. A-7, at 2 (Procedures Manual, Special Situations), ECF No. 143-9. Additionally, the Manual provided the following regarding emergency detention of mentally ill persons:

> **3-402.04 EMERGENCY DETENTION**. When Officers have reason to believe a person is mentally ill and poses a

substantial risk of harm to self or others, they may take that person into custody for the purpose of obtaining an evaluation of the person's emotional and mental status and the need for involuntary hospitalization. Individuals may not be taken into custody merely for being mentally disturbed. Probable cause for obtaining an Emergency Detention Warrant may be established by a reliable third party, by considering the overall circumstances of the incident which may indicate mental illness and immediate danger or from the Officer's own observations. Mentally ill persons will be transported to a suitable facility as determined by Emergence Health Network (EHN). . . .

A. **EMERGENCY DETENTION WARRANT.** An officer will make a reasonable effort to locate the person. If the person is absent from the scene and the officer is unable to locate him or her, the officer has the authority, with supervisor approval, to obtain a Mental Illness Warrant. The warrant will be filed in the warrant office.

B. **EMERGENCY DETENTION WITHOUT A WARRANT.** Emergency detention without a warrant may be used, with supervisor approval, when a mentally ill person presents an immediate threat to themselves or others and immediate transport to a psychiatric facility is necessary. Emergency Detention Applications are available for officer's signature at the facility. Supervisors must be notified and approve the circumstances for the emergency detention without a warrant office.

*Id.* at 3–4. Specifically, Plaintiffs argue that this "Emergency Detention Without a Warrant" policy violates the Fourth Amendment and the requirements set forth in *Cantrell* because (1) the policy does not require probable cause and (2) the policy only requires that the

mentally ill person present an "immediate threat" and not "a substantial risk of serious harm." Resp. 42–43.

The Fifth Circuit has held that "[i]n analyzing the written policy of [a city], [the court] must do so in the context of the whole." *Maddux v. Officer One*, 90 F. App'x 754, 771 (5th Cir. 2004). Accordingly, "to confine [the court's] consideration to a subsection that [the plaintiff] finds particularly troublesome, narrowly examining in a vacuum, a single sentence of [a section], would be inconsistent with generally applicable principles of interpretation regularly employed by this Court in the construction of a controlling writing." *Id.* Therefore, the Court will consider the totality of the section for its broader context when analyzing each of Plaintiffs' textual claims, namely whether it authorized detention without probable cause or a threat of serious harm.

### a. Whether the policy authorized detention without probable cause

First, Plaintiffs contend that the policy as written did not require probable cause because it "simply stated that a warrantless arrest 'may be used . . . when a mentally ill person presents an immediate threat to themselves or others and immediate transport is necessary.'" Resp. 42

(quoting Mot. Ex. A-7, at 3). Therefore, Plaintiffs argue, in choosing to use "'may be used' language [that] falls short of 'probable cause,'" Defendant City of El Paso promulgated a written policy that did not require probable cause. *Id.* Additionally, Plaintiffs identify new language in an amended policy that Defendant City of El Paso issued on May 11, 2015, twelve days after the shooting in this case.[4] *Id.* at 43. The amended policy explicitly requires probable cause:

> **EMERGENCY DETENTION ORDER WITHOUT A WARRANT**
> Emergency detention without a warrant shall be used when probable cause exists that a mentally ill person presents an immediate threat to themselves or others and immediate transport to a psychiatric facility is necessary. Supervisors must be notified and approve the circumstances for the emergency detention without a warrant.

Resp. Ex. 4, at 97 (Procedures Manual, Special Situations, Chapter Revised May 11, 2015).[5] Thus, Plaintiffs read the amended

---

[4] Presently, the Court declines to consider whether the amended policy would be inadmissible evidence at trial as a "subsequent remedial measure" pursuant to the Federal Rules of Evidence Rule 407. *See* Fed. R. Evid. 407 ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct.").

[5] Plaintiffs contend that the amended policy includes a new section titled "NON-VIOLENT MENTALLY ILL PERSONS." Resp. 43–44. That section provides, "Non-violent mentally ill persons who do not

language as an acknowledgment of the past policy's constitutional inadequacy.

In its Reply, Defendant City of El Paso contends that Plaintiff's reading of the policy is noncontextual. Reply 1–2. Defendant first presents that the policy incorporates Title 7 of the Texas Health & Safety Code in its language directing officers to "adhere to . . . [the] Code when dealing with persons suffering from mental illness." Mot. Ex. A-7, at 3–4. Relevantly, § 573.001 requires that an officer have "reason to believe and does believe that" a person is mentally ill, that because of that illness "there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained," and

_____

present an immediate threat to themselves or others and who have not committed an offense may be informed of appropriate treatment options. Officers may not take the person to a treatment facility without their agreement." Resp. Ex. 4, at 102.

Plaintiffs argue that this new section demonstrates that the prior policy did not require officers to have probable cause prior to taking a mentally ill person into custody for transport to a mental health facility. Resp. 44. However, Plaintiffs appear to be mistaken: the prior policy in place at the time of the shooting, dated April 28, 2014, did include a section titled "NON-VIOLENT MENTALLY ILL PERSONS" and contained substantially identical language to the new policy. *See* Mot. Ex. A-7, at 5.

that the officer "believes that there is not sufficient time to obtain a warrant" before seizing the mentally ill person. § 573.001(a). As explained above, the Fifth Circuit has held that there is probable cause if these elements are satisfied. *See Cantrell*, 666 F.3d at 923. Therefore, Defendant City of El Paso argues, the Emergency Detention policy should be read to incorporate the Texas Code's probable cause standards.

Additionally, Defendant argues that other references in the overall Special Situations policy demonstrates that the Emergency Detention policy requires probable cause prior to detention. Reply 2–3. Specifically, the policy implies the need for probable cause in the context of obtaining an Emergency Detention Warrant and requires probable cause if Adult Protective Services requests the emergency detention of a mentally ill adult or elderly person. Mot. Ex. A-7, at 3, 6. Plaintiffs present these same facts differently, arguing that "the mention of probable cause in separate sections of Section 3.402 only underscores its absence under the 'Emergency Detention Without a Warrant' policy." Surreply 2.

Having reviewed the relevant provisions, the Court concludes that neither party's interpretation is dispositive. Opinions may differ on how to interpret the provision adopting portions of the Texas Health and Safety Code. One could surmise that the Texas Code was incorporated into all aspects of the policy, such that requiring probable cause for warrantless emergency detentions did not need to be expressly reiterated in the Emergency Detention policy. Simultaneously, one could consider Defendant City of El Paso's omission of explicit probable cause language to be indicative of a deliberate exception to such an incorporation. After due consideration, when viewing these provisions in the light most favorable to Plaintiffs, the Court is of the opinion that a jury could conclude that the written policy affirmatively sanctioned the warrantless emergency detention of a mentally ill individual without probable cause.

### b. *Whether the policy authorized detention without threat of "serious harm"*

Second, Plaintiffs argue that the policy is unconstitutional because it provides for detention so long as the mentally ill individual presents merely "an immediate threat" and does not require that the individual present a threat of "serious harm." *Id.* at 43. Plaintiffs

maintain that "[t]he 'serious harm' language is an important constitutional constraint on a peace officer's arrest authority. One can imagine any number of situations where a person with a mental disability poses a threat of kicking his dog or taking his mother's sandwich."[6] *Id.* at 43 n.1.  An apprehension in such circumstances, Plaintiffs argue, would violate the Fourth Amendment but would be consistent with Defendant City of El Paso's written policy at the time of the shooting.[7] *Id.*

After due consideration, the Court is of the opinion that a reasonable jury could conclude that the Emergency Detention policy authorized warrantless emergency detention of a mentally ill individual who presented "an immediate threat" as the text of the policy provides, and not a "substantial risk of serious harm" as required pursuant to the Texas Health and Safety Code and Fifth Circuit jurisprudence.  Similar to the Court's reasoning in the previous subsection, though a jury might

---

[6] The Court presumes that Plaintiffs' argument does not intend to diminish the travesty of animal cruelty.  Additionally, one could imagine circumstances where a threat to a dog could provide probable cause.

[7] Defendant City of El Paso did not address this argument in either its Motion or Reply.

ultimately determine that the reference to Title 7 of the Texas Health and Safety Code incorporates the higher standard into Defendant City of El Paso's policy, a reasonable jury might also determine that the text of the Emergency Detention policy authorizes detention based on the lower "immediate threat" standard.

The Court is mindful of its role in determining Defendant City of El Paso's Motion. The Court is not tasked with constructing the policy. The Court must instead assess these provisions as evidence of the existence of a written policy that supports one of Plaintiffs' claims for relief. Therefore, the Court determines that Plaintiffs have demonstrated that the language of Defendant City of El Paso's Emergency Detention policy creates a fact issue as to whether the written policy authorizes emergency detention without probable cause that a mentally ill person poses a substantial risk of serious harm to themselves or others. If the policy so authorizes, a reasonable factfinder could conclude that Defendant City of El Paso's mental health detention policy is facially unconstitutional.[8]

---

[8] The Court notes that a jury's determination that the policy is facially unconstitutional does not preclude a determination that the Defendant City of El Paso's unwritten policies through training and practices

Furthermore, a facially unconstitutional policy would be the moving force for any constitutional violation resulting from an EPPD officer's actions pursuant to the policy.[9]  *See Jauch v. Choctaw Cty.*, 874 F.3d 425, 435 (5th Cir. 2017) (explaining that causation is clear when an employee acts at the direction of a municipal policy); *Kersh v. Derozier*, 851 F.2d 1509, 1513 (5th Cir. 1988) (same).  Therefore, when considering the facts in the light most favorable to Plaintiffs, a reasonable jury could find that all three elements of municipal liability are satisfied as to this theory.  Accordingly, the Court is of the opinion that Defendant City of El Paso should be denied summary judgment regarding the question of whether its written policy for warrantless emergency detentions of a mentally ill individual is facially

---

absolves it of liability for its unconstitutional written policy.  *See Maddux v. Officer One*, 90 F. App'x 754, 771–72 (5th Cir. 2004) ("It is plausible that the jury could believe that, though the written policy had not been updated to reflect current law, officers were nevertheless trained in protocol that complied with decisional law interpreting the extent of the Fourth Amendment protection against unreasonable searches.").

[9] The Court has already determined that a reasonable jury could conclude that the actions of Defendant Officers Gomez and Rivera violated Mr. Salas-Sanchez's constitutional rights.  *See* Mem. Op. and Order, July 24, 2019, ECF No. 189.

unconstitutional, such that it may serve as a basis for Plaintiffs' requested relief.

## 2. EPPD's Choice to Not Implement a Dedicated Mental Health Unit

In further support of their theory that the EPPD failed to ensure officers employ appropriate tactics in confronting mentally ill persons, Plaintiffs argue that Chief Allen made a deliberate choice to not implement a "Critical Intervention Training" unit or a "Crisis Intervention Team"[10] [hereinafter "CIT"] and this choice was a moving force of Mr. Salas-Sanchez's shooting death. Resp. 46. Specifically, Plaintiffs argue that "Chief Allen knew that [mental health] teams could reduce the risk of excessive force when presented with mental health issues, yet deliberately chose not to implement them." *Id.*

After due consideration, the Court is of the opinion that a reasonable jury could find: (1) that Defendant City of El Paso made the policy decision to not implement a CIT program; (2) which otherwise may have prevented Mr. Salas-Sanchez's death; and (3) that Chief Allen

---

[10] Plaintiffs refer to a "Critical Intervention Training" team in their Response but refer to "crises intervention" teams in their Amended Complaint. *Compare* Resp. 5, *with* Am. Compl. 15. Both are apparently abbreviated as "CIT" and used interchangeably in the parties' filings.

supported this policy decision while deliberately indifferent to the risk that EPPD officers may use excessive force against mentally ill individuals.

### a. Policy

"The existence of a policy can be shown through evidence of . . . [a] decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Valle*, 613 F.3d at 542. "A municipal 'policy' must be a deliberate and conscious choice by a municipality's policy-maker." *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). "While the municipal policy-maker's failure to adopt a precaution can be the basis for § 1983 liability, such omission must amount to an intentional choice, not merely an unintentionally negligent oversight." *Id.* (citing *City of Canton*, 489 U.S. at 387). That is, "municipal liability under § 1983 attaches where—and only where— a deliberate choice to follow a course of action is made from among various alternatives by city policymakers." *Goodman v. Harris Cty.*, 571 F.3d 388, 396 (5th Cir. 2009) (quoting *City of Canton*, 489 U.S. at 389). Accordingly, a department's decision not to implement a policy set

forth in a proposal may constitute an official policy of failing to implement such policy. *See Valle*, 613 F.3d at 545 (holding that plaintiff presented sufficient summary judgment evidence to raise jury issue as to "whether the department's decision not to implement the CIT training recommendations in [an internal] proposal constituted an official policy of failing to adequately train.").

Here, Plaintiffs argue that the evidence shows that Chief Allen was aware of the need for CIT units but chose not to implement them. Resp. 46–49. In their briefs, Plaintiffs refer to "CIT" units, the "CIT" model, "CIT" training, "CIT" teams, and "CIT" tactics. In some references, "CIT" appears to stand for "Critical Intervention Training," Resp. 5, and at others, "crisis intervention team," *id.* at 6, 46. Based on the parties' submissions, it appears that a "CIT" or "mental health" unit refers to a formal program that deploys "CIT teams" in response to mental health crises. In turn, CIT teams include at least one CIT-trained officer or a mental health professional. For example, in the City of Houston, a CIT team is "a multifaceted comprehensive law enforcement program for responding to persons in mental health crisis." Resp. 5 (citing Resp. Ex. 5 (Houston Police Dep't, Mental Health

Division Website)). According to Plaintiffs, these "CIT teams pair a uniformed officer with a licensed mental health professional to respond to field officers' calls for assistance." *Id.*

Additionally, "CIT" is also used to describe particular training, tactics, and officers who have received such training. Plaintiffs direct the Court to consider the significant evidence presented in *Valle* regarding CIT training. Resp. 5 (citing *Valle*, 613 F.3d at 544). Specifically, Plaintiffs quote testimony discussed in *Valle* by a lieutenant in the Houston police department's Mental Health Unit that CIT training is "180 degrees different than . . . typical police officer and law enforcement training." *Id.* (quoting *Valle*, 613 F.3d at 545). Furthermore, Plaintiffs describe what is involved in CIT training based on the evidence discussed in *Valle*:

> For instance, situations involving mentally ill persons require a greater degree of patience and can require use of CIT tactics for periods as long as twenty-four hours. CIT-trained officers are trained not to 'let the pressure of time be a factor in [their] decisionmaking.'

*Id.* As another *Valle* witness explained, CIT training provides police officers with "appropriate de-escalation and communication tactics." *Id.* (quoting *Valle*, 613 F.3d at 545).

At the time of Mr. Salas-Sanchez's death, the EPPD did not have a CIT or mental health unit in place. Resp. 5 (citing Resp. Ex. 3, at 31 (Deposition Testimony of Gregory K. Allen)). Chief Allen had been Chief of the EPPD for seven and a half years prior to Mr. Salas-Sanchez's shooting in April 2015, during which time police departments in Houston, Dallas, Austin and San Antonio "already had crisis intervention teams to increase their officers' capacity to deescalate situations involving the mentally ill to avoid the use of deadly force." Resp. 6 (citing Resp. Ex. 3, at 5; Resp. Exs. 5, 7, 8).

Additionally, Chief Allen testified that the EPPD ultimately created the CIT program in 2017 because of "the perception by certain members of the public that the department was ill-equipped to deal with mental health issues." Resp. 6 (citing Ex. 3, at 20). As Chief Allen elaborated, "This had been a concern over the years from various members of the community and city council members, not only on my term, but during past administrations of the police department."[11] *Id.*

---

[11] Once again, the Court declines to consider whether the implementation of a CIT program in 2017 is inadmissible evidence at trial as a "subsequent remedial measure" pursuant to the Federal Rules of Evidence Rule 407. *See* Fed. R. Evid. 407. Conversely, deposition testimony related to attitudes prior to the incident might be admissible

Plaintiffs cite to several other pieces of evidence supporting the reasonable inference that Chief Allen was aware of the existence of CIT units prior to the April 2015 shooting, including his testimony that he knew that Houston had implemented CIT units, his participation in chief training, his testimony that he reads publications by the International Association of Chiefs of Police and the Major Cities Chiefs Associations, and his testimony regarding familiarity that other cities have CIT programs in place. Resp. 6–7.

Finally, Plaintiffs contend that the "need for CIT units was specifically brought to Chief Allen's attention fifteen months" prior to the shooting when, on January 17, 2014, "Chief Allen received a detailed "review from a non-profit organization—Disability Rights Texas—informing him of the results of an investigation that they conducted of an incident involving his officers using excessive force against a mentally ill person, Michael Sosa." Resp. 8 (citing Resp. Ex. 11 (Letter from Disability Rights Texas)). In the review, an attorney on behalf of the organization explained that the EPPD officers tased,

despite having been prompted by questions regarding inadmissible evidence.

physically restrained, and punched Mr. Sosa in the face. *Id.* The

attorney was also of the opinion that "the EPPD had the opportunity to

consider or take other more appropriate measures short and prior to the

use of force, to deescalate the situation and failed to do so." *Id.*

Accordingly, Disability Rights Texas:

> Ask[ed] the EPPD to re-examine its policies, procedures, and
> practices . . . [and ensure that] any in-house mental
> health/crisis response teams, e.g., CIT teams, certified
> mental health deputies, mobile crisis intervention units, are
> readily available, properly trained, and fully prepared to
> respond immediately and when necessary to address calls
> involving individuals with a mental health illness or
> [intellectual developmental disability] and in crisis.

Resp. Ex. 11, at 4.

In its Reply, Defendant City of El Paso appears to argue that

there is no cognizable official policy as part of Plaintiffs' claim that the

EPPD failed to implement a CIT unit. Specifically, Defendant City of

El Paso maintains that this case is distinguishable from *Valle*, in which

the Fifth Circuit held that the City of Houston's decision not to

implement recommendations set forth in an internal proposal could

constitute an official policy of failing to adequately train. *Valle*,

613 F.3d at 544–45. Defendant argues, "Plaintiff has produced no

evidence of an internal policy suggestion in the El Paso Police Department that predates this incident." Reply 3.

However, the Fifth Circuit in *Valle* did not state that an internal policy suggestion is the exclusive means by which an official policymaker can become aware of a potential policy and deliberately choose, as a form of official policy, not to implement such policy. That is, the reasoning in *Valle* does not preclude the finding that a policymaker's awareness of a potential policy through means other than an internal proposal and choice to decline to implement such policy, could be considered an official policy.

After due consideration, the Court is of the opinion that Plaintiffs have provided sufficient summary judgment evidence to create a fact issue as to whether the City had an official policy of not implementing a CIT unit. According all reasonable inferences in favor of Plaintiffs, a reasonable jury could conclude that Chief Allen was aware of the existence of CIT units and the recommendation that the EPPD implement such units. Therefore, the summary judgment record suggests that Chief Allen had ample evidence to make an informed decision regarding the outside policy proposal. Furthermore, his

decision to disregard Disability Rights Texas's recommendation, a little over a year before Mr. Salas-Sanchez's death, could be considered deliberate.

### b. *Moving Force Causation*

In order to succeed in a claim for municipal liability, a plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Valle*, 613 F.3d at 542 (quoting *Brown*, 520 U.S. at 404). "[T]he connection must be more than a mere 'but for' coupling between cause and effect." *Id.* at 546 (citing *Thompson v. Connick*, 578 F.3d 293, 300 (5th Cir. 2009)). Rather, the deficiency must be the "actual cause of the constitutional violation." *Id.*

Plaintiffs argue that "[e]vidence of the overall effectiveness of mental health units combined with the events leading to the tasing and shooting death of [Mr. Salas-Sanchez] raise significant fact issues that Chief Allen's failure to implement such units was a 'moving force' in the death of [Mr. Salas-Sanchez]." Resp. 48. Specifically, Plaintiffs claim that a CIT trained officer or paired mental health professional would have recognized that the officers' actions were the source of Mr. Salas-Sanchez's irritation and "would have likely resolved the encounter by

simply leaving a referral to a mental health facility with [Mr. Salas-Sanchez]'s mother which is what she was seeking in the first place." *Id.* Defendant City of El Paso argues that Plaintiffs' position is based on a "conjecture that the outcome might have been different." Reply 7. Further, Defendant City of El Paso suggests that Plaintiffs make the unsubstantiated assertion that:

> [T]he outcome might have been different, IF the City had established CIT units, and IF a CIT unit was available at the time of this incident, and IF those CIT officers had made the scene in time, and IF they had chosen different tactics, and IF Erik Salas-Sanchez had reacted differently to the CIT officers.

Reply 7.

At this juncture, the Court must construe evidence to draw all reasonable inferences in the light most favorable to Plaintiffs. Accordingly, as detailed in the Court's Memorandum Opinion and Order regarding the Defendant Officers' motions for summary judgment, the following is true for the purposes of resolving the instant motion: Prior to the officer's entry into the home, "Mr. Salas-Sanchez had insulted the officers and asked them to leave but not threatened them." Mem. Op. and Order 59. Additionally, Mr. Salas-Sanchez was not holding any object. *Id.* at 39. Furthermore, Mr. Salas-Sanchez "did not assault or

threaten his mother." *Id.* at 45. Subsequently, after the officers entered the home, "Mr. Salas-Sanchez placed the object he was holding (or his hands, if no object existed) on the table and then put his empty hands in the air while walking away from the table. He walked into the kitchen, where he was hit by Rivera's taser probes." *Id.* at 64. Next, "Mr. Salas-Sanchez entered the hallway and walked toward his bedroom. When Gomez shot Mr. Salas-Sanchez, Mr. Salas-Sanchez was facing away from the officers." *Id.* at 64–65.

It is reasonable to infer that, if the EPPD had a CIT unit similar to that of the City of Houston's, a CIT team would have been deployed and a CIT trained officer or mental health professional would have employed de-escalation and communication techniques and recommended that the officers not enter the home. Instead, when resolving the factual disputes in favor of Plaintiffs, it is clear that the opposite happened. The Defendant Officers entered the Salas-Sanchez's home and did not de-escalate the situation. Their subsequent use of excessive force was the very thing CIT training and tactics were designed to prevent. Therefore, the Court concludes that a reasonable jury could determine that Defendant City of El Paso's failure to

implement a CIT program was a moving force of the unlawful entry and use of excessive force in this case.

### c. Deliberate Indifference

When a policy does not facially violate a federal right, a plaintiff "must show that the policy was adopted or maintained with deliberate indifference to the known or obvious fact that such constitutional violations would result." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004).  In other words, a plaintiff must show the municipal action reflects "the requisite degree of culpability"—that is, "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Valle*, 613 F.3d at 542 (quoting *Brown*, 520 U.S. at 404, 411). "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.'" *Id.* (citing *Piotrowski*, 237 F.3d at 579).  Establishing deliberate indifference "generally requires that a plaintiff demonstrate at least a pattern of similar violations." *Johnson*, 379 F.3d at 309 (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003)).

In *Valle*, the Fifth Circuit held that the plaintiffs failed to link the "*potential* for constitutional violations" in situations involving mentally ill persons "to a pattern of actual violations sufficient to show deliberate indifference." *Valle*, 613 F.3d at 548. Notably, the internal proposal recommending additional CIT training did "not detail any prior specific instances of the use of excessive force by non-CIT officers." *Id.* Additionally, the *Valle* plaintiffs failed to "elicit testimony that City officials were aware of prior shootings of unarmed mentally ill individuals." *Id.* Though the *Valle* plaintiffs presented testimony demonstrating the assistant police chief was "aware of two shootings of mentally ill persons that occurred *after* [the victim] was killed," it was deemed not sufficient evidence to survive summary judgment. As the *Valle* Court explained, "[E]ven assuming that these later shootings involved excessive force, they are not sufficient to show that the City was on notice of similar constitutional violations *before* [the decedent] was killed." *Id.*

Furthermore, evidence that merely suggested that "prior shootings of mentally ill persons in fact had occurred" was deemed insufficient when it failed to "establish a pattern of constitutional

violations." *Id.* Additionally, "[p]rior instances must point to the specific violation in question; 'notice of a pattern of *similar* violations is required.'" *Id.* (quoting *Davis*, 406 F.3d at 383). Accordingly, based on *Valle*, in order to show deliberate indifference, Plaintiffs must allege a pattern of actual constitutional violations similar to the alleged violations in this cause and demonstrate that Defendant City of El Paso officials were aware of those constitutional violations.

      i.   <u>Considering what constitutes a pattern</u>

In support of Plaintiffs' theory of *Monell* liability based on Chief Allen's choice not to implement a CIT unit, Plaintiffs propose a "pattern of cases" involving the EPPD, Resp. 49 n.18 (citing Resp. Sec. II(C)), identifying eight instances where EPPD officers acted in accordance with an alleged "[p]attern of use of excessive force against mentally ill victims," *id.* at 10. These eight instances encompass the following victims: (1) Gregory Smith (2008); (2) Efrain Velasquez (2008); (3) Daniel Rodrigo Saenz (2013); (4) Fernando Gomez (a.k.a. Mercedes de Marco) (2013); (5) David Alejandro Gandara (May 2015); (6) Daniel Ramirez (June 2015); (7) Arthur Williams (2016); and (8) Francisco

Ramirez (2016).[12]  Plaintiff supports each instance with facts on the record.  Notably, Plaintiffs' presentation of events that took place both *before* and *after* the shooting of Mr. Salas-Sanchez pushes the Court beyond *Valle* and into new territory.

Defendant City of El Paso argues that "*Valle* makes clear, subsequent incidents are not probative of causation for 'conscious and deliberate indifference' . . . [e]ach of the incidents in a 'pattern' must be prior."  Mot. 23 (citing *Valle*, 613 F.3d at 548).  Therefore, Defendant City of El Paso objects to the evidence of future instances on relevancy and Federal Rules of Evidence Rule 403 grounds.[13]  *Id.*  Having considered *Valle*, the Court concludes that Defendant City of El Paso's interpretation overstates the Fifth Circuit's reasoning.

The *Valle* Court established that a claim may not survive summary judgment when it relies exclusively on future instances.  This

_____

[12] Defendant City of El Paso objects to the use of instances "not pled in Plaintiffs' Amended Complaint."  Reply 19.  The Court is unaware of any requirement that all instances in an alleged pattern be present in the Complaint.  Therefore, the Court denies Defendant City of El Paso's objection without prejudice given the absence of relevant legal precedent.

[13] The Court notes Defendant City of El Paso's objection and denies it without prejudice.

is common sense, for the Court is unaware of any city official who can divine the future. However, Plaintiffs in this case have provided prior instances, addressing the *Valle* Court's concerns. Furthermore, the Court is inclined to consider future instances as still probative in determining whether a "pattern" existed at the time of Mr. Salas-Sanchez's death. Thus, the inquiry is nuanced: might the future instances permit a reasonable jury to conclude that any prior instance was part of a pattern, and, if there was such a pattern, could Chief Allen have known a pattern existed at the time of Mr. Salas-Sanchez's death?[14]

To answer this question in the case at bar, the Court must now consider when the character of a prior instance changes from that of an isolated incident into that of one of a pattern of instances. It is possible that the pattern might only reveal itself after Mr. Salas-Sanchez's death, a distinction that may be significant. Alternatively, this distinction may be inconsequential if Chief Allen had sufficient information at his disposal to know that any prior instance was part of

---

[14] Considering the facts of *Valle*, the answer to this question would be no. Without a prior instance, the municipality could not have anticipated that any victim's death would be the first in a pattern.

a pattern, even if the pattern had not run its course. Furthermore, if future instances were admissible, a jury would have more evidence of a pattern to consider than Chief Allen had at the time of Mr. Salas-Sanchez's death.

These issues underscore the difficulty the Court has balancing what it perceives as the dual purposes of finding a pattern. On the one hand, a pattern is evidence regarding Defendant City of El Paso's actions prior to Mr. Salas-Sanchez's death. It enables a jury to determine the scope of available evidence that informed Defendant City of El Paso's actions at the time of the events giving rise to the cause of action. On the other hand, a pattern is a legal requirement forming the basis of a claim for relief. It defines the very nature of Mr. Salas-Sanchez's death pursuant to the laws of the United States. The Court questions whether a jury should be limited to considering only evidence relevant to the former at the expense of abundant evidence relevant to the latter. Unfortunately, the Court is of the opinion that the law provides few answers to these concerns.

Simultaneously, the Court is uncertain whether the fact that Mr. Salas-Sanchez's death occurred early in a possible pattern would impact

Plaintiffs' claim for relief, rendering his death as the basis for a future plaintiff's *Monell* claim while insulating Defendant City of El Paso from municipal liability in this case. Were the Court limited to only past instances, a hypothetical plaintiff from a future instance in the pattern could rely on Mr. Salas-Sanchez's death to survive summary judgment, while Plaintiffs in this case might lose summary judgment should the prior instances not reveal a pattern on their own.[15] Thus, the Court contemplates how many instances of excessive force are necessary before Defendant City of El Paso has earned the "requisite degree of culpability" for possible municipal liability. Furthermore, the law is unclear on whether it requires Defendant City of El Paso to answer for all instances forming the pattern, or only the final few. This challenge gets to the heart of the nebulous and ill-defined "deliberate indifference" standard, one that is difficult to apply when prior instances do not

---

[15] For example, proof of a pattern might be stronger for the family of Mr. Daniel Ramirez, who was tased while hanging himself from a basketball hoop on June 23, 2015, because his death occurred two months after Mr. Salas-Sanchez's death. *See* Resp. 15. The Court questions whether the nature of Defendant City of El Paso's culpability changes merely because Mr. Ramirez's family may present an additional instance to prove a pattern.

indicate an obvious conclusion.  Therefore, the Court is reluctant to deny a plaintiff access to justice when the law does not so require.

On this day, the Court could undertake the unenviable task of predicting what the Fifth Circuit might prefer in this circumstance. The Court declines to make such a prediction, concluding that the Fifth Circuit is better suited to define the scope of its own jurisprudence. Additionally, the Court is mindful that "summary judgment must be used with due regard for its purposes and should be cautiously invoked so that no person will be improperly deprived a trial of disputed factual issues." *See* 10A Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2712 (4th ed. 2019).  Furthermore, "when a court is called upon to apply a legal principle in a novel fashion, the potential impact of the decision and the deleterious nature of the conduct called into question are relevant . . . a more complete factual record is required." *Id.* § 2725.

The Court cannot overstate the seriousness of Plaintiffs' allegations against Defendant City of El Paso.  Were the Court to expand the Fifth Circuit's existing jurisprudence on municipal liability to deny Plaintiffs an opportunity to make their case on the record, the Court would risk committing an injustice when it is not legally bound to

do so. Accordingly, the Court concludes that it would be preferable to revisit the question of whether Plaintiffs have established a pattern once their record is complete. *See* Fed. R. Civ. P. 50 (permitting a party to move for judgment as a matter of law during a jury trial, "specify[ing] the judgment sought and the law and facts that entitle the movant to the judgment"). Should Plaintiffs fail to show a pattern at trial, the question of future instances would be inconsequential for this case. Should Plaintiffs receive a favorable jury determination, the Fifth Circuit may have the opportunity to reconsider municipal liability on appeal.

After due consideration, the Court is of the opinion that Plaintiffs have provided sufficient evidence that create genuine disputes of material fact, and deny Defendant City of El Paso summary judgment regarding its failure to implement a CIT program. Considering the facts in the light most favorable to Plaintiffs, a reasonable jury could determine that Chief Allen was deliberately indifferent that constitutional violations may result if he did not implement a CIT program. The Court arrives at this conclusion after developing a

framework to determine when force is excessive, and applying that framework to each of Plaintiffs' cited instances.

ii. <u>Defining excessive force</u>

When considering a Fourth Amendment excessive-force claim, courts must apply the "objective reasonableness" standard to determine whether an officer's use of force amounted to an unconstitutional seizure.[16] *Graham v. Connor*, 490 U.S. 386, 388 (1989). In applying *Graham*, the Fifth Circuit has required plaintiffs to show the subject of the use of force "suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'" *Carroll v. Ellington*, 800 F.3d 154, 173 (5th Cir. 2015) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)). Considering an excessive force claim is "necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)

---

[16] When deadly force is intentionally used against a person, the person has been seized pursuant to the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968) (stating that when an officer "has in some way restrained the liberty of a citizen" either "by means of physical force or show of authority," a seizure has occurred).

(quoting *Graham*, 490 U.S. at 396). Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Additionally, the Fifth Circuit has narrowed its application of *Graham* to consider only those facts in existence at the moment an officer chose to use force. *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (refusing to consider events that may have prompted the victim to raise his weapon at an officer). Thus, the Court must not consider any prior actions an officer may have taken that might have increased the likelihood that they use a taser or firearm. *See Cass v. City of Abilene*, 814 F.3d 721, 731–32 (5th Cir. 2016) (citing *Harris*, 745 F.3d at 772) (rejecting argument that the officers' decision to execute a warrant with their firearms drawn created a dangerous circumstance where the use of excessive force was likely).

In the context of mental illness, the Court is precluded from considering whether an officer's inadequate response to a mental health crisis provoked the victim into acting aggressively. *See Elizondo v. Green*, 671 F.3d 506, 511 (5th Cir. 2012) (DeMoss, C.J., concurring)

(lamenting the narrow scope of excessive force law and suggesting that "[e]ither law enforcement procedures or our law must evolve if we are to ensure that more avoidable deaths do not occur at the hands of those called to 'protect and serve'").  Furthermore, once a mentally ill victim has acted in such a way that the use of force would be objectively reasonable, it is inconsequential whether the officers attempted to "accommodate" the illness before using force.  *See City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1771, 1775 (2015) (disagreeing with the lower court's view that the officer should have used other means to de-escalate the situation).  Therefore, mental illness appears to factor very little into an excessive force analysis, if at all.[17]

---

[17] The Court is mindful that Plaintiffs' claims rely heavily on the proposition that Defendant City of El Paso's liability is predicated on its failure to ensure EPPD officers de-escalate encounters with mentally ill individuals.  This argument occupies a gray area between the Fifth Circuit's separate *Monell* and *Graham* jurisprudences.  Though seemingly permissible as a claim for relief pursuant to *Monell*, it simultaneously appears to be precluded pursuant to the Fifth Circuit's application of *Graham*.  It is unclear to what extent this dissonance impacts the viability and scope of Plaintiffs' claims.  Noticeably, the Court considers it highly persuasive that the Fifth Circuit has considered similar arguments in the past without questioning these Fourth Amendment implications.  Accordingly, the Court is of the opinion that though a *Graham* analysis is necessary to consider *Monell* in this case, the Fifth Circuit's interpretation of *Graham* is not fatal to Plaintiffs' claims.

Accordingly, it is insufficient for Plaintiffs to allege a pattern of instances where officers used tasers or firearms against mentally ill individuals when de-escalation may have been an option. The law does not account for mental illness or provide a separate test for what a reasonable officer would do in response to a mental health crisis. Instead, the pattern must consist of only those cases where an officer's use of a taser or firearm against a mentally ill individual was excessive pursuant to the Fifth Circuit's application of *Graham*. *See Harris*, 745 F.3d at 772 (narrowing *Graham* to consider only "the moment of the threat"). Therefore, the Court shall apply this strict standard to determine whether the facts of each cited instance, when considered in the light most favorable to Plaintiffs, could support a finding of excessive force. Should a sufficient number of instances indicate excessive use of force, Plaintiffs will have adequately alleged a pattern to survive summary judgment.

### iii.    Isolated instances where force was not excessive

Plaintiffs have provided significant documentation for each alleged instance, including but not limited to police reports, eyewitness statements, interrogatories, and review board findings. *See* Resp.

Sealed Exs. [hereinafter "Resp. Sealed"], June 28, 2019, ECF No. 180.

At summary judgment, the Court must consider the evidence in the

light most favorable to Plaintiffs, viewing each instance in isolation to

consider whether a reasonable jury could determine that there had been

excessive use of force in that specific event. Having considered the

evidence, the Court is of the opinion that a reasonable jury could not

determine that EPPD officers used excessive force in the matters of

Gregory Smith (2008), Efrain Velasquez (2008), David Alejandro

Gandara (2015), and Arthur Williams (2016). Though all four instances

share the similar thread of EPPD officers failing to de-escalate mental

health crises, each victim wielded a possible weapon in a threatening, or

violent, manner such that the use of force was objectively reasonable.

A. Gregory Smith

Regarding the shooting death of Gregory Smith on June 13, 2008,

an EPPD officer used his service firearm after Mr. Smith had drawn

what appeared to be a handgun and pointed it in the EPPD officer's

direction. While on patrol, the EPPD officer observed Mr. Smith

behaving erratically in a motel parking lot. Resp. Sealed Ex. 16, at 42

(EPPD Shooting Review Team [hereinafter "SRT"] Form Three

Narrative). After initiating a stop and interacting with Mr. Smith, the EPPD officer concluded that Mr. Smith may have been mentally ill or under the influence of narcotics. *Id.* The EPPD officer then conducted a routine search of the police database, revealing that Mr. Smith had an outstanding warrant for his arrest. *Id.*

When the EPPD officer approached Mr. Smith to make the arrest, Mr. Smith shouted twice that he possessed a gun, brandished what appeared to be a silver handgun, and aimed it at the EPPD officer. *Id.* at 42–43. Fearing for his safety, the EPPD officer took cover by the side of his patrol vehicle, drew his service firearm, and proceeded to shoot at Mr. Smith until he appeared to be incapacitated. *Id.* at 43. The EPPD officer fired seventeen shots, eleven of which hit Mr. Smith. *Id.* at 48 (EPPD SRT Form Six Subject Report). Though investigators later discovered that Mr. Smith's weapon was merely a "toy gun wrapped in duct tape," *id.*, there is no evidence that the EPPD officer was aware of this fact at the time.

Furthermore, because Plaintiffs have not provided any evidence that contradicts the EPPD officer's statement given to the EPPD Shooting Review Team, there are no fact issues that need to be resolved

in Plaintiffs' favor.  Accordingly, the Court concludes that it was objectively reasonable for the EPPD officer to use his service firearm to neutralize the perceived risk that his life was in danger.  Therefore, because the use of force was not excessive, the Court is of the opinion that a reasonable jury could not determine that Mr. Smith's shooting death was the result of a constitutional violation that is part of a pattern relevant in this case.

### B. Efrain Velasquez

Regarding the shooting death of Efrain Velasquez on December 11, 2008, an EPPD officer used her service firearm after Mr. Velasquez assaulted another EPPD officer with a kitchen knife.  Three EPPD officers arrived at the Velasquez's residence after responding to a report that Mr. Velasquez had threatened his neighbor with a knife.  Resp. Sealed Ex. 17, at 61 (EPPD SRT Form Three Narrative).  Mr. Velasquez's mother informed the EPPD officers that she did not know where her son was located.  *Id.*  She requested the EPPD officers find Mr. Velasquez "due to the fact that he was schizophrenic."  *Id.*  Shortly thereafter, Mr. Velasquez's mother discovered him in the master bedroom of the Velasquez's residence.  *Id.*  She invited two of the EPPD

officers into the home and led them to Mr. Valasquez, who she said was hiding from her.  *Id* at 61–62.

Once the two EPPD officers approached the master bedroom, they discovered Mr. Velasquez with his back against a wall and his right hand concealed.  *Id.* at 62.  One EPPD officer instructed Mr. Velasquez to show his hands and drop any objects he may be holding, commands that Mr. Velasquez refused to comply with.  *Id.*  Next, Mr. Velasquez "raised a large kitchen knife up over his head, with the blade pointed towards [the EPPD officer] and ran towards him . . . striking him in the face with the knife."  *Id.*  An intense altercation ensued, with the first EPPD officer attempting to disarm Mr. Velasquez while avoiding multiple knife lunges and swings.  *Id.*  Simultaneously, the second EPPD officer drew her service firearm, explaining to the EPPD Shooting Review Team that "she was afraid that [Mr. Velasquez] would overpower [the first EPPD officer] and kill him."  *Id.* at 63.  Ultimately, the second EPPD officer fired one round into Mr. Velasquez's abdomen.  *Id.* at 63; *see also id.* at 71 (EPPD SRT Form Six Subject Report).  As a result, the struggle ended and the first EPPD officer disarmed Mr. Velasquez.  *Id.* at 63 (EPPD SRT Form Three Narrative).

Similar to the matter of Gregory Smith, Plaintiffs have not provided any evidence that contradict the witness statements made to the EPPD Shooting Review Team. The Court is mindful that the many witnesses' perspectives contained therein differ in some respects. Accordingly, the Court, having considered the salient uncontested facts, determines that the inconsistencies between witnesses do not pertain to whether Mr. Velasquez had attacked the first EPPD officer with a knife before the shooting. Accordingly, the Court is of the opinion that it was objectively reasonable for the second EPPD officer to use her service firearm to neutralize the deadly threat Mr. Velasquez posed to the first EPPD officer. Therefore, the use of force was not excessive, and a reasonable jury could not conclude that Mr. Velasquez's shooting death was the result of a constitutional violation that is part of a pattern relevant to this case.

C. David Alejandro Gandara

Regarding the shooting death of David Alejandro Gandara on May 21, 2015, two EPPD officers used their service firearms after observing Mr. Gandara reach into what the EPPD officers believed was a gun case. Four EPPD officers responded to a report that there was a subject

with a gun in public and that the "subject had a rifle or shotgun to his own head."  Resp. Sealed Ex. 31, at 44 (Witness Sworn Statement of First EPPD Officer);  *see also* Resp. Sealed Ex. 32, at 48 (Witness Sworn Statement of Second EPPD Officer) (recalling that the report said the subject had a rifle);  Resp. Sealed Ex. 34, at 57 (Witness Sworn Statement of Third EPPD Officer) (recalling that the report said the subject had a rifle or shotgun).  The first and second EPPD officers arrived first and discovered Mr. Gandara urinating on the side of a building in an alleyway.  Resp. Sealed Ex. 31, at 44–45; Resp. Sealed Ex. 32, at 49.  Both EPPD officers chose to carry rifles in response to the report that Mr. Gandara was armed.  Resp. Sealed Ex. 31, at 44; Resp. Sealed Ex. 32, at 49.  By the time the third EPPD officer arrived, Mr. Gandara was behaving erratically.  Resp. Sealed Ex. 31, at 44; Resp. Sealed Ex. 32, at 49; Resp. Sealed Ex. 34, at 57.  He paced back and forth, kept a hand concealed in his shorts, and ignored commands to stop and raise his hands.  Resp. Sealed Ex. 31, at 45; Resp. Sealed Ex. 32, at 49; Resp. Sealed Ex. 34, at 57.  The first and second EPPD officers continuously aimed their rifles at Mr. Gandara during these moments.  Resp. Sealed Ex. 31, at 44 ("I had my weapon aimed at the

subject . . . because the comments of the call stated the subject had a rifle or shotgun on his person . . . ."); Resp. Sealed Ex. 32, at 49 ("The subject was very wide eyed and didn't appear phased at my presence or the fact that I had a rifle pointed at him . . . it made me uneasy.").

Subsequently, the fourth EPPD officer arrived at the opposite end of the alleyway, containing Mr. Gandara inside. Resp. Sealed Ex. 32, at 49; Resp. Sealed Ex. 34, at 57. Mr. Gandara turned to the fourth EPPD officer and began to approach him in the same manner that Mr. Gandara had approached the first and second EPPD officers. Resp. Sealed Ex. 32, at 49. The third EPPD officer began giving commands in Spanish, slowly approaching Mr. Gandara to get within an effective taser distance. Resp. Sealed Ex. 34, at 57. Mr. Gandara ignored the commands, choosing instead to approach the rear of a truck parked in the alleyway. Resp. Sealed Ex. 31, at 45; Resp. Sealed Ex. 32, at 49; Resp. Sealed Ex. 34, at 57. The three EPPD officers who gave sworn statements all observed Mr. Gandara reach into the truck bed and retrieve what appeared to be a black rifle case. Resp. Sealed Ex. 31, at 45; Resp. Sealed Ex. 32, at 50; Resp. Sealed Ex. 34, at 57. Responsively, the second EPPD officer warned Mr. Gandara, "Don't do it!" and

instructed him to put down the case. Resp. Sealed Ex. 31, at 45; Resp. Sealed Ex. 32, at 50. When Mr. Gandara continued to reach into the case, both the first and second EPPD officers fired their rifles and Mr. Gandara collapsed on the ground. Resp. Sealed Ex. 31, at 45, Resp. Sealed Ex. 32, at 50 ("Fearing that the subject was accessing a weapon and not knowing the weapon's orientation in the case," the second EPPD officer was concerned for his and his fellow EPPD officers' safety); Resp. Sealed Ex. 34 at 58 ("I observed a[n] entry wound to his right chest and right side of his head by his ear. The subject was unresponsive.").

Once again, Plaintiffs have not provided any evidence to question the accuracy or veracity of the EPPD officers' sworn statements about Mr. Gandara's shooting. Furthermore, all three EPPD officers provide similar accounts. The EPPD officers were on notice that Mr. Gandara may be armed, observed Mr. Gandara behave erratically, attempted to gain Mr. Gandara's cooperation through verbal instructions, and fired their service weapons only after Mr. Gandara reached for what appeared to be a weapon of his own. Accordingly, the Court concludes that it was objectively reasonable for the first and second EPPD officers

to fire their service weapons in response to the apparent threat Mr. Gandara posed to their safety. Thus, the use of force was not excessive, and a reasonable jury could not determine that Mr. Gandara's death was one of a pattern of cases relevant to this case.

### D. Arthur Williams, Jr.

Regarding the shooting death of Arthur Williams, Jr., on May 9, 2016, two EPPD officers used their service firearms when Mr. Williams pointed what appeared to be a gun in the EPPD officers' directions. The EPPD officers made two trips to the Williams' residence the day of the shooting. Resp. Sealed Ex. 49, at 104 (Witness Sworn Statement of Arthur Williams, Jr.'s Mother) [hereinafter "Ms. Williams' Statement"]; Resp. Sealed Ex. 51, at 4 (SRT Report) [hereinafter "Williams SRT Report"]. That morning, Mr. Williams' mother entered an EPPD police station to request help with transporting Mr. Williams to a behavioral clinic. Ms. Williams' Statement 105. The two had participated in a domestic dispute that Mr. Williams' mother attributed to her son's diagnosed bipolar disorder, depression, and schizophrenia. *Id.* at 104–5. As a result, two EPPD officers visited the Williams' residence "to determine if [Mr.] Williams could be taken into custody under an EDO

as no assault was alleged." Williams SRT Report 4.  After a brief exchange with Mr. Williams, the EPPD officers determined that the situation did not permit them to execute an EDO and the EPPD officers left the Williams' residence.[18]  Ms. Williams Statement 105;  Williams SRT Report 4.

Shortly thereafter, Mr. Williams' mother called the EPPD and reported that Mr. Williams had continued to act out at her once the two EPPD officers left the Williams' residence.  Ms. Williams Statement 105.  Additionally, Mr. Williams' mother indicated that Mr. Williams was holding what appeared to be a handgun, and she "heard shots like caps, sounded like they were just going off."  *Id.*  A dispatcher relayed this report as "a[n] aggravated assault in progress . . . the subject had a gun and that shots had been fired inside the home."  Williams SRT Report 4.  Subsequently, a number of EPPD officers responded to the report, including the two who had just left the Williams' residence.  *Id.* The two EPPD officers joined with the others to form a perimeter

---

[18] The record is incomplete on how the EPPD officers made the decision not to execute an EDO and the standard for seizures by which they operated.

around the Williams' Residence, as a third EPPD officer attempted to speak with Mr. Williams, who was still inside. *Id.* at 4–5.

At some point, Mr. Williams exited the front door of the Williams' residence and stood in the front yard, holding the same handgun his mother had reported to the EPPD. Ms. Williams' Statement 106. He pointed the handgun at various EPPD officers, ignoring their commands to drop the weapon. *Id.* (recalling that the EPPD officers said "drop it at least more than five times"); Williams SRT Report 4. In response, the two EPPD officers who had been involved in this matter from the beginning each used their service firearms. Williams SRT Report 4 ("[Mr.] Williams fell to the ground where he was immediately secured" and the EPPD officers attempted to get him prompt medical attention). Further investigation revealed that Mr. Williams had been wielding an air pistol. Resp. Sealed Ex. 50, at 2 (Sworn Statement Search Warrant Executed).

As with the previous instances, Plaintiffs have not provided any additional evidence that would controvert the facts laid out in Mr. Williams' mother's sworn statement and the EPPD Shooting Review Team Report. Additionally, the statement appears to be consistent with

the report. Two EPPD officers arrived at the Williams' residence to assess whether they should execute an EDO on Mr. Williams. Having determined that an EDO was inappropriate, the EPPD officers left the Williams' residence. Subsequently, the two EPPD officers returned to the Williams' residence in response to reports of a violent crime involving a firearm. Then, Mr. Williams confronted the EPPD officers, waving what appeared to be a handgun. The EPPD officers instructed Mr. Williams multiple times to drop the handgun, instructions that Mr. Williams ignored.

The Court is mindful of the low probability that the EPPD officers could have known that the handgun was merely an air pistol. Accordingly, the Court is of the opinion that it was objectively reasonable for the two EPPD officers to use their service firearms to neutralize the perceived deadly threat to themselves and their fellow EPPD officers. Therefore, a reasonable jury could not determine that the shooting death of Mr. Williams was part of a pattern of instances as relevant to this case.

The Court does not intend to diminish the tragedies resulting from the shooting deaths of Mr. Smith, Mr. Velasquez, Mr. Gandara,

and Mr. Williams.  It is clear that each had their own personal challenges, not just those expressed, but possibly others.  It is also clear that following a confrontation with law enforcement, these men responded with a threat, or in the case of Mr. Velasquez an act, of violence.  The Court is sympathetic to Plaintiffs' position that each of these deaths might have been avoided had a CIT team been present to de-escalate the situation.  Arguably, it is possible that a CIT team would have diminished the chances that each man would brandish a weapon.  Unfortunately, once these men resorted to perceived violence, they arguably posed an imminent threat to EPPD officers.  In each circumstance, the EPPD officers responded with deadly force, to be assessed pursuant to the objective reasonableness standard.  Therefore, pursuant to the laws of the Fifth Circuit, the Court considers each event abstractly, limited to a few seconds, devoid of the larger context.

Furthermore, the Court does not question that all members of law enforcement have the right to defend themselves and the public from the threat of violence.  One would be hard-pressed to challenge the EPPD officer who chose to use her service firearm to save her fellow EPPD officer from Mr. Velasquez; she acted after Mr. Velasquez

stabbed her colleague with a kitchen knife.  Simultaneously, the Court

is mindful of the possibility that an officer could use "objectively

reasonable" force in response to a dangerous situation of the officer's

own making.  Bound by Fifth Circuit precedent, the Court cannot

consider such a circumstance as grounds for relief.  Though reasonable

minds may disagree as a matter of judicial equity, the Court is of the

opinion that the law is clear.  Having considered the evidence before it,

the Court concludes that the shooting deaths of Mr. Smith, Mr.

Velasquez, Mr. Gandara, and Mr. Williams were not the result of

constitutional violations as relevant to this case.[19]

iv.   A pattern of constitutional violations

The respective shooting victims in the above-stated instances acted

in a manner that insulates Defendant City of El Paso from scrutiny for

the EPPD officers potentially escalating actions in those cases.

Conversely, when considering the facts in the light most favorable to

Plaintiffs, the remaining instances of Daniel Rodrigo Saenz (2011),

Fernando Gomez (a.k.a. Mercedes de Marco) (2013), Daniel Ramirez

---

[19] Additionally, the Court anticipates a ruling that any evidence of these four instances for purposes of proving a pattern of constitutional violations is inadmissible at trial.

(2015), and Francisco Ramirez (2016), involve EPPD officer conduct that arguably increased the likelihood that EPPD officers would use force in a manner that was not objectively reasonable. In each instance, the victims did not present the kind of threat to EPPD officers that would implicate the Fifth Circuit's excessive force jurisprudence and preclude a consideration of the EPPD officers' prior conduct. Therefore, these matters should permit Plaintiffs to proceed to trial on a *Monell* liability claim predicated on the theory that Defendant City of El Paso was deliberately indifferent when it failed to implement a CIT program.

### A. Daniel Rodrigo Saenz

Regarding the shooting death of Daniel Rodrigo Saenz on March 8, 2013, an EPPD officer used his service firearm while Mr. Saenz was in custody and not posing a threat that would warrant the use of such force.[20] The EPPD officer first interacted with Mr. Saenz in a holding cell shortly after Mr. Saenz had been arrested for assault. Resp. Sealed

---

[20] The Court is mindful that it presided over much of the subsequent civil suit that Mr. Saenz's family filed against Defendant City of El Paso and the individuals involved. *See Saenz v. Flores*, EP-14-CV-244-DCG (W.D. Tex. Sept. 27, 2019). Accordingly, the Court has taken great care to only consider those facts presented for summary judgment, and today's Order is based solely on the record in this case.

Ex. 18, at 76 (EPPD Internal Affairs Division Case Summary Report).
At the time, Mr. Saenz was calm and nonresponsive, giving a
supervising EPPD officer the "impression that he was under some form
of a narcotic or substance[;] under the influence of any medication."
Resp. Sealed Ex. 19, at 81 (Shooting Review Board [hereinafter "SRB"]
Testimony of Supervising EPPD Officer). Additionally, Mr. Saenz was
partially unclothed because he had "urinated himself two to three
times." Resp. Sealed Ex. 20, at 86 (SRB Testimony of Shooting EPPD
Officer). The EPPD officer helped transport Mr. Saenz from a distant
police command center to the downtown El Paso County Jail
[hereinafter "EPCDF"], during which time Mr. Saenz asked the EPPD
officer to "shoot him." Resp. Sealed Ex. 24, at 8 (Notice of Termination
of Employment). "[Mr.] Saenz, at all relevant times, was double-cuffed
behind his back." *Id.*

Soon thereafter, the EPCDF refused to accept Mr. Saenz because of
a head injury he sustained when he lunged at a door upon his arrival at
the facility. *Id.* The EPPD officer and a private security guard then
began to escort Mr. Saenz to a hospital for treatment. *Id.* The two had
to drag Mr. Saenz because he was unable or unwilling to walk as a

result of the head injury. *Id.* Once outside the El Paso County Jail, Mr. Saenz resisted, falling to the ground while still in handcuffs. *Id.* After a brief struggle, the EPPD drew his service firearm and shot Mr. Saenz from a short distance. *Id.* at 9. Chief Allen determined that the EPPD officer's use of force was not objectively reasonable. *Id.* at 10.

It is clear that Mr. Saenz was mentally unstable, physically incapacitated, and could not pose a serious threat of harm to the EPPD officer. Rather than de-escalate the situation, the EPPD officer responded to the slightest amount of resistance with deadly force. Chief Allen's subsequent determination that the EPPD officer acted outside of policy does not negate the possibility that the outcome may have been different had there been a CIT team to pacify Mr. Saenz and gain his cooperation at any point that day. Therefore, a reasonable jury could determine that the shooting death of Mr. Saenz was part of a pattern of constitutional violations as relevant to this case.

### B. Fernando Gomez (a.k.a. Mercedes de Marco)

Regarding the arrest, tasing, and death of Fernando Gomez (a.k.a. Mercedes de Marco) on October 13, 2013, an EPPD officer tased Mr. Gomez who was on the ground, in handcuffs, and resisting arrest. In

the early-morning hours, EPPD officers responded to a report of "family violence in progress."  Resp. Sealed Ex. 27, at 21 (Witness Sworn Statement of Responding Officer).  The first EPPD officer to arrive observed Mr. Gomez standing outdoors screaming.  *Id.*  Earlier that evening, a friend of Mr. Gomez noticed that he was "acting a little strange and paranoid."  Resp. Sealed Ex. 26, at 18 (Witness Sworn Statement of Friend).  When the first EPPD officer asked if Mr. Gomez needed help, Mr. Gomez responded with what the EPPD officer described as "a thousand yard stare and took off running . . . toward the office door of [a nearby hotel.]"  Resp. Sealed Ex. 27, at 21.  Once at the door, Mr. Gomez "continued to act erratically by screaming, breathing heavily, clawing at the glass of the door, and pacing quickly in front of the door."  *Id.*

Subsequently, more EPPD officers arrived and attempted to take Mr. Gomez into custody.  *Id.* at 22.  After initially resisting before the EPPD officers were able to handcuff them, Mr. Gomez then "became to a degree compliant" before he "began to scream and attempt to break away from the officers."  *Id.*  Next, Mr. Gomez "let his body go limp" and dropped to the ground, continuing to resist by "kicking his legs,

swinging his head, and shifting his body weight." *Id.* A large individual, "it took about six or seven officers to pick up Mr. Gomez due mainly to his size and also his combativeness which made it almost impossible." *Id.*

The second relevant EPPD officer in this matter chose to threaten Mr. Gomez with the use of force to coax their compliance. Resp. Sealed Ex. 28, at 27–28 (EPPD Internal Affair Division, Statement of Second Officer) ("I thought that by Tazing Mr. Gomez, that we would get some compliance and be able to place him in the patrol unit with less effort."). During a subsequent investigation of this incident, the second EPPD officer stated that he "had dealt with him on other occasions where Mr. Gomez had the same behavior so I just assumed this was just another encounter with him." *Id.* The second EPPD officer warned Mr. Gomez three times that if he refused to comply, the second EPPD officer would tase him. Resp. Sealed Ex. 27, at 22. According to the first EPPD officer, Mr. Gomez responded "you are going to have to taser me."

Subsequently, the second EPPD officer tased Mr. Gomez twice while he was still lying on the ground in handcuffs.[21]  *Id.*

Similar to the matter of Mr. Saenz, Mr. Gomez was clearly in some form of mental distress from the moment the first EPPD officer arrived at the scene.  He behaved erratically, both verbally and physically.  In response, EPPD officers chose to physically restrain Mr. Gomez rather than de-escalate the situation by other means.  Mr. Gomez reacted to the EPPD officers' attempts poorly, resisting arrest and posing a degree of physical danger.  By the time the second EPPD officer chose to tase Mr. Gomez, he was lying on the ground in handcuffs.  To the second

---

[21] Mr. Gomez died in custody a short time later.  Resp. Sealed Ex. 29, at 35 (EPPD Incident Investigation Report).  An autopsy determined his cause of death to be "cocaine toxicity."  Mot. Ex. A-6 (Autopsy Report), at 9, May 1, 2019, ECF No. 143-8.  Accordingly, the record indicates that Mr. Gomez's death is not the result of the second EPPD officer's use of a taser.  Therefore, his death is irrelevant to the Court's analysis in this case.

Simultaneously, the autopsy report indicates that Mr. Gomez had "small abrasions" on the back likely caused by the taser.  *Id.* at 8. Courts have held that at least "some injury" is necessary to serve as the basis of an excessive force claim, to be considered in the context of whether the force "is constitutionally permissible under the circumstances."  *Ikerd v. Blair,* 101 F.3d 430, 434–35 (5th Cir. 1996) (citing *Hudson v. McMillian,* 503 U.S. 1, 7 (1992)).  Accordingly, for purposes of summary judgment, the Court concludes that Mr. Gomez suffered an injury from the use of force.

EPPD officer's credit, it appears that Mr. Gomez continued to physically resist. Simultaneously, the second EPPD officer had interacted with Mr. Gomez in the past and stated that he tased Mr. Gomez only after "becom[ing] fatigued" from attempting to take him into custody by lesser means. Resp. Sealed Ex. 28, at 27.

Furthermore, multiple EPPD officers were still present to assist, and this use of force might have been in a manner that a reasonable jury could determine was out of a desire for expedience, not as a reasonably objective response to an "immediate threat." *See Ramirez v. Martinez*, 716 F.3d 369, 377–78 (5th Cir. 2013) (holding that a detainee may not have posed an immediate threat once he was handcuffed, even if he resisted to some extent). The second EPPD officer did so with the belief that this was a routine interaction with Mr. Gomez. Once again, when faced with resistance while responding to a mental health crisis, an EPPD officer resorted to using his taser rather than de-escalating the situation. Accordingly, the Court is of the opinion that a reasonable jury could determine that the tasing of Mr. Gomez was a constitutional violation that is part of a pattern of instances relevant to this case.

## C. Daniel Ramirez

Regarding the tasing and subsequent death of Mr. Daniel Ramirez [hereinafter "Mr. Daniel Ramirez"][22] on June 23, 2015, an EPPD officer deployed his taser while Mr. Daniel Ramirez attempted suicide by hanging from a basketball hoop. That night, an EPPD officer arrived at the Ramirez's residence in response to a report of a suicide in progress. Resp. Sealed Ex. 42, at 90 (Witness Sworn Statement of Responding Officer). During the subsequent investigation, the EPPD officer stated that the report indicated the "subject was going to be in the back yard . . . [and] had weapon." *Id.* Upon entering the backyard with his service firearm drawn, the EPPD officer observed Mr. Daniel Ramirez hanging from a basketball hoop with a rope around his neck. *Id.* Both of Mr. Daniel Ramirez's hands were squeezed tightly around the rope, and "he was standing on the tip of his toes." *Id.* at 90–91. The EPPD officer told the investigator that he instructed Mr. Daniel Ramirez to show his hands because it was difficult to determine if he was holding a

---

[22] The Court shall refer to both Mr. Daniel Ramirez and Mr. Francisco Ramirez by their full names to differentiate between the two instances.

weapon in his palms. *Id.* Mr. Daniel Ramirez did not follow the EPPD officer's instructions. *Id.*

Next, the EPPD officer began to approach Mr. Daniel Ramirez. *Id.* As he later described to the investigator, the EPPD officer assessed the situation and noted the following conditions: (1) he had been advised that Mr. Daniel Ramirez may be armed; (2) it was dark in the backyard; (3) Mr. Daniel Ramirez refused to show his hands; and (4) Mr. Daniel Ramirez may kick the EPPD officer if in range. *Id.* Accordingly, the EPPD officer holstered his service firearm and drew his taser. *Id.* Once he was within five feet of Mr. Daniel Ramirez, the EPPD officer fired his taser into Mr. Daniel Ramirez's abdomen. *Id.* Mr. Daniel Ramirez was still hanging from the basketball hoop. *Id.* The EPPD officer then struggled to remove the noose from the now limp Mr. Daniel Ramirez, who died shortly thereafter. *Id.*

When considering the EPPD officer's own description of the events that precipitated Mr. Daniel Ramirez's death, it is clear to the Court that a reasonable jury could determine that the EPPD officer's actions were not objectively reasonable. Arguably, it should have been obvious to the EPPD officer that Mr. Daniel Ramirez was in a most dire mental

state; he was attempting to end his own life.  Additionally, given the likelihood that Mr. Daniel Ramirez was primarily focused on the task at hand, it is improbable that he contemplated surprising the EPPD officer with a concealed weapon or kick.  At first, the EPPD officer was likely at a sufficient distance where such a threat was limited, if not impractical.  Furthermore, the EPPD officer made the autonomous decision to approach Mr. Daniel Ramirez and tase him, rather than attempt to talk him down from the proverbial ledge, or in this case, the basketball hoop.  After due consideration, the Court is of the opinion that a reasonable jury could determine that the EPPD officer's decision to use his taser was excessive.  Accordingly, the matter of Mr. Daniel Ramirez could be one of a pattern of constitutional violations as relevant to this case.

### D. Francisco Ramirez

Regarding the shooting of Mr. Francisco Ramirez on November 5, 2016, an EPPD officer used his service firearm when he observed Mr. Francisco Ramirez behave erratically while holding a boxcutter.  That afternoon, an EPPD officer responded to a request to conduct a welfare check of a man who had expressed thoughts of suicide.  Resp. Sealed Ex.

54, at 19 (Event Chronology).  Arriving at Mr. Francisco Ramirez's parents' residence, the EPPD officer approached the backyard and discovered Mr. Francisco Ramirez sitting on the back bumper of a parked van.  Resp. Sealed Ex. 58, at 115 (Witness Sworn Statement of Responding Officer).  The EPPD officer positioned himself behind a dumpster near the van.  *Id.* at 116.

The EPPD officer told investigators that Mr. Francisco Ramirez was holding "a knife with a blue handle that appeared to be 8 inches in his right hand . . . with his closed fist and making a rapid, jerking motion, upward and downward as though he was practicing using it." *Id.* at 116.  Later, the detective assigned to investigate the scene discovered both a boxcutter with a blue handle and folding knife with the blade extended.  Resp. Sealed Ex. 59, at 120 (Incident Investigation Report, Scene Detective).  Additionally, an EPPD sergeant told investigators that the knife belonged to, and was dropped in error by, another EPPD officer at the scene.[23]  Resp. Sealed Ex. 60, at 124

---

[23] Though the Court finds it concerning that these facts suggest that an EPPD officer may have planted a folding knife at the scene, at summary judgment the Court must presume that Mr. Ramirez was holding a boxcutter.  Furthermore, the Court is uncertain of the Federal Rules of

(Witness Sworn Statement of EPPD Sergeant). Subsequently, investigators determined that Mr. Francisco Ramirez had been holding a box cutter. Resp. Sealed Ex. 64, at 137 (Supplemental Report).

Ultimately, the EPPD officer fired his service firearm three times, though the circumstances are in dispute. The EPPD officer claimed that Mr. Francisco Ramirez ignored verbal commands to drop the boxcutter, began to approach, then lunged, thrusting the boxcutter towards the EPPD officer. Resp. Sealed Ex. 58, at 116. Mr. Francisco Ramirez's brother told investigators that Mr. Francisco Ramirez "was holding something to his neck and he was telling the officer to leave" and that he was "standing on the other side of the van towards the back" as the EPPD officer remained by the dumpster when he used his service firearm. Resp. Sealed Ex. 57, at 111 (Witness Sworn Statement of Mr. Francisco Ramirez's Brother). Furthermore, Mr. Francisco Ramirez's brother makes no mention of the assault that the EPPD officer describes. One bullet made contact with Mr. Francisco Ramirez,

---

Evidence Rule 403(b) implications for Defendant City of El Paso should Plaintiffs attempt to admit evidence of the folding knife.

just below his left eye, before travelling through his mouth, neck, and shoulder.  Resp. Sealed Ex. 59, at 120.

When considering the facts in the light most favorable to Plaintiffs, the EPPD officer used his service firearm from a distance while Mr. Francisco Ramirez stood still with a boxcutter held to his neck.  The EPPD officer did so with the understanding that Mr. Francisco Ramirez was suicidal, and apparently on the cusp of taking his own life.  Similar to the circumstances of the tasing of Mr. Daniel Ramirez, the EPPD officer chose to use his service firearm rather than de-escalate the situation.  Furthermore, Mr. Francisco Ramirez did not pose the type of imminent threat that would make the EPPD officer's use of force objectively reasonable.  Therefore, the Court is of the opinion that a reasonable jury could determine that Mr. Francisco Ramirez's death is one of a pattern of constitutional violations as relevant to this case.

Should Plaintiffs succeed in proving that the matters of Mr. Daniel Saenz, Mr. Gomez, Mr. Daniel Ramirez, and Mr. Francisco Ramirez are instances of unconstitutional excessive use of force, Plaintiffs will have presented substantial evidence that the EPPD relied too frequently on tasers and handguns when responding to mental health crises.  A

reasonable jury could conclude that EPPD officers chose force because a CIT response was not an option. These four instances could show a pattern of constitutional violations.

As the Court articulated when it denied Defendant City of El Paso's Motion to Dismiss, these instances "evince a strikingly similar pattern of force." Mem. Op. & Order Den. Def. City of El Paso's Mot. to Dismiss 22, Oct. 6, 2017, ECF No. 46. Therein, the Court noted that when EPPD officers respond to reports that individuals are suffering from mental health crises, they "almost immediately resort to force without attempting any sort of de-escalation." *Id.* at 23. "They either tase the individual . . . or shoot him or her with their service weapons." *Id.* After extensive discovery, the Court concludes that Plaintiffs have produced sufficient evidence to support the pattern claimed in their Complaint.

Furthermore, Chief Allen may have been able to recognize this pattern after the deaths of Mr. Saenz and Mr. Gomez. He was aware of concerns the community had regarding EPPD responses to mental illness, as well as other cities' implementation of CIT teams. Accordingly, a reasonable jury could determine that these two deaths

should have put Chief Allen on notice that a change was necessary, such that he was deliberately indifferent to the risk of constitutional violations by the time of Mr. Salas-Sanchez's death. Additionally, the subsequent tasing death of Mr. Daniel Ramirez and the shooting of Mr. Francisco Ramirez support the conclusion that not only was Chief Allen deliberately indifferent at the time of Mr. Salas-Sanchez's death, he continued to be deliberately indifferent thereafter.

Accordingly, the Court concludes that Plaintiffs have satisfied the *Monell* requirements to survive summary judgment. The Court finds that a reasonable jury could determine that (1) Defendant City of El Paso chose to not implement a CIT program; (2) a CIT program may have prevented the unconstitutional use of force against Mr. Salas-Sanchez; and (3) Chief Allen supported this decision while deliberately indifferent to the risk that EPPD officers would use excessive force against mentally ill individuals suffering from a mental health crisis. Therefore, after due consideration, the Court is of the opinion that Defendant City of El Paso's Motion should be denied as to its decision to not create a dedicated mental health unit, such that it could serve as a basis for Plaintiffs' claims for relief.

## B. Failure to Properly Investigate and Discipline Officers Involved in Excessive Use of Force Cases

Plaintiffs' second theory alleges that the EPPD, and Chief Allen specifically, failed to properly investigate and discipline officers who may have used excessive force. As a result, Defendant City of El Paso had an "unwritten policy of leniency . . . that emboldened officers to engage in the unconstitutional conduct" that led to Mr. Salas-Sanchez's death. Resp. 50. In support of their argument, Plaintiffs advance a number of Chief Allen's alleged decisions in support of this policy: (1) protecting and failing to discipline former EPPD Officer Jorge Gonzalez [hereinafter "Mr. Gonzalez"] despite him having a history of misconduct; (2) failing to implement proper investigative techniques to ensure that the SRB[24] has a complete record to rely on when making a determination on whether a use of force was excessive; (3) preventing the El Paso District Attorney's Office from participating in EPPD investigations of officer-involved shootings; (4) failing to properly use an internal system to monitor allegations of the excessive use of force; and

---

[24] EPPD Shooting Review Board.

(5) failing to discipline the EPPD officers involved in the pattern of cases identified in the prior section of this Order.  Resp. 50–61.

Courts have held that a failure to investigate or discipline can be the basis for *Monell* liability.  *See McGregory v. City of Jackson*, 335 Fed. Appx. 446, at *3 (5th Cir. 2009) (considering a claim that the Jackson City Police Department's failure to investigate and discipline officers, as well as protect officers through a "code of silence," permitted the excessive use of force "without fear of repercussions"); *Piotrowksi*, 237 F.3d at 581 (considering an instance where the Houston Police Department did not act on a report of officer misconduct).  The Court's analysis is similar to that conducted above for the failure to implement a dedicated mental health unit.  Accepting that Chief Allen is a policymaker directly overseeing investigations and discipline,[25] Plaintiffs must also allege:  (1) a policy of failing to investigate or discipline, that (2) was the moving force causation for constitutional violations against Mr. Salas-Sanchez, and (3) the risk of which Chief Allen was deliberately indifferent to when he adopted the policy.

---

[25] *See supra* pp. 19–20.

*a. Policy*

As stated above, Plaintiffs present five grounds in support of their argument that Chief Allen's failure to investigate or discipline EPPD officers who engage in the unconstitutional use of force amounted to a policy sufficient to confer *Monell* liability in this case. Accordingly, the Court shall consider each of these in turn, concluding that in the totality, Plaintiffs have alleged facts that could permit a reasonable jury to determine that such a policy did exist.

i.  <u>Former EPPD Officer Jorge Gonzalez</u>

Plaintiffs argue that Chief Allen "failed to impose reasonable and required discipline" on Mr. Gonzalez, a former EPPD officer with numerous misconduct complaints over the course of nine years. Resp. 21. Furthermore, Chief Allen made public statements in support of Mr. Gonzalez shortly after an El Paso grand jury returned an indictment against Mr. Gonzalez related to a shooting incident on April 1, 2010. *Id.* at 26, 28. Therefore, Plaintiffs contend, Chief Allen "allowed an officer with such a demonstrated history of excessive force violations to stay on the job . . . [and] sent a message of leniency to his officers." Surreply 4 n.2. In response, Defendant City of El Paso argues that

there is not sufficient evidence to support the proposition that Chief Allen protected or failed to discipline Mr. Gonzalez. Reply 11. In the alternative, even if Chief Allen had done such things, the evidence does not indicate that his actions fostered an expectation of leniency amongst other EPPD officers. *Id.*

Mr. Gonzalez has a colorful record of alleged misconduct. *See* Resp. Sealed Ex. 67 (Cases Involving Officer Jorge Gonzalez) (appearing to be a demonstrative aid purporting to list every allegation and outcome in Mr. Gonzalez's tenure). Additionally, the Court is mindful that Plaintiffs have not provided evidence of how many complaints would be considered "typical" for an EPPD officer, a number that should ideally be "zero." Simultaneously, the Court presumes that it is uncommon for an off-duty EPPD officer to have multiple excessive force complaints. As Plaintiffs represent, "[Mr.] Gonzalez was the first officer indicted in an off-duty officer involved shooting in El Paso in almost 30 years." Resp. 21 (citing Resp. Ex. 3, at 67 (Oral Dep. of Gregory K. Allen)). This status distinguishes Mr. Gonzalez from other officers, providing possible insight into Chief Allen's response to high-profile instances involving the alleged excessive use of force.

Furthermore, the Court concludes that not every instance involving Mr. Gonzalez's alleged misconduct may be relevant in the context of this case. For example, possible misconduct involving intraoffice antisocial behavior may not be probitive regarding how Chief Allen considers misconduct involving weapons. *See* Resp. 26 (citing Resp. Sealed Ex. 68 (EPPD Supervisor's Daily Log, Internal Investigation) (describing an incident between Mr. Gonzalez and a fellow EPPD officer)). For purposes of summary judgment, the Court considers the facts of, and Chief Allen's response to, the following instances to be particularly persuasive: (1) the April 1, 2010, shooting of Andres Cortez, *id.* at 24–25; (2) the March 3, 2011, shooting at a motorist on the University of Texas El Paso [hereinafter "UTEP"] campus, *id.* at 25–26; and (3) the January 21, 2012, brandishing of a firearm at Johnny Reyes, *id.* at 26–27.[26]

---

[26] The Court anticipates that the Parties shall file motions in limine to address the admissibility of the remaining evidence regarding Mr. Gonzalez.

A. Andres Cortez

Regarding the shooting of Andres Cortez on April 1, 2010, Mr.

Gonzalez, while off-duty, shot Mr. Cortez after a traffic incident,

paralyzing Mr. Cortez from the neck down. Resp. Sealed Ex. 68, at 81–

82 (Witness Sworn Statement of Responding Paramedic), June 28,

2019, ECF No. 180-2; *id.* at 87 (Summary & SRB Findings). While Mr.

Gonzalez was in his personal car, travelling with his wife,[27] and stopped

at a red light, Mr. Cortez rear-ended Mr. Gonzalez's vehicle. Resp.

Sealed Ex. 68, at 89 (Summary & SRB Findings). Next, the Gonzalez's

exited their vehicle and approached Mr. Cortez. *Id.* Shortly thereafter,

Mr. Cortez accelerated his vehicle, in what Mr. Gonzalez and

independent witnesses described at Ms. Gonzalez's general direction.

*Id.* at 90. In response, Mr. Gonzalez used his personal firearm. *Id.*

Witnesses could not confirm that Mr. Gonzalez had identified himself as

an EPPD officer before using deadly force. *Id.*

After investigating, the SRB concluded that Mr. Gonzalez had

acted within policy when he used force to prevent Mr. Cortez from

---

[27] Mr. Gonzalez's wife was also an EPPD officer at the time, and also off-duty. Resp. Sealed Ex. 68, at 89 (Summary & SRB Findings).

driving into Ms. Gonzalez.  Resp. 25 (citing Resp. Sealed Ex. 68, at 86–96 (Summary & SRB Findings)).  Conversely, an El Paso grand jury considered the same event and entered a two-count indictment for aggravated assault with a deadly weapon.  *Id.* at 26 (citing Resp. Ex. 41, at 132–33 (Indictment)).  Shortly after the indictment, Chief Allen made public comments that he wanted to "reassure the department, the personnel and the officers on the street, that we will stand behind them regardless of the circumstances, of the findings of a grand jury."  Resp. 28 (citing Resp. Ex. 75, at 153 (KVIA Article, July 22, 2011)).

### B. Shooting at a Motorist

Regarding the shooting on March 3, 2011, Mr. Gonzalez shot at a motorist on the UTEP campus despite being unable to see into the motorist's vehicle.  Resp. 25 (citing Resp. Sealed Ex. 68, at 102–05 (Sworn Statement of Mr. Gonzalez).  Plaintiffs have not provided evidence of the events leading up to the shooting, though Mr. Gonzalez's statement to SRB investigators suggests that he had responded to an alert involving reckless driving or an altercation.  Resp. Sealed Ex. 68, at 104 ("I didn't know if she was a victim or a subject at that time but her actions of yelling that the subject was crazy and drunk led me to

believe that she was more of a victim th[a]n a threat.").  At some point, Mr. Gonzalez approached the motorist's vehicle from behind on foot.  *Id.* at 103.

Standing just seven or eight feet to the rear, Mr. Gonzalez drew his service firearm and shot at the driver's side of the vehicle.  *Id.* at 104.  Mr. Gonzalez said he was "aiming at the driver" despite not being able to see into the vehicle.  *Id.*  Additionally, Mr. Gonzalez stated that he did not believe the motorist "was going to use a weapon, other than the vehicle, to harm [him]" and that Mr. Gonzalez was concerned that the motorist would "drive forward away from [him]."  *Id.*  After an investigation, Chief Allen accepted the SRB's recommendation that Mr. Gonzalez had acted outside of policy.  Resp. 25 (citing Resp. Sealed Ex. 68, at 107 (SRB Incident Evaluation Report)).  Mr. Gonzalez received a forty-hour suspension that Chief Allen reduced to twenty-eight hours, all of which Mr. Gonzalez was able to satisfy by forfeiting vacation time.  *Id.* at 25–26 (citing Resp. Sealed Ex. 68, at 106 (Settlement Agreement)).

### C. Johnny Reyes

Regarding the August 4, 2013, brandishing of a firearm, the off-duty Mr. Gonzalez pointed a gun "point blank" in Johnny Reyes's face after the two narrowly missed a vehicular collision. Resp. Sealed Ex. 68, at 136–38 (Witness Sworn Statement of Johnny Reyes). Mr. Gonzalez followed Mr. Reyes into a Walmart parking lot after the near miss. *Id.* at 148 (Sworn Statement of Mr. Gonzalez). Later, Mr. Reyes told investigators that Mr. Gonzalez was screaming at him, and had not announced himself as a police officer. *Id.* at 137. Mr. Reyes admitted that he brandished a knife in self-defense, though claimed that he dropped it once Mr. Gonzalez "pulled out his gun and said 'El Paso Police.'" *Id.* Conversely, Mr. Gonzalez told investigators that he was standing at least ten feet away from Mr. Reyes but described Mr. Reyes as a noncompliant aggressor who refused to drop the knife as he walked towards Mr. Gonzalez. *Id.* at 149–50. Subsequently, Chief Allen agreed to suspend any investigation or determination until "twenty business days following the disposition of the [Andres Cortez] criminal case." Resp. Sealed Ex. 68, at 124 (Tolling Agreement).

When considered in the light most favorable to Plaintiffs, the evidence presents an EPPD officer who is quick to use a firearm. Be it in an act of off-duty road rage, or when responding to a reported crime, Mr. Gonzalez does not appear to think twice before brandishing a weapon. Additionally, Chief Allen allowed Mr. Gonzalez to continue to serve with the EPPD after each of these events. Chief Allen did so despite overwhelming evidence that Mr. Gonzalez was not deterred from using his firearm on more than one occasion. Furthermore, Chief Allen publicly supported Mr. Gonzalez after the indictment related to the shooting of Andres Cortez. Accordingly, a reasonable jury could conclude that Chief Allen set the expectation that an EPPD officer could use his or her firearm without fear of serious repercussion.

Defendant City of El Paso suggests that the Court should consider that these instances do not involve individuals suffering from a mental health crisis. *See* Reply 9 (regarding the shooting of Mr. Cortez, though applicable to all three instances). After due consideration, the Court rejects this argument. Evidence of how Chief Allen responds to allegations of excessive force generally are inherently relevant to how Chief Allen responds to allegations of excessive force against mentally

ill individuals specifically. A reasonable jury could consider the evidence presented and conclude that Chief Allen acts consistently regardless of whether the matter involves a mental health crisis. Considering the evidence in the light most favorable to Plaintiffs, such a conclusion could support a jury determination that Chief Allen failed to investigate or discipline EPPD officers accused of using excessive force.

Additionally, Defendant City of El Paso argues that Mr. Gonzalez's record should be interpreted as "a pattern of progressive discipline, taking into account, the facts and circumstances of each allegation and the findings associated with each allegation." Reply 10. The Court is of the opinion that it would be improper for it to make a subjective interpretation of the facts, not an objective one grounded in law. Rather, Defendant City of El Paso will have the opportunity to explain to the jury how it may consider Mr. Gonzalez's record.

Furthermore, Defendant City of El Paso presents evidence that Chief Allen has "previously terminated officers for misconduct . . . [and] disciplined 17 officers." Mot. 32 (citing Mot. Sealed Ex. B, Attach. B-4, May 1, 2019, ECF No. 144-2). Curiously, Defendant City of El Paso's exhibit only contains four instances, one of which the Court is to

exclude from the record.  *See id.* (stating that Mot. Sealed Ex. B, Attach.
B-4 is "offered only as to incidents prior to April 29, 2015").  The
remaining three each involve different EPPD officers who used less
than lethal force, and penalties that exceeded those Chief Allen gave to
Mr. Gonzalez.  Mot. Sealed Ex. B, Attach. B-4 (first officer suspended
126 hours for punching a suspect; another officer suspended eighty
hours for striking a detainee in the face while she was handcuffed on
the ground; and a third officer terminated for pushing a handcuffed
detainee into a wall and then lying to a supervisor that it was in self-
defense).  This evidence, though relevant to determining Chief Allen's
approach to discipline, does not preclude a finding that Chief Allen fails
to effectively discipline EPPD officers.  A reasonable jury could consider
this evidence and decide that Chief Allen has a history of unwarranted
leniency for EPPD officers involved in the use of deadly force.

     ii.   <u>Failing to Implement Proper Investigative Techniques</u>

Next, Plaintiffs argue that "the manner in which [the] EPPD
investigates officer-involved shootings further serves to insulate officers
from discipline" creating an environment where "officers feel[] free to
engage in excessive force without punishment."  Resp. 54.  This policy

results from investigations Plaintiffs characterize as "far below recognized standards." *Id.* Specifically, the EPPD: (1) does not separate EPPD officers to prevent them from communicating during the investigation; (2) investigates all shootings as assaults on the EPPD officer, thereby "identifying the shooting officer as the victim and the deceased or person shot as the suspect"; and (3) fails to consider the testimonies of non-officer witnesses who contradict EPPD officers' versions of events. Resp. 30. Supporting these conclusions, Plaintiffs' expert witness Mr. Ken Katsaris reviewed all evidence on the record regarding the EPPD's investigative practices, both generally and in Mr. Salas-Sanchez's death specifically.[28] Resp. Ex. 77, at 160–73 (Sworn Statement of Ken Katsaris), June 28, 2019, ECF No. 181-3.

First, after Mr. Salas-Sanchez's death, the EPPD did not separate Officers Gomez and Rivera, counter to "a recognized standard

---

[28] The Court is mindful that much of Plaintiffs' argument relies on the expert opinion of Mr. Ken Katsaris, whose testimony is the subject of a motion still pending before the Court. *See* Def.'s Mot. to Exclude or Limit Ops. of W. Ken Katsaris, Dec. 31, 2019, ECF No. 229. Additionally, Mr. Katsaris's deposition that is the subject of said Motion is not part of the Summary Judgment record. Accordingly, the Court concludes that it may consider Mr. Katsaris's opinions as presented in Plaintiffs' Response and Surreply.

nationwide in officer involved shootings." *Id.* at 163. Failing to separate witness officers may "have the effect of compromising the facts and findings to allow for an impartial determination of each officer's role and view at the scene." *Id.* at 164. Additionally, Mr. Katsaris is of the opinion that the evidence indicates that the EPPD only provides the testimony of EPPD officer witnesses in its presentation to the SRB. *Id.* at 170; *see* Resp. 32 ("At the presentation before the SRB, the SRT only presented the officers' testimony. . . . This was testimony given after the officers were able to regroup immediately after Erik was shot." (citations omitted)). When considered in the light most favorable to Plaintiffs, a reasonable jury could conclude that the EPPD departed from a standard practice and compromised excessive force investigations.

Second, the EPPD investigated Mr. Salas-Sanchez's death as an assault on a police officer, which Mr. Katsaris suggests "would impact the implementation of the standard protocols and investigative inquiry/evidence evaluation for officer involved shootings." *Id.* at 164. Accordingly, the EPPD's investigation would have been focused on "building a case against Mr. Salas-Sanchez" rather than investigating

matters "directly relevant to the officer involved shooting." *Id.* at 165. For example, Mr. Katsaris notes that the EPPD did not investigate a cell phone found next to Mr. Salas-Sanchez's body, failed to memorialize in writing a conducted blood splatter analysis that might have indicated Mr. Salas-Sanchez was shot in the back, and submitted a false report to the Texas Attorney General's office claiming that Mr. Salas-Sanchez was shot in the chest. *Id.* Considering that this evidence did not make it to the SRB, Mr. Katsaris concluded that "the entirety of the investigative efforts appear to be conducted in a manner consistent with a finding favorable to Officer Gomez but are inconsistent with proper protocols in an officer involved shooting." *Id.* at 167–68. Once again, when viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that this investigative approach prevented the EPPD from conducting a proper and unbiased investigation.

Third, Plaintiffs allege that the EPPD did not gather sufficient evidence to help resolve witness contradictions or provide such evidence to the SRB. Resp. 32–33. For example, Plaintiff Sanchez and her daughter witnessed the incident, but the SRB was not provided with

their testimony. *Id.* at 33. Mr. Katsaris concluded that these decisions contributed to the SRB's determination that Mr. Gomez's use of force was within policy regardless of the investigation's "clear failure to test the officers' and witnesses' testimony against the evidence." Resp. Ex. 77, at 167. Furthermore, in the shooting of Mr. Francisco Ramirez, multiple non-officer witnesses contradicted the shooting EPPD officer's claims that he used his service firearm in self-defense. *Id.* at 170. Additionally, Mr. Katsaris is of the opinion that, "no effort was made to reconcile these very disparate accounts," despite the shot pattern evidence not supporting the EPPD officer's story. *Id.* Mr. Katsaris believes the failure to present contradictory testimony "narrows the focus of the board members" and limits evidence, creating "the high potential for bias, misleading and false assessment." *Id.* When considering these facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that the EPPD's failure to collect contradicting testimony and present it to the SRB undermines the investigatory process.

Defendant City of El Paso argues that Plaintiffs "completely ignore the fact that El Paso Police shootings are also investigated by the

Texas Rangers." Reply 12–13. Elaborating, Defendant City of El Paso presents that the Texas Rangers' involvement means a reputable, independent agency conducted a "parallel investigation" of the shooting. *Id.* Furthermore, Defendant City of El Paso suggests that Plaintiffs needed to present evidence that Chief Allen was aware of any shortcomings in the EPPD investigatory process. *Id.* at 12 Were there shortcomings, Defendant City of El Paso asserts, Plaintiffs should have evidence that the Texas Rangers expressed concerns to Chief Allen. *Id.* at 13.

Once again, the Court concludes that it should refrain from determining at summary judgment that the Texas Rangers' involvement precludes the possibility that the EPPD may be liable for a failure to investigate. Far from dispositive, the Texas Rangers' investigation is but one piece of evidence for a jury to consider—to be given weight and value as the jury deems appropriate.

### iii.  Remaining Arguments

Plaintiffs identify that shortly after Mr. Gonzalez's indictment, Chief Allen made the decision to exclude the El Paso District Attorney's Office [hereinafter "DA's Office"] from participating in EPPD

investigations of officer involved shootings.  Resp. 56 (citing Resp. Ex. 3, at 40–45 (Deposition of Gregory K. Allen), June 28, 2019, ECF No. 181-2).  Significantly, the parties do not dispute that Chief Allen excluded the DA's Office.  Instead, they present two different rationales behind the decision, and disagree on the extent to which this decision had an impact on the investigation's efficacy.

Plaintiffs argue that Chief Allen excluded the DA because he was "[o]utraged" at the indictment.  *Id.*; *see* Resp. Ex. 3, at 41 (Chief Allen explaining in his deposition that "how [the DA's Office] came up to an indictment was beyond us").  Identifying a portion of Defendant City of El Paso's Summary Judgment evidence "Affidavit of Gregory K. Allen" (ECF No. 143-12) regarding the DA Office's conclusions on Mr. Gonzalez's conduct, Plaintiffs contend that "Chief Allen was upset because the [DA's Office] did not concur with EPPD."  Resp. 57. (citing Mot. Ex. B, at ¶ 24).  Conversely, Defendant City of El Paso argues that Chief Allen was "concerned with prejudice" in the DA's Office.  Reply 14 (citing Resp. Ex. 3, at 40–45).  Additionally, Chief Allen stated that supplanting the DA's Office with the Texas Rangers "was the best option to avoid political situations and have an unbiased investigation

. . . . I would fully expect for a grand jury to indict an officer on a Texas Ranger investigation that found probable cause for violation of the criminal law." Mot. Ex. B, at ¶ 23. Further, Defendant City of El Paso asserts that Chief Allen did not have the power to prohibit the DA's Office from conducting their own investigation. Reply 14.

After due consideration, the Court is of the opinion that a fact issue exists as to the motivation, purpose, and impact of Chief Allen's decision to exclude the DA's Office from participating in EPPD investigations of officer involved shootings. Particularly, the timing of Chief Allen's decision raises plausible concern that he may have been motivated by a desire to prevent future indictments that he opposed. A reasonable jury could decide that Chief Allen excluded the DA's Office to insulate EPPD officers from scrutiny and the possibility of receiving consequences for their actions.

Additionally, Plaintiffs present that the EPPD failed to use an internal affairs monitoring system to track investigations into EPPD officer misconduct. Resp. 57–58. In 2010, Chief Allen implemented the system known as "Blue Team" to address concerns about police misconduct and excessive use of force. *Id.* at 57. Plaintiffs note that

despite being available for use during the time of Mr. Salas-Sanchez's death, the EPPD had not been using it. *Id.* (citing Ex. 3, 17–18). Defendant City of El Paso responds that Plaintiffs have not presented sufficient evidence linking the failure to use Blue Team with any constitutional violations. Reply 16–17. After due consideration, the Court concludes that though not dispositive, the failure to use Blue Team is probative regarding Chief Allen's investigation and disciplinary policy. The jury may determine what weight to give this evidence as they consider Plaintiffs' argument in its totality.[29]

Furthermore, Plaintiffs identify the investigations and disciplinary actions taken in the pattern of EPPD shootings that the Court has considered above.[30] "In all cases presented, Chief Allen

---

[29] Plaintiffs argue that Defendant City of El Paso's Reply "attempts to balkanize Plaintiffs' evidence—failing to review the evidence as a whole and instead arguing that each separate section of Plaintiffs' failure to discipline argument alone does not support *Monell* liability. Surreply 4. The Court is of the opinion that Defendant City of El Paso's Blue Team argument is an example of Plaintiffs' assertion.

[30] *See* discussion *supra* Sections III.A.2.c.iv.A–D regarding the uses of force against Mr. Daniel Rodrigo Saenz, Mr. Fernando Gomez, Mr. Daniel Ramirez, and Mr. Francisco Ramirez. Additionally, the Court does not consider it necessary to restate its conclusions for each cited instance.

decided not to impose discipline, excluding the Saenz case where the summary judgment evidence shows he reluctantly imposed discipline." Resp. 59. Considering all facts in these cases in the light most favorable to Plaintiffs, Chief Allen failed to impose discipline in the tasings of Mr. Fernando Gomez and Mr. Daniel Ramirez, and the shooting of Mr. Francisco Ramirez. Moreover, it is possible that Chief Allen's threshold for discipline requires there be significant public scrutiny when an EPPD officer shoots and kills a handcuffed individual in custody. The Court is of the opinion that many cases of excessive force would fail to meet this subjective standard. Accordingly, the Court concludes that a reasonable jury could determine that Chief Allen's investigative and disciplinary approach to similar instances of police misconduct helps insulate EPPD officers from facing consequences for the excessive use of force.

When considered in their totality, and taken in the light most favorable to Plaintiffs, these facts are sufficient for a reasonable jury to conclude that Chief Allen created a policy of failing to investigate or discipline EPPD officers accused of using excessive force, sufficient to establish a claim for *Monell* liability.

### b. *Moving Force Causation*

Plaintiffs have the difficult task of proving to a jury that Chief Allen's failure to investigate or discipline uses of excessive force was a moving force of Mr. Salas-Sanchez's death. Their argument attempts to prove a negative, namely that the evidence suggests that EPPD officers did not fear repercussions for their actions, such that they were "emboldened" to use force. *See* Resp. 50. Therefore, had Defendant Officers Gomez and Rivera been on notice that their use of force might have consequences, they may have been more restrained before deploying their service firearm or taser, respectively.

Having considered the law and the evidence, the Court is uncertain that, to meet this moving force burden, Plaintiffs must prove that EPPD officers were "emboldened" to use force. *See Peterson*, 588 F.3d at 852 (considering whether there was an "official policy of *condoning* excessive force so as to hold the city liable" (emphasis added)). Certainly, one could conclude that Mr. Gonzalez acted with impunity as he continued to receive arguably inadequate discipline for shooting people. Conversely, there is no evidence that the EPPD officers in the other instances went on to use force again or encourage

others to do so.  Instead, a reasonable jury could look at the evidence and determine that Chief Allen's failure to discipline communicated to the EPPD that these actions were not punishable, let alone unconstitutional.

One could conclude that when faced with an officer involved shooting, Chief Allen would communicate to the EPPD that either (1) the EPPD officer had done nothing wrong, or (2) the EPPD officer's actions only warranted a minimal punishment.  Accordingly, it is not hard to imagine that Defendant Officers Gomez and Rivera may have used force because Chief Allen failed to reinforce the right behavior through discipline.  Therefore, EPPD officers were "emboldened" to act at least to the extent that they may have believed their use of force was acceptable.  A jury may not need to go the extra step and conclude that Chief Allen had encouraged the behavior, or that Defendant Officers Gomez and Rivera acted with the express expectation that they would not be disciplined.  Instead, a jury could possibly conclude that Chief Allen's policy may have created an environment devoid of caution rather than purposely aggressive.

The Court finds that there is sufficient evidence in the record to support a *Monell* liability claim regarding a policy of inadequate disciplinary decisions and investigative practices. After due consideration, the Court is of the opinion that a reasonable jury could conclude that Chief Allen's failure to adequately investigate or discipline EPPD officers involved in shootings was a moving force of Mr. Salas-Sanchez's death.

### c. Deliberate Indifference

Plaintiffs argue that "as the final authority on all aspects of discipline, Chief Allen cannot reasonably claim that he was unaware of his own decisions not to discipline and the obvious consequence of those decisions." Resp. 60. As Defendant City of El Paso notes in its reply, the Court has previously articulated that "[w]hat matters, and what Plaintiffs ultimately need to prove, is that Chief Allen either explicitly promoted or was deliberately indifferent to a policy of refusing to discipline officers guilty of excessive force." Reply 12 (quoting Mem. Op. & Order Den. Def. City of El Paso's Mot. to Dismiss 43, Oct. 6, 2017, ECF No. 46). Furthermore, Defendant City of El Paso rearticulates this standard as "whether Chief Allen knew that the unidentified deficient

policies or procedures were insufficient, illegal, or improper and that they were actually causing violations of the Constitution by [EPPD] officers." *Id.* The Court is of the opinion that Defendant City of El Paso's standard requiring actual knowledge is not an accurate statement of law.

The Fifth Circuit has explained that "[w]here the city policymaker knows or should know that the city's police officers are likely to shoot to kill without justification and without restraint . . . the city should be liable when the inevitable occurs and the officers do so." *Grandstaff v. City of Borger*, 767 F.2d 161, 179 (5th Cir. 1985). Additionally, as shown earlier in this Memorandum Opinion and Order, Chief Allen can subjectively disagree with how to interpret EPPD officer conduct and still satisfy the deliberate indifference standard when considering facts in the light most favorable to Plaintiffs.[31]

The Court considers it an obvious consequence that failing to investigate or discipline EPPD officers who are accused of using

_____

[31] *See* discussion *supra* Sections III.A.2.c. With each instance of excessive use of force, Chief Allen was not moved to change EPPD tactics and procedures. Therefore, whatever subjective interpretation he may have had regarding the facts before him would appear to be inconsistent with an objective analysis as a matter of law.

excessive force would inevitably result in a constitutional violation of excessive force. The facts indicate that Chief Allen may have so failed, and his opinion that the vast majority of shootings did not violate EPPD policy or the constitution has no bearing on whether he was deliberately indifferent to the risks. Additionally, he continued to inadequately investigate or discipline EPPD officers who used excessive force despite evidence that a change was necessary. The summary judgment record suggests that Chief Allen knew or should have known that Mr. Gonzalez was an EPPD officer undeterred by prior punishment, of the DA office's decision to indict said officer, of complaints from the community, and of a pattern of unconstitutional uses of force against mentally ill individuals. If proven at trial, it is reasonable to conclude that Chief Allen was deliberately indifferent as to a policy of failing to investigate or discipline EPPD officers accused of using excessive force.

Defendant City of El Paso suggests that the Court should give weight to the fact that an investigation was conducted at all. Mot. 30 (citing *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009)). As the Fifth Circuit explains, "conduct[ing] an internal investigation . . . appear[s] to cut against the argument that the City condoned the use of

112

excessive force." *Peterson*, 588 F.3d at 852. Further, in the same paragraph on which Defendant City of El Paso relies, the *Peterson* Court opined that "vaguely rul[ing] most of its complaints "not sustained" or "unfounded" is no assurance that these investigations exonerate the City." *Id.* Though the *Peterson* Court ultimately found in the defendant municipality's favor, its reasoning is highly applicable to the case at bar. The Court is reluctant to conclude that the mere act of conducting an investigation justifies exoneration if the EPPD has not actually put in the work to earn to it.

Additionally, the Court recognizes that Chief Allen may be the advocate that many individuals wish they had in their own workplace. The evidence put forth suggests that Chief Allen is deeply loyal to his officers, and believes that he has an obligation to support them when they are accused of wrongdoing. Simultaneously, Chief Allen is responsible for investigating any accusations and disciplining his officers when they have in fact done wrong. It is possible that where Chief Allen succeeds in supporting his officers, he fails in disciplining them.

After due consideration, the Court is of the opinion that when taking the evidence in the light most favorable to Plaintiffs, a reasonable jury could determine that the EPPD had a policy of failing to adequately investigate and discipline EPPD officers involved in shootings such that EPPD officers were insulated from the consequences of using excessive force. Additionally, a reasonable jury could find that such a policy was a moving force of Mr. Salas-Sanchez's death, and Chief Allen was deliberately indifferent to the risk that this policy might result in constitutional violations. Therefore, the Court concludes that it should deny Defendant City of El Paso's Motion as to its failure to investigate and discipline that provides a basis for one of Plaintiffs' *Monell* claims for relief.

## C. Failure to Train Officers on How to Respond to a Person in a Mental Health Crisis

Plaintiffs' third theory for municipal liability is that Defendant City of El Paso failed to train EPPD officers on how to respond to mental health crises. Resp. 61. Whereas Plaintiff's first theory focuses

on systemic policy decisions regarding proper training, the third theory

focuses on the training EPPD officers received.[32]

The standard for establishing liability for failure to train is the

same standard for establishing municipal liability in general. *Valle*,

613 F.3d at 544 (citing *Roberts*, 397 F.3d at 293). "A plaintiff must

show that (1) the municipality's training policy or procedure was

inadequate; (2) the inadequate training policy was a 'moving force' in

causing [a] violation of the plaintiff's rights; and (3) the municipality

was deliberately indifferent in adopting its training policy." *Id.* (citing

*Sanders–Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010)).

"Moreover, 'for liability to attach based on an "inadequate training"

claim, a plaintiff must allege with specificity how a particular training

---

[32] The Court is mindful that there is inherent overlap between these two theories. For example, a jury determination that EPPD policy required EPPD officers to have probable cause to initiate an EDO may be negated through a factual showing that the EPPD officers were not trained on the probable cause requirement. Additionally, the inverse is true—an EDO policy that does not require probable cause may be remedied through evidence that the EPPD officers were trained on probable cause anyway. The Court is uncertain whether a jury determination that Defendant City of El Paso is not liable on the theory of failure to train would preclude liability on the theory that it had failed to institute proper procedures to ensure a constitutional response to mental health crises. It is possible that the third theory is a necessary condition of the first.

program is defective.'" *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)).  After due consideration, the Court is of the opinion that Plaintiffs provide sufficient facts at the summary judgment stage to establish municipal liability for a failure to train.

    *a. Policy*

Defendant City of El Paso argues that EPPD's training program is adequate because it complies with the standards provided by the Texas Commission on Law Enforcement [hereinafter "TCOLE"].  Mot. 21. TCOLE "is the Texas State agency responsible for certifying and licensing law enforcement officers in Texas."  Mot. Ex. A, at 2 (Affidavit of Peter Pacillas).  In its Motion, Defendant City of El Paso describes EPPD's training program in detail, citing to the affidavits of Chief Allen, Assistant Chief of Police Peter Pacillas [hereinafter "Assitant Chief Pacillas"], and In-Service Training Coordinator Robert Zavala as evidence.  Mot. 4–8.  According to Assistant Chief Pacillas, EPPD has, including prior to the shooting of Mr. Salas-Sanchez, "maintained full and complete compliance with TCOLE training mandates."  *Id.* at ¶ 26.

Despite summary judgment evidence of EPPD compliance with TCOLE, Plaintiffs argue that Defendant City of El Paso failed to adequately train its officers when it failed to: (1) make sure that Defendant Officers Gomez and Rivera received the necessary training; (2) train its officers on how to properly execute mental health arrests; and (3) train its officers on when one can make a warrantless entry into a home to make a mental health arrest.[33] Resp. 61–63. As a threshold matter, it would appear that a determination that Defendant Officers Gomez and Rivera did not receive the necessary training may prove one or both of Plaintiff's second and third arguments. Conversely, if the jury determined that Officers Gomez and Rivera received what the EPPD considered necessary training, Plaintiffs' arguments for failure to train on initiating an EDO or making a warrantless entry rely on the

---

[33] Similar to the Court's concerns in the previous footnote, one may attempt to argue that a jury determination of municipal liability predicated on the theory of failing to implement a CIT program is a sufficient condition to prove the theory of failure to train. The Court is of the opinion that there is a distinct difference between creating a formal CIT program and training an individual officer. The inquiry is not whether Defendant City of El Paso de facto failed to train EPPD officers because it did not have a CIT program. Instead, this theory pertains to whether Defendant City of El Paso knew the existing training procedures were inadequate.

supposition that the training was pursuant to policies that were facially

unconstitutional. Resp. 61–62. Therefore, any factual support

indicating training within the scope of those policies would appear to

establish that there was a policy of failing to train EPPD officers.[34]

In its Motion, Defendant City of El Paso provides a detailed

explanation of the standard training that all EPPD officers are required

to participate in, whice includes "1,000 hours of TCOLE approved

training hours," Mot. 4, and "40 hours of in-service training within a

two-year period," *id.* 6. Each EPPD recruit is "provided with the

Intermediate CIT curriculum." *Id.* at 27 (citing Mot. Ex. C, attach. C-1

(Crisis Intervention Training), May 01, 2019, ECF No. 143-26).

---

[34] Similar to the prior two footnotes, the Court is of the opinion that a
finding that EPPD policies are facially unconstitutional as to Plaintiff's
first theory is a necessary condition for proving Plaintiffs' failure to
train theory through this specific argument. The Court is mindful that
when a jury is presented with alternative arguments for the same
theory of liability, it is impossible to know which argument ultimately
prevailed in the deliberation room. *See* Fed. R. Evid. 606(b) (preventing
a juror from testifying regarding jury deliberations except in limited
circumstances); *see also Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 865
(2017) (explaining that the Federal Rules of Evidence Rule 606(b)
"promotes full and vigorous discussion" during jury deliberations and
"gives stability and finality to verdicts"). Should the Court determine
that the evidence is insufficient to support a finding that the policy is
facially unconstitutional, *see* Fed. R. Civ. P. 50, the Court may preclude
Plaintiffs from presenting this argument to the jury.

Additionally, other mandatory trainings included topics on mental health and use of force. *Id.* at 6–7. Notably, Defendant Officers Gomez and Rivera have been current on their training requirements throughout their careers and received "mental health/mental health officer certification" as well as training in the use of force and "search and seizure/entry of homes." *Id.* at 8. Furthermore, Defendant City of El Paso represents that EPPD's training exceeds TCOLE requirements. *Id.* at 22.

Conversely, Plaintiffs suggest that meeting these requirements on paper does not accurately reflect the amount of training Defendant Officers Gomez and Rivera actually received. Resp. 37. Reviewing Defendant City of El Paso's exhibits, Plaintiffs argue that both officers received little, if any, relevant training on handling mental health crises in the decade between when each graduated from the EPPD academy and the date of Mr. Salas-Sanchez's death. *Id.* ("[I]n the ten years that have passed since he finished his probationary period, it does not appear that Officer Gomez had taken the State-required refresher mandatory mental health officer training."). Furthermore, deposition testimony indicates that EPPD officers may not remember their

training.  *Id.* 37–38 (citing Resp. Ex. 78, at 179–85 (Oral Deposition of Alberto Rivera) (unable to answer when asked what instructors covered in trainings)).

The Fifth Circuit instructs that courts should "consider compliance with state requirements as a factor counseling against a 'failure to train' finding" though it also suggests that a plaintiff might be able to "establish[] that the City's training practices are inadequate." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 171 (5th Cir. 2010). Assuming arguendo that every EPPD officer was TCOLE compliant, Plaintiffs still identify possible gaps in both Defendant Officers Gomez's and Rivera's training records.  At best, the summary judgment evidence suggests that EPPD officers receive one intermediate CIT course at the beginning of their careers, to be reinforced with a periodic refresher course once every few years.  Given these gaps, the Court is of the opinion that it is ill-equipped to decide whether this amount of training is sufficient to justify taking a fact issue away from the jury.

Nevertheless, it is undeniable that these trained, TCOLE compliant, EPPD officers still made a warrantless entry into the Salas-Sanchez's home to execute an EDO and used force after failing to

de-escalate a mental health crisis.  Furthermore, Officer Rivera had

initiated a number of EDOs, Chief Allen knew that "the use of

warrantless emergency detention orders had increased over the years,"

and Chief Allen appointed Defendant Officer Gomez as a training

instructor at the EPPD Academy "less than two weeks after shooting a

mentally ill person."  Resp. 38, 62.  This evidence could indicate that the

decision-making Defendant Officers Gomez and Rivera exhibited the

night of Mr. Salas-Sanchez's death was consistent with EPPD training.

Hence, a reasonable jury could consider the facts in the light most

favorable to Plaintiffs and conclude that it does not matter whether

EPPD officer training was actually administered, inherently deficient,

or facially deficient.  EPPD officers were interacting with mentally

individuals, initiating EDOs, and making warrantless entries in a

manner that suggests training policies that were constitutionally

inadequate.

### b. Moving Force Causation

As the Court explained in its prior analysis on facially

unconstitutional policies, actions consistent with any constitutionally

inadequate training provided to EPPD officers should satisfy the

moving force causation requirement to establish *Monell* liability.[35] Specifically, were Defendant Officers Gomez and Rivera trained to execute warrantless EDOs without probable cause, their training would be a moving force of the unconstitutional entry into the Salas-Sanchez home and seizure of Mr. Salas-Sanchez.

Conversely, if a reasonable jury were to determine that EPPD training was substantively consistent with the Constitution, but inadequately administered, the jury would then have to consider whether Defendant Officers Gomez and Rivera violated Mr. Salas-Sanchez constitutional rights because of a lack of training. The Court is of the opinion that there is sufficient evidence for such a finding. Taking the facts in the light most favorable to Plaintiffs, Defendant Officers Gomez and Rivera initiated an EDO without probable cause, entered the Salas-Sanchez's residence, and used excessive force against Mr. Salas-Sanchez. A reasonable jury could conclude that had Defendant Officers Gomez and Rivera received adequate training, they would have taken a different course of action that evening.

---

[35] *See* discussion *supra* Section III.A.1.c regarding Plaintiffs' argument that Defendant City of El Paso's EDO policy is facially unconstitutional.

### c. Deliberate Indifference

"Deliberate indifference of this sort is a stringent test, and 'a showing of simple or even heightened negligence will not suffice' to prove municipal culpability." *Piotrowski*, 237 F.3d at 579 (quoting *Brown*, 520 U.S. at 407). Additionally, deliberate indifference requires "a systemic failure attributable to the [municipality]." *Sanchez v. Young Cty.*, 866 F.3d 274, 280 (5th Cir. 2017). To show deliberate indifference, it must be "obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992). For example, arming officers with guns but failing to train them on the constitutional limits of the use of deadly force would amount to deliberate indifference. *Id.* In such circumstances, "'the need for more or different training is obvious . . . [and] the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Connor v. Travis Cty.*, 209 F.3d 794, 796–97 (5th Cir. 2000) (quoting *City of Canton*, 489 U.S. at 390).

The record reflects that throughout his tenure, Chief Allen has been aware of various shortcomings regarding EPPD responses to

mental health crises and the use of force.  It would appear fundamental to even the most casual of observers that these concerns might be best addressed through proper training.  When evidence exists that EPPD officers are inadequately trained, it would seem to fall on the Chief of the EPPD to improve training programs.  A reasonable jury could determine that Chief Allen not only failed to improve training programs but did so despite the clear risk of constitutional violations that failing to train poses.

If a jury were to determine that EPPD officers were trained pursuant to policies that were facially unconstitutional, Chief Allen as a policymaker could be deemed to have been deliberately indifferent to the unconstitutional conduct that his own policy prescribed. Simultaneously, if a jury were to determine that EPPD officers were inadequately trained, Chief Allen as a policymaker failed to improve training as EDOs increased and EPPD officers used excessive force against mentally ill individuals.  Accordingly, the Court is of the opinion that these facts indicate that the need for different training is plainly obvious.  *See City of Canton*, 489 U.S. at 390.  Furthermore, a reasonable jury, viewing the facts in the light most favorable to

Plaintiffs, could conclude that Chief Allen's failure to train the EPPD was so systemic as to hold Defendant City of El Paso liable for the consequential violations of Mr. Salas-Sanchez's rights. *See Sanchez*, 866 F.3d at 280. Therefore, the Court determines that it should deny Defendant City of El Paso's Motion for Summary Judgment as to Plaintiffs' theory of *Monell* liability regarding a failure to train.

### D. Pattern and Practice of Excessive Use of Force When Dealing with Persons Suffering from Mental Health Crises

Plaintiffs argue that the EPPD "had a persistent and widespread practice of using excessive force against persons in mental health crises." Resp. 63. In prior sections of this Memorandum Opinion and Order, the Court's analysis has considered whether Plaintiffs alleged a sufficient pattern for Chief Allen to have been deliberately indifferent to the potential for constitutional violations inherent in his policies. Dissimilarly, now the Court focuses on the EPPD officers' actions and whether a pattern existed that could reflect on the EPPD as a whole. Though the evidence presented may be the same, its effect changes when considered for a different purpose.

A "persistent, widespread practice" is sufficient to constitute an official policy or custom. *Piotrowski*, 237 F.3d at 579. A pattern is

tantamount to official policy when it is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Peterson*, 588 F.3d at 850 (quoting *Piotrowski*, 237 F.3d at 579). "Where prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Id.* (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc)).

A pattern requires similarity and specificity; that is, "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Id.* at 851 (5th Cir. 2009) (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)). "A pattern also requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" *Id.* (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)).

Previously, in deciding Defendant City of El Paso's motion to dismiss, the Court held that Plaintiffs' allegations regarding:

126

> [S]tatistics combined with the numerous past cases of excessive force in similar circumstances to those involved in the present case—followed by the repeated denial of wrongdoing—lead to a reasonable and plausible inference that excessive force against the mentally ill in El Paso is a widespread practice.

Mem. Op. and Order Denying Def. City of El Paso's Mot. to Dismiss 23. Additionally, the Court determined that for each of the cases cited in Plaintiffs Amended Complaint, Plaintiffs alleged "that officers should have been on notice that an individual was suffering from some mental condition, that the individual never substantially threatened or attacked any officer, but [the individual] was nonetheless killed, tased, or beaten by the officers." *Id.* at 26.

Once again, it is unclear how the Court should navigate the Fifth Circuit's *Monell* and *Graham* jurisprudences. Plaintiffs' argument implies that the Court should consider all eight instances discussed above as a pattern of similar conduct that, as the Court has concluded, resulted in constitutional violations half of the time. Simultaneously, if relevancy is limited to those matters that involved constitutional violations, four examples of near-identical conduct must be excluded. If, as the Court has determined today, the remaining four examples are sufficient to prove a pattern of deliberate indifference, the Court must

then decide whether the same holds true for a pattern of a widespread practice.

Conversely, the Fifth Circuit has been quite clear on the significant hurdle of proving a widespread unwritten policy or custom. *See Peterson*, 588 F.3d at 851 (affirming trial court's conclusion that twenty-seven alleged instances of force over four years was insufficient to prove a pattern); *Pineda*, 291 F.3d at 329 (vacating trial court's conclusion that eleven instances of warrantless entry was sufficient to prove a pattern).  It is one thing for Plaintiffs to present a pattern that should move Chief Allen.  It is quite another to find a pattern that reflects the very nature and character of an entire police force.  Accordingly, regardless of whether the Court considers four instances or all eight, there are not enough instances for the Court to conclude that Plaintiffs have met their burden.

Furthermore, this legal conclusion is consistent with the broader context of this case.  The evidence presented creates a compelling argument that Defendant City of El Paso's municipal liability is derived from policies Chief Allen implemented, expressly or implicitly.  Additionally, EPPD officers' actions are better characterized as a

symptom of broad policy decisions, not a groundswell of misconduct from everyday officers. Should Plaintiffs prove their case at trial, it would appear to be a classic example of the proverbial fish that rots from the head down. A reasonable jury could not conclude that many of these EPPD officers did anything other than conform with the flawed policies Chief Allen has promulgated.

The Court is of the opinion that an unwritten policy or custom that starts from the ground up requires a pattern so extensive as to preclude the possibility that a rotten apple spoils the whole bunch. Contrastingly, a smaller, but nonetheless impactful, pattern should move an individual policymaker to act in a manner that sets the proper standard for every EPPD officer. One can imagine a circumstance where municipal liability may be systemically derived from all levels of an organization. After due consideration, the Court concludes that this is not such a case. Accordingly, Defendant City of El Paso's Motion for Summary Judgment is granted as to Plaintiffs' theory that the EPPD had a pattern or practice of using excessive force against persons in mental health crises.

## IV. CONCLUSION

After many months of consideration, having navigated significantly complex issues of fact and law, the Court is of the opinion that Defendant City of El Paso, Texas' "Motion for Summary Judgment" (ECF No. 143) should be **GRANTED IN PART AND DENIED IN PART**.

Accordingly, **IT IS ORDERED** that Defendant City of El Paso, Texas' Motion for Summary Judgment regarding Plaintiffs Celia Sanchez and Oscar Salas's *Monell* liability theory that the EPPD had a pattern or practice of using excessive force against persons suffering from mental health crises is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant City of El Paso, Texas' Motion for Summary Judgment regarding Plaintiffs Celia Sanchez and Oscar Salas's *Monell* liability theory that the EPPD failed to institute proper procedures to ensure officers employ appropriate tactics when dealing with persons suspected of suffering from mental illness is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant City of El Paso, Texas' Motion for Summary Judgment regarding Plaintiffs Celia

Sanchez and Oscar Salas's *Monell* liability theory that the EPPD failed to properly investigate and discipline officers involved in excessive use of force is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant City of El Paso, Texas' Motion for Summary Judgment regarding Plaintiffs Celia Sanchez and Oscar Salas's *Monell* liability theory that the EPPD failed to train officers on how to handle individuals suffering from a mental health crisis is **DENIED**.

**IT IS FURTHER ORDERED** that any request or objection addressed in today's Memorandum Opinion and Order shall be bound by the determinations included herein.

**IT IS FINALLY ORDERED** that any request or objection not addressed in today's Memorandum Opinion and Order is **DENIED WITHOUT PREJUDICE** and may be brought again through the appropriate pre-trial motion or a timely objection at trial, so long as permissible pursuant to the Federal and Local Rules of Civil Procedure, and all other rights and privileges afforded to the parties by law.[36]

---

[36] This Order shall not be construed as a determination on the form or substance of any request or objection contemplated herein.

Counsels are **ADVISED** that any motion made outside of corresponding deadlines previously set in this case shall require leave of Court to file. Furthermore, the Court retains the right to carry any such motion through trial.

    **SIGNED** this **3rd day** of **March, 2020**.

                _____

                **PHILIP R. MARTINEZ**
                **UNITED STATES DISTRICT JUDGE**